

# 2024
## ANNUAL REPORT

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2024

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-39189

# UWM HOLDINGS CORPORATION

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **84-2124167** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **585 South Boulevard E.**        **Pontiac,**        **MI** | **48341** |
| (Address of Principal Executive Offices) | (Zip Code) |

38

**(800) 981-8898**

Registrant's telephone number, including area code

**N/A**

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | **UWMC** | New York Stock Exchange |
| Warrants, each warrant exercisable for one share of Class A Common Stock | **UWMCWS** | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's voting stock held by non-affiliates on June 30, 2024 was $656,736,696 based on the closing price on the New York Stock Exchange on that date of $6.93. (Does not include shares issuable upon exercise of warrants).

As of February 24, 2025, the registrant had 157,975,819 shares of Class A common stock outstanding and 1,440,332,098 shares of Class D common stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive proxy statement for use in connection with its 2025 Annual Meeting of Stockholders, which is to be filed no later than 120 days after December 31, 2024, are incorporated by reference into Part III of this Annual Report on Form 10-K.

**Table of Contents**

| Section Name | Page |
|---|---|
| Glossary of Terms | 1 |
| Cautionary Note Regarding Forward-Looking Statements | 2 |
| Risk Factor Summary | 2 |
| **PART I** | |
| Item 1. Business | 4 |
| Item 1A. Risk Factors | 11 |
| Item 1B. Unresolved Staff Comments | 34 |
| Item 1C. Cybersecurity | 34 |
| Item 2. Properties | 36 |
| Item 3. Legal Proceedings | 36 |
| Item 4. Mine Safety Disclosures | 37 |
| **PART II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. Reserved | 38 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A. Quantitative and Qualitative Disclosures about Market Risk | 56 |
| Item 8. Financial Statements and Supplementary Data | 58 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 89 |
| Item 9A. Controls and Procedures | 89 |
| Item 9B. Other Information | 90 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 90 |
| **PART III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 90 |
| Item 11. Executive Compensation | 90 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 90 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 91 |
| Item 14. Principal Accountant Fees and Services | 91 |
| **PART IV** | |
| Item 15. Exhibits and Financial Statement Schedules | 92 |
| Item 16. Form 10-K Summary | 96 |
| Signatures | 97 |

## GLOSSARY OF TERMS

| Terms | Definitions |
| --- | --- |
| "Fannie Mae" | The Federal National Mortgage Association is a government-sponsored enterprise that purchases qualifying mortgage loans from mortgage lenders, packages them together, and sells them as a mortgage-backed security to investors on the secondary market. |
| "FHA" | The Federal Housing Administration is a governmental agency that provides mortgage insurance on loans made by FHA-approved lenders. |
| "Forward-settling Loan Sale Commitment" or "FLSC" or "TBA" | A forward-settling Loan Sale Commitment (also referred to as a FLSC or a TBA) is a forward derivative that requires a mortgage lender to commit to deliver at a specific future date a mortgage-backed security issued by Fannie Mae, Freddie Mac or guaranteed by Ginnie Mae which is collateralized by an undesignated pool of mortgage loans. |
| "Freddie Mac" | The Federal Home Loan Mortgage Corporation is a government-sponsored enterprise that purchases qualifying mortgage loans from mortgage lenders, packages them together, and sells them as a mortgage-backed security to investors on the secondary market. |
| "Ginnie Mae" | Government National Mortgage Association (GNMA) is a government-owned corporation that guarantees mortgage-backed securities that have been guaranteed by a government agency, mainly the Federal Housing Administration (FHA) and the Veterans Administration (VA). |
| "GSE" | Government-sponsored enterprises, such as Fannie Mae and Freddie Mac. |
| "interest rate lock commitment" or "IRLC" | An interest rate lock commitment is a binding agreement by a mortgage lender with a borrower to extend a mortgage loan at a specified interest rate and term within a specified period of time. |
| "loan officers" | We use the term loan officers to refer to the individual employees of our clients. Each loan officer is licensed, or exempt from licensure, in the state or states in which he or she operates. |
| "mortgage-backed security" or "MBS" | Mortgage-backed securities, or MBSs, are securities that are secured by a pool of mortgage loans, which does not include the MSRs which are separated from the mortgage loan prior to the mortgage loan being placed in the pool and are therefore not part of the collateral. |
| "mortgage servicing rights" or "MSRs" | Mortgage servicing rights, or MSRs, are the right to service a mortgage loan for a fee, which rights are separated from the mortgage loan once the mortgage loan is sold in the secondary market. |
| "USDA" | The U.S. Department of Agriculture is a government agency that provides mortgage insurance on loans made by USDA-approved lenders. |
| "VA" | The U.S. Department of Veteran Affairs is a government agency that provides mortgage insurance on loans made by VA-approved lenders. |

**PART I**

**Item 1. Business**

*Unless otherwise indicated or the context otherwise requires, when used in this Annual Report, the term "UWMC" means UWM Holdings Corporation, "UWM" means United Wholesale Mortgage, LLC and the "Company," "we," "our" and "us" refer to UWM Holdings Corporation and our subsidiaries.*

**Overview**

We are the publicly traded indirect parent of United Wholesale Mortgage, LLC ("UWM"). UWM is the largest overall residential mortgage lender as well as the largest purchase lender in the U.S., by closed loan volume, despite originating loans exclusively through the wholesale channel. We originate primarily conforming and government loans across all 50 states and the District of Columbia.

Founded in 1986 and headquartered in Pontiac, Michigan, we have built a client-focused, team-oriented culture that strives to bring superior customer service, efficiency and operational stability to our clients, the Independent Mortgage Brokers. After being privately owned for 35 years, on January 21, 2021, UWM completed its business combination with Gores Holdings IV, Inc. and changed its name to UWM Holdings Corporation. We began trading on the New York Stock Exchange ("NYSE") on January 22, 2021 under the ticker symbol "UWMC".

**Strategy**

Our principal strategy that has driven our substantial growth over the past years, is our strategic decision to operate solely as a Wholesale Mortgage Lender—thereby avoiding conflict with our partners, the Independent Mortgage Brokers and their direct relationship with borrowers. Unlike "Retail Mortgage Lenders" that offer mortgage loans directly to individual borrowers and underwrite the mortgage loans, we do not work directly with the borrower during the mortgage loan financing process. We believe that by not competing for the borrower connection and relationship, we are able to generate significantly higher loyalty and satisfaction from our clients, the Independent Mortgage Brokers, who, in turn, armed with our partnership tools, are positioned to direct a growing share of the residential mortgage volume nationwide. Our model is focused on the origination business, with a specific focus on purchase loans. Historically, residential purchase mortgage loan origination volume has experienced less volatility in response to interest rate movements than the refinancing mortgage loan origination volume. Consequently, we believe that by focusing on the purchase business we will be better positioned to deliver more consistent volume in increasing and decreasing interest rate environments.

Integral components of our strategy are (1) continuing our leadership position in the growing wholesale channel by investing in technology, including AI, and partnership tools designed to meet the needs of Independent Mortgage Brokers and their customers, (2) capitalizing on our strategic advantages which include a singular focus on the wholesale channel, that allows us to quickly adapt to market conditions and opportunities, and ample capital and liquidity, (3) employing our six pillars to drive a unique culture that we believe results in a durable competitive advantage, (4) originating high quality loans, the vast majority of which are backed directly or indirectly by the federal government, and (5) to minimize market risks and to maximize opportunities in different macroeconomic environments.

The residential mortgage loan financing process typically involves three stages:

- *Initiate Borrower Connection*. A broker or other party is either approached by or reaches out to a potential borrower for a mortgage loan. This party advises the borrower on loan options, runs the initial credit check, gathers the borrower's information for the loan application and submits the loan application.

- *Underwrite, Close and Fund*. The borrower's loan application is reviewed, the mortgage loan is underwritten, the borrower is approved, the closing is arranged and the loan is funded, collectively referred to as loan origination.

- *Portfolio or Package and Sell Mortgage Loan into Secondary Market Sales*. The loan is either placed into an investment portfolio (in the case of banks and typically only for certain loans with variable or shorter term fixed interest rates) or packaged together with other loans and sold as MBS to investors in the secondary market.

**Leader in the Wholesale Channel**

UWM has been the largest wholesale lender in the U.S. since 2015, and through the first nine months of 2024, originated 43.5% of the loans closed through the wholesale channel and 8.4% of the first lien residential mortgages that closed during the first nine months of 2024 in all origination channels (based on data from Inside Mortgage Finance). According to the Nationwide Multistate Licensing System ("NMLS"), as of September 30, 2024, there were approximately 360,000 federally registered mortgage loan officers in the U.S. Our exclusive focus on the wholesale channel has resulted in relationships with over 13,000 independent broker businesses throughout the U.S., with over 55,000 associated loan officers—of which approximately 35,000 submitted a loan to us during 2024. Because we exclusively work through the wholesale channel, loan officers that are not currently affiliated with independent brokers do not submit any loans to us. For the last ten years, we have been the largest originator of residential mortgage loans in the country despite only doing business with a fraction of the market.

Our business is premised on our belief that the fastest, cheapest and easiest way for a borrower to obtain a residential mortgage is through the wholesale channel. In large part due to our investments in technology and service, the wholesale channel's share of the market has almost doubled from a low point in 2014, and we believe that there remains ample room for growth in this channel as more consumers become educated on the benefits of the wholesale channel. Currently, approximately 2 of every 10 loans are originated through the wholesale channel. If the wholesale channel share continues to grow, we believe that we will continue to materially grow our loan production volume due to our leadership position within the channel. For example, if, over time, UWM maintains a 40% market share in the wholesale channel, but the wholesale channel grows from 20% of the overall market to 30% of the overall market, UWM would be in the position to grow from 8% to 12% of the overall market.

**Our Loan Programs**

We focus primarily on originating conventional, agency-eligible loans that can be sold to Fannie Mae, Freddie Mac or transferred to Ginnie Mae pools for sale in the secondary market. Our conventional agency-conforming loans meet the general underwriting guidelines established by Fannie Mae and Freddie Mac. Loans that are written under the FHA program, the VA program or the USDA program are guaranteed by the governmental agencies and then transferred to Ginnie Mae pools for sale in the secondary market. The vast majority of our mortgage loans are underwritten to the "Qualified Mortgage" underwriting standards established by the Consumer Financial Protection Bureau ("CFPB"). For the year ended December 31, 2024, 89% of loans originated by UWM were sold to Fannie Mae or Freddie Mac, or were transferred to Ginnie Mae pools in the secondary market, while the remainder primarily include non-agency jumbo loans that are underwritten to the same "Qualified Mortgage" underwriting standards and have a similar risk profile but are sold to third party investors primarily due to loan size, construction loans, and non-qualified mortgage products, including home equity lines of credit (which in many instances are second liens).

**Our Mortgage Lending Process**

We believe that our highly scaled, efficient and centralized mortgage lending processes are key to our success. Utilizing our proprietary system, "Easiest Application System Ever" (EASE$^{TM}$), and our dedicated team members, we focus on client service and loan quality throughout the entire loan origination, underwriting and closing processes. EASE$^{TM}$ automates the process and, based on the jurisdictional requirements of the client and borrower, automatically generates the necessary documents required by us and by the clients for applications. The entire origination, underwriting and preparation of closing documents takes place in our centralized, paperless work environment where documents and data are entered into EASE$^{TM}$ and are reviewed, processed and analyzed based on a set of pre-determined, rules-based workflows. We focus on speed to close as it is one of the primary metrics for client satisfaction. We believe our closing process is the most efficient in the industry and results in shorter application to clear-to-close times than any of the other major Retail Mortgage Lenders or Wholesale Mortgage Lenders. For the years ended December 31, 2024 and December 31, 2023, we delivered an average of 16 and 17 business days, respectively, from loan application to clear to close, as compared to management's estimates of the industry average of 41 calendar days for both years. We delivered this speed while receiving an 84% average monthly client Net Promoter Score ("NPS") for the year ended December 31, 2024, as well as an 86% average monthly client NPS for the past eight years.

Loan closing speeds and costs to consumers are also positively impacted for clients who use our innovative Title Review and Closing ("TRAC") and TRAC+ services, which provide an efficient alternative to utilizing a traditional lender title policy and title company. By leveraging in-house title counsel to review title related documents and issue attorney title opinion letters ("ATOL(s)"), UWM is able to streamline the title review process and facilitate a faster and easier experience for the

borrower. With TRAC+, UWM also handles the loan closing and disbursement processes normally managed by a title company, giving Independent Mortgage Brokers the option to close a loan without working with a third-party title company or settlement agent.

Our rules-based mortgage loan origination system, or LOS allows multiple teams to work on the same loan at the same time, to track and be alerted to missing or incomplete items, to flag items in order to alert other team members of possible deficiencies and to have visibility into the history, status and progress of loans in process. We use advanced technologies and workflow systems to assist underwriting and operations team members in prioritizing which loans require their immediate attention and to monitor each team's progress so workload-balancing decisions can be made among the operation teams in real time and avoid bottlenecks. We also provide our clients access to our proprietary communication tool, Client Request ("CR"), that allows them to ask general or loan-specific questions, submit requests, and escalate potential issues, which provides a transparent and consistent line of communication between the client and the various internal UWM teams. UWM follows four-hour response time service level agreement for initially responding to CRs submitted during normal office hours. The CR system allows clients to track their requests, add comments, upload images, and provide satisfaction feedback after their issue is resolved. We believe that our CR communication platform and process is a competitive differentiator for UWM, and contributes positively to our strong client service scores, via NPS.

**Underwriting**

Our underwriting process is one of our key strategic advantages as our extensive training program and technology platforms allow us to produce a portfolio of high-quality loans, with an industry-leading time from application to clear to close and maintain the superior level of client service that allows us to attract and retain our clients. All mortgage loans that we originate are underwritten in-house by our underwriting team. We invest significant time and resources in our underwriters through our robust training process to help them and us succeed. We believe that our intensive training program is an integral component of our scalability as we are able to materially increase our underwriting resources, at a consistent quality, with less labor constraints and complications than our competitors.

Our clients, the Independent Mortgage Brokers, have the initial communication with a potential borrower and they receive from the borrower the relevant financial and property information to run a credit check and obtain a pre-approval through one of the automated underwriting systems. Once a pre-approval has been received, an Independent Mortgage Broker is able to seamlessly import the borrower's information and documentation into our EASE$^{TM}$ LOS without the need for extra data entry. One of our underwriters then reviews the file and, based on the loan product and the financial and other information provided, makes an underwriting decision. If the mortgage loan is approved, our system generates a "conditions to close" list based on the specifics of the borrower, the property and the loan product and an underwriter generally takes ownership of the file ensuring that each of these conditions is met prior to granting a "clear-to-close."

In 2021, we launched BOLT, an industry-first technology tool designed to speed up the mortgage approval process for conventional and FHA loans by allowing Independent Mortgage Brokers to obtain initial underwriting approval for qualified borrowers in as little as 15 minutes. BOLT is also utilized by our underwriters, providing them an intuitive platform for a more efficient review of the loan. While underwriters remain responsible for the overall risk assessment of and underwriting decision for the loan, BOLT's AI and data extraction capabilities reduce much of the manual review of documentation and corresponding data entry redundancies. This technology, in turn, creates a more streamlined loan underwriting experience and accurate approval for our brokers, all while maintaining continued compliance with our investors' guidelines and requirements.

In 2021, we launched UWM Appraisal Direct, UWM's appraisal ordering and tracking service in which we directly engage appraisers rather than utilizing an appraisal management company. We believe that UWM Appraisal Direct streamlines the ordering and completion of property appraisals as part of the underwriting process, leading to high-quality, faster appraisals, and cost savings for borrowers.

In 2023, we launched PA+ which is a service that offers an additional level of loan processing support for our clients when needed. When an Independent Mortgage Broker or their loan processor uses PA+, a dedicated UWM Loan Coordinator will work with them and their borrower to help order, review, and send UWM documents to support the underwriting process. We believe that PA+ will help our clients scale their businesses during periods of increased volume.

**Capital Markets and Secondary Marketing**

Our capital markets team is dedicated to maximizing loan sale profitability while at the same time minimizing operational, interest rate and market risks. This team manages the interest rate risk for the business and is responsible for interest rate lock management policies and procedures, hedging the pipeline, managing warehouse facilities and associated

the failure to meet specified timelines relating to delinquent loans and foreclosure proceedings, and other breaches of servicing obligations. We generally cannot negotiate these terms with the agencies and they are subject to change at any time without our specific consent. A significant change in these guidelines, that decreases the fees we charge or requires us to expend additional resources to provide mortgage services, could decrease our revenues or increase our costs.

In addition, changes in the nature or extent of the guarantees provided by Fannie Mae, Freddie Mac, Ginnie Mae, the USDA or the VA, or the insurance provided by the FHA, or coverage provided by private mortgage insurers, could also have broad adverse market implications. Any future increases in guarantee fees or changes to their structure or increases in the premiums borrowers are required to pay to the FHA or private mortgage insurers for insurance or to the VA or the USDA for guarantees could increase mortgage origination costs. These industry changes could negatively affect demand for our mortgage services and consequently our origination volume, which could be detrimental to our business.

***If the mortgage loans originated and sold by us do not comply with the guidelines established by the GSEs, GNMA or private investors to whom they are sold, we are required to repurchase or substitute these loans or indemnify for related losses.***

Substantially all of our mortgage loans are sold to GSEs, insured by FHA or VA and sold into GNMA securities or sold to private investors. In connection with such sales and insuring, we make representations and warranties to the GSE, FHA or VA or the private investor that the mortgage loans conform to their respective standards. These standards include, among other items, adherence to origination guidelines and compliance with applicable federal, state and local laws and regulations, underwriting in conformity with the applicable guidelines, and conformity with guidelines relating to, appraisals, insurance and legal documents generally. In addition, we are contractually obligated, in certain circumstances, to refund to the purchasers certain premiums paid to us on the sale if the mortgagor prepays the loan within a specified period of time.

If a mortgage loan does not comply with the representations and warranties that we made with respect to it at the time of our sale or insuring, we are required to repurchase the loan, replace it with a substitute loan and/or indemnify the applicable agency for losses. In the case of repurchases, we typically repurchase such loan and resell it into a non-conforming market at a discount from the repurchase price. As of December 31, 2024, we had accrued a $87.6 million reserve for repurchase and indemnification obligations. Actual repurchase and indemnification obligations could materially exceed the reserves recorded in our consolidated financial statements. Any significant repurchases, substitutions, indemnifications or premium recapture could be detrimental to our business and financial condition.

***Our business is dependent on our ability to maintain and expand our relationships with our clients, the Independent Mortgage Brokers.***

Our clients are the Independent Mortgage Brokers who refer us mortgage loans to originate. Consequently, our results of operations are dependent, in large part, on our ability to maintain and expand our relationships with Independent Mortgage Brokers. If we are unable to attract Independent Mortgage Brokers to join our network and to provide a level of service such that our clients remain with the network or refer a greater number of their mortgage loans to us, our ability to originate loans will be significantly impaired. The willingness of Independent Mortgage Brokers to originate mortgage loans with us is dependent on (i) the rates that we are able to offer our clients' borrowers for mortgage loans, (ii) our customer service, and (iii) compensation. In determining with whom to partner, Independent Mortgage Brokers are also focused on the technological services and platforms we can provide so that the Independent Mortgage Brokers can best attract and serve consumers. If our clients are dissatisfied with our services or platform or technological capabilities, or they cannot offer prospective borrowers competitive rates, we could lose a number of clients which would have a negative impact on our business, operating results and financial condition.

***All of our mortgage loans are initiated by third parties, which exposes us to business, competitive and underwriting risks.***

As a Wholesale Mortgage Lender, we market and originate mortgage loans exclusively through independent third-parties, comprised of Independent Mortgage Brokers. While we believe using Independent Mortgage Brokers best serves mortgage consumers, our reliance on third parties presents risks and challenges, including the following:

- Our business depends in large part on the marketing efforts of our clients and on our ability to offer loan products and services that meet the requirements of our clients and their borrowers. However, loan officers are not obligated to sell or promote our products and many sell or promote competitors' loan products in addition to our products. Some of our competitors may have higher financial strength ratings, may offer a larger variety of products, and/or may offer higher incentives than we do. Therefore, we may not be able to continue to attract and retain clients to originate loans for us. The failure or inability of our clients to