UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW JAMES MCGONIGLE and
JOSHUA HESTER, individually and on
behalf of all similarly situated,

               Plaintiffs,

v.

UNITED WHOLESALE MORTGAGE, LLC,

               Defendant.

Case No. 25-cv-13865
Hon. Susan K. DeClercq
Mag. Kimberly G. Altman

**ORAL ARGUMENT
REQUESTED**

---

**DEFENDANT UNITED WHOLESALE
MORTGAGE, LLC'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT AND STRIKE CLASS ALLEGATIONS**

Defendant United Wholesale Mortgage, LLC ("UWM") moves this Court to dismiss Plaintiffs' First Amended Complaint ("FAC") with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6). At a minimum, the Court should strike the class allegations in the FAC pursuant to Fed. R. Civ. P. 12(f).

This case involves claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and its implementing Do-Not-Call regulations, 47 C.F.R. § 64.1200(c)-(d) ("DNC Provisions") (Counts I and III), as well as the Virginia Telephone Privacy Protection Act, Va. Code Ann. §§ 59.1-510, *et seq.* ("VTPPA") (Count II). In their original Complaint, Plaintiffs alleged that UWM initiated the

calls and the text messages at issue directly. (ECF No. 1, ¶¶ 35-56, 92-94, 98-101, 111-113.) UWM moved to dismiss (ECF No. 9), and Plaintiffs filed the FAC, replacing the direct liability theory with vicarious liability. But the vicarious liability theory as pled in the FAC also warrants immediate dismissal. Regardless of the tools that UWM allegedly makes available to its broker clients, UWM is not alleged to have control over their day-to-day activities and communications. Nor is UWM alleged to have the power to give brokers interim instructions over the means and methods of their operations. Absent such allegations, vicarious liability would turn ordinary arms-length business relationships into one of agency. Neither the law of agency nor the TCPA was intended to stretch that far.

The FAC fails to state a claim for at least three reasons. ***First***, the FAC does not plausibly allege vicarious liability under the three theories of agency. Its actual-authority claim rests on vaguely-described tools allegedly made available by UWM to its independent mortgage broker clients, which are common features of a wholesale lending relationship—industry training, access to technology (not alleged to be the technology used to make the calls or text messages to Plaintiffs), product information, compliance tools, and underwriting standards. Availability of these tools does not plausibly support an inference that UWM ***controlled*** brokers' day-to-day activities or communications with consumers or had the power to give these independent brokers interim instructions on how to conduct business. The FAC does

2

not allege that UWM directed brokers to make certain calls or texts, identified for the brokers whom to contact, or supervised the telemarketing methods of the unidentified callers (other than to prohibit violations of the law). And UWM's Broker Agreement, which the Court can consider at this stage, confirms that brokers are independent contractors rather than agents, requires brokers to comply with applicable laws, and prohibits brokers from holding themselves out as UWM's agents. (Ex. 3, Broker Agr. ¶¶ 3.03, 7.04, 7.11.) Since agency arises when a principal—here, it would be UWM—manifests assent to an agent—here, it would be the brokers that called Plaintiffs—that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act, actual authority cannot exist where the contract affirmatively refutes the existence of agency.

Nor does the FAC plead facts to support apparent authority, which depends on manifestations *by the alleged principal* that the broker is acting on the principal's behalf. Here, the FAC relies solely on what unidentified callers allegedly told Plaintiffs about their affiliation with UWM—such as calling themselves "UWM Partner[s]"—not on any representation by UWM. It is well established that representations by the alleged agents alone are not sufficient to give rise to apparent authority. To the extent the FAC suggests that UWM's support and tools for its broker clients give rise to apparent authority, that theory necessarily fails because

3

the FAC does not allege any consumer-facing representations by UWM and any reliance on such UWM representations or tools by either Plaintiff.

Lastly, the FAC falls woefully short of sustaining a ratification theory of agency. Ratification requires knowledge of the unlawful facts by the principal and, despite this full knowledge, acceptance of the benefits of the acts in question. Here, the FAC does not allege that either Plaintiff obtained a UWM loan such that UWM knowingly accepted any benefit from the challenged communications. Without allegations that UWM knew of the brokers' unlawful acts vis-à-vis Plaintiffs and nevertheless accepted the benefits of such acts, the ratification theory fails.

**Second**, all of Plaintiff McGonigle's claims and some of Plaintiff Hester's claims are based on text messages. On its face, the TCPA only allows a private right of action for violations of Do-Not-Call regulations for persons who received one or more "telephone call[s]" within any 12-month period. 47 U.S.C. § 227(c)(5). The FCC previously issued rules treating text messages in the same way as telephone calls for purposes of 47 U.S.C. § 227(b), which courts interpreted to apply to 47 U.S.C. § 227(c)(5)—a provision that creates a private right of action for violations of DNC Provisions at 47 C.F.R. § 64.1200(c)-(d). *In re Rules & Regulations Implementing the TCPA*, FCC 03-153, 18 FCC Rcd. 14014, 14116 ¶ 165 ("2003 FCC Order"). But in the wake of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), abandoning *Chevron* deference,

4

many courts have properly interpreted the plain meaning of § 227(c)(5) as only allowing persons who received "telephone call[s]"—and not text messages—to sue for violation of DNC Provisions. *See, e.g.*, *Stockdale v. Skymount Prop. Grp.*, LLC, 2026 WL 591842, at *3 (N.D. Ohio Mar. 3, 2026); *Davis v. CVS Pharm., Inc.*, 797 F. Supp. 3d 1270, 1275-76 (N.D. Fla. 2025); *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 898-902 (C.D. Ill. 2025).[1] Text messages did not exist at the time Congress passed TCPA in 1991. Given that courts must interpret the TCPA under ordinary principles of statutory construction to determine the best reading of the statute as written in 1991, this Court should follow this line of authority and dismiss Plaintiffs' claims to the extent they rest on text messages.

***Third***, Counts I and III separately fail because, under § 227(c) of the TCPA, the DNC Provisions were intended to "protect ***residential telephone subscribers'*** privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1) (emphasis added). Yet, Plaintiffs allege calls and texts to cellular phones. (FAC ¶¶ 47, 77.) The TCPA treats "residential telephone" differently from

---

[1] *See also James v. Smarter Contact, Inc.*, 2026 WL 879244, at *4-5 (M.D. Fla. Mar. 31, 2026); *Sayed v. Naturopathica Holistic Health, Inc*, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025); *Radvansky v. 1-800-Flowers.com, Inc.*, 2026 WL 456919, at *4 (N.D. Ga. Feb. 17, 2026); *Richards v. Shein Dist. Corp.*, 2026 WL 847584, at *2 (S.D. Ind. Mar. 26, 2026); *Lopresti v. Nouveau Essentials Mtkg. LLC*, 2026 WL 964758, at *5 (M.D. Fla. Feb. 26, 2026); *Richards v. Fashion Nova, LLC*, 2026 WL 847568, at *5 (S.D. Ind. Mar. 26, 2026); *Radvansky v. Kendo Holdings, Inc.*, 3:23-cv-00214-LLM, slip op. (N.D. Ga. Feb. 12, 2026).

"cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii) (referencing "telephone number assigned to a paging service, cellular telephone number"), (b)(1)(B) (referencing "residential telephone line"), (c)(1) (referencing "residential telephone subscribers"). And the Supreme Court has recognized that § 227(c) of the TCPA, which enabled promulgation of the DNC Provisions, was intended to protect privacy in the home. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). Moreover, after *Loper Bright*, FCC interpretations suggesting cell phones may qualify as "residential telephone[s]" are non-binding, and courts applying the statute's best reading have held that "a cellular phone and a residential phone are not the same thing." *Moore v. Triumph CSR Acquisition, LLC*, 2023 WL 8601528, at *2 (N.D. Ill. Dec. 12, 2023).[2] Because the DNC Provisions were only intended to protect residential telephone subscribers, and both Plaintiffs claim to have received solicitations only to their cell phones, they cannot state a claim for violation of DNC Provisions in Counts I and III of the FAC.

Finally, even if the FAC survives the Motion to Dismiss, each proposed class Plaintiffs seek to represent—the National Do-Not-Call Registry Class, the VTPPA

---

[2] *See also Cunningham v. Sunshine Consulting Grp., LLC*, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018); *Iniguez v. CBE Grp.*, 969 F. Supp. 2d 1241, 1249 (E.D. Cal. 2013); *Kapp v. E. Wisc. Water Conditioning Co.*, 2021 WL 778168, at *4 (E.D. Wisc. Mar. 1, 2021); *Gaker v. Q3M Ins. Sols.*, 2023 WL 2472649, at *3 (W.D.N.C. Feb. 8, 2023); *Cunningham v. Politi*, 2019 WL 2517085, at *4 (E.D. Tex. Apr. 30, 2019), *R&R adopted*, 2019 WL 2524737 (E.D. Tex. June 19, 2019).

Subclass, and the Internal Do-Not-Call Class—is an impermissible "fail-safe" class defined by reference to UWM's alleged liability under the various principles of agency ("delivered or ***caused to be delivered***" or "call from ***or on behalf*** of Defendant"). Fail-safe classes should be stricken at the pleadings stage.

For all of these reasons, and as set forth more fully in UWM's accompanying brief in support, UWM respectfully requests that the Court dismiss the FAC in its entirety with prejudice, or alternatively, strike Plaintiffs' class allegations, and grant such further relief as the Court deems just and proper.

On April 21, 2026, UWM sought Plaintiffs' concurrence in this relief via email, but concurrence was denied.

WHEREFORE, UWM requests this Honorable Court issue an Order:

A.    Dismissing the FAC in its entirety with prejudice;

B.    If the FAC is not dismissed in its entirety, striking class allegations in the FAC; and

C.    Awarding attorneys' fees, costs, and all other relief to which UWM is entitled.

Dated: April 23, 2026                    Respectfully submitted,

                                         FOLEY & LARDNER LLP

                                         By: */s/ Irina Kashcheyeva*
                                         Irina Kashcheyeva (P72575)
                                         Amir El-Aswad (P86092)
                                         500 Woodward Avenue, Suite 2700
                                         Detroit, Michigan 48226
                                         (313) 234-7100

(313) 234-2800
ikashcheyeva@foley.com
ael-aswad@foley.com
*Counsel for Defendant United*
*Wholesale Mortgage, LLC*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW JAMES MCGONIGLE and
JOSHUA HESTER, individually and on
behalf of all similarly situated,

                    Plaintiffs,

v.

UNITED WHOLESALE MORTGAGE, LLC,

                    Defendant.

Case No. 25-cv-13865
Hon. Susan K. DeClercq
Mag. Kimberly G. Altman

**ORAL ARGUMENT
REQUESTED**

---

**BRIEF IN SUPPORT OF DEFENDANT UNITED WHOLESALE
MORTGAGE, LLC'S MOTION TO DISMISS AND STRIKE CLASS
ALLEGATIONS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

STATEMENT OF ISSUES PRESENTED................................................................x

I.      INTRODUCTION ...........................................................................................1

II.     FACTUAL BACKGROUND...........................................................................4

        A.      Communications With Named Plaintiffs. .............................................4

        B.      Allegations About UWM And UWM's Business Model. ....................6

        C.      Plaintiffs' Claims And Class Allegations. ...........................................8

        D.      Procedural History...............................................................................10

III.    STANDARD OF REVIEW...........................................................................10

IV.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM. ...............11

        A.      The FAC Fails To State A Claim Of Vicarious Liability
                Against UWM. ......................................................................................11

                1.      The FAC Fails To Plausibly Allege Actual Authority. ...........13

                2.      The FAC Fails To Plausibly Allege Apparent Authority. ........16

                3.      The FAC Fails To Plausibly Allege Ratification......................19

        B.      Text Messages Are Not Actionable Under the DNC Provisions........22

        C.      TCPA Claims Must Be Dismissed Because Plaintiffs Own Cell
                Phones, and Cell Phone Users Are Not "Residential Telephone
                Subscribers" Under the DNC Provisions. ..........................................26

V.      The Court Should Strike Class Allegations..................................................28

VI.     CONCLUSION..............................................................................................30

i

ii

## TABLE OF AUTHORITIES

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.,*
727 F.3d 502 (6th Cir. 2013) ...............................................................20

*Abolaji v. Parker 1833 LLC,*
2025 WL 2379644 (D. Colo. Jan. 8, 2025) ...........................................18

*Adamchik v. Credit Control Servs., Inc.,*
832 F. Supp. 2d 744 (W.D. Tex. 2011) .................................................23

*Alvarez v. Fiesta Nissan, Inc.,*
2026 WL 202930 (S.D. Tex. Jan. 26, 2026)...........................................25

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................... 10, 19

*Beck v. Cuyahoga Cnty.,*
2022 WL 4363562 (N.D. Ohio Sept. 16, 2022) ....................................30

*Bovee v. Coopers & Lybrand C.P.A.,*
272 F.3d 356 (6th Cir. 2001) ..................................................................6

*Boyer v. Diversified Consultants, Inc.,*
306 F.R.D. 536 (E.D. Mich. 2015) ................................................ 11, 29

*Brainard v. Am. Skandia Life Assurance Corp.,*
432 F.3d 655 (6th Cir. 2005) ................................................................17

*Bruce v. Adams & Reese, LLP,*
168 F.4th 367 (6th Cir. 2026) ....................................................... 24, 25

*Bryant v. Byron Udell & Assocs. Inc.,*
2023 WL 5180351 (E.D. Va. Aug. 11, 2023) ............................... 11, 12

*Bryant v. King's Creek Plantation, L.L.C.,*
2020 WL 6876292 (E.D. Va. June 22, 2020).........................................30

*Cacho v. McCarthy & Kelly LLP,*
739 F. Supp. 3d 195 (S.D.N.Y. 2024) .......................................... 12, 19

*Callier v. Wide Merch. Inv., Inc.*,
    671 F. Supp. 3d 736 (W.D. Tex. 2023) ...................................................16

*Chennette v. Porch.com, Inc.*,
    50 F.4th 1217 (9th Cir. 2022) ..............................................................27

*Chinitz v. NRT W., Inc.*,
    2019 WL 4142044 (N.D. Cal. Aug. 30, 2019) ......................................30

*Cunningham v. Rapid Response Monitoring Servs., Inc.*,
    251 F. Supp. 3d 1187 (M.D. Tenn. 2017) .............................................18

*Cunningham v. Sunshine Consulting Grp., LLC*,
    2018 WL 3496538 (M.D. Tenn. July 20, 2018) .....................................26

*D'Ambrosio v. Marino,*
    747 F.3d 378 (6th Cir. 2014) ................................................................10

*Davis v. CVS Pharmacy, Inc.*,
    797 F. Supp. 3d 1270 (N.D. Fla. 2025) ........................................ 23, 24

*Davis v. Mut. Life Ins. Co. of New York*,
    6 F.3d 367 (6th Cir. 1993) ........................................................... 19, 21

*DeClements v. RE/MAX LLC*,
    2020 WL 9259326 (D. Colo. Oct. 13, 2020)..........................................16

*Dobronski v. Anthony J. Russo, Jr., PA*,
    2024 WL 4363118 (E.D. Mich. Sept. 30, 2024) ....................................11

*Dobronski v. CHW Grp., Inc.*,
    2025 WL 2426370 (E.D. Mich. Aug. 21, 2025).....................................26

Dobronski v. Tobias & Assocs., Inc.,
    769 F. Supp. 3d 681 (E.D. Mich. 2025) ........................................ 13, 20

*Doe v. G6 Hosp. Prop. LLC*,
    2025 WL 3537626 (W.D. Wash. Dec. 10, 2025) ...................................14

*Eight Mile Style, LLC v. Spotify USA Inc.*,
    745 F. Supp. 3d 632 (M.D. Tenn. 2024) ...............................................18

*Fisher v. Le Vian Corp.*,
    815 F. App'x 170 (9th Cir. 2020) ..............................................................15

*Gaker v. Q3M Ins. Sols.*,
    2023 WL 2472649 (W.D.N.C. Feb. 8, 2023) ......................................28

*Gavitt v. Born*,
    835 F.3d 623 (6th Cir. 2016) ...................................................................10

*Gonzales v. Cordoba Legal Grp., LLC*,
    2026 WL 772359 (W.D. Tex. Feb. 5, 2026) ......................................21

*Gonzales v. Cordoba Legal Grp., LLC,* 2026 WL 790575 (W.D. Tex. Feb. 21,
    2026) ............................................................................................................21

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)....................................................................................28

*Hicks v. Alarm.com Inc.*,
    2020 WL 9261758 (E.D. Va. Aug. 6, 2020) ......................................13

*Hirsch v. USHealth Advisors, LLC*,
    337 F.R.D. 118 (N.D. Tex. 2020)..........................................................30

*Hoffman v. JDM Assocs., Inc.*,
    213 Mich. App. 466, 473, 540 N.W.2d 689 (1995)...........................14

*Howard v. Republican Nat'l Comm.*,
    164 F.4th 1119 (9th Cir. 2026) ..............................................................25

*Imhoff Inv., LLC v. SamMichaels, Inc.*,
    2014 WL 172234 (E.D. Mich. Jan. 15, 2014) .....................................3

*In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*,
    223 F. Supp. 3d 514 (N.D.W. Va. 2016).............................................16

*Iniguez v. CBE Grp.*,
    969 F. Supp. 2d 1241 (E.D. Cal. 2013) ...............................................28

*James v. Smarter Contact, Inc.*,
    2026 WL 879244 (M.D. Fla. Mar. 31, 2026) ....................................23

*Johansen v. HomeAdvisor, Inc.*,
 218 F. Supp. 3d 577 (S.D. Ohio 2016) ........................................................ 20, 21

*Jones v. Blackstone Med. Servs., LLC*,
 792 F. Supp. 3d 894 (C.D. Ill. 2025) ................................................ 23, 24, 25, 26

*Jones v. Federated Fin. Reserve Corp.*,
 144 F.3d 961 (6th Cir. 1998) ...............................................................................17

*Jones v. Royal Admin. Servs., Inc.*,
 887 F.3d 443 (9th Cir. 2018) ...............................................................................16

*Kapp v. E. Wisc. Water Conditioning Co.*,
 2021 WL 778168 (E.D. Wisc. Mar. 1, 2021) ......................................................28

*Keating v. Peterson's Nelnet, LLC*,
 615 F. App'x 365 (6th Cir. 2015) ................................................................ passim

*Kern v. VIP Travel Servs.*,
 2017 WL 1905868 (W.D. Mich. May 10, 2017) ......................................... 13, 14

*Lopresti v. Nouveau Essentials Mtkg. LLC*,
 2026 WL 964758 (M.D. Fla. Feb. 26, 2026) .......................................................23

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*,
 606 U.S. 146 (2025) .................................................................................... 23, 27

*Mediacom Se. LLC v. BellSouth Telecomms., Inc.*,
 672 F.3d 396 (6th Cir. 2012) .................................................................................7

*Messner v. Northshore Univ. HealthSystem*,
 669 F.3d 802 (7th Cir. 2012) ...............................................................................29

*Mims v. Arrow Fin. Servs.*,
 *LLC*, 565 U.S. 368 (2012).....................................................................................26

*Moore v. Charter Commc'ns, Inc.*,
 523 F. Supp. 3d 1046 (N.D. Ill. 2020).................................................................21

*Moore v. Triumph CSR Acquisition, LLC*,
 2023 WL 8601528 (N.D. Ill. Dec. 12, 2023).......................................................27

*Mujahid v. Newity, LLC,*
    2025 WL 3140725 (N.D. Ill. Nov. 10, 2025) ......................................................25

*Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.,*
    783 F.3d 1045 (6th Cir. 2015) ...........................................................................11

*Pilgrim v. Universal Health Card., LLC,*
    660 F.3d 943 (6th Cir. 2011) ..................................................................... 11, 29

*Pulsifer v. United States,*
    601 U.S. 124 (2004)............................................................................................25

*Radvansky v. 1-800-Flowers.com, Inc.,*
    2026 WL 456919 (N.D. Ga. Feb. 17, 2026)................................................. 23, 24

*Radvansky v. Kendo Holdings, Inc.,*
    3:23-cv-00214-LLM, slip op. (N.D. Ga. Feb. 12, 2026)....................................23

*Rahaman v. State Farm Mut. Ins. Co.,*
    2023 WL 5439212 (E.D. Mich. Aug. 23, 2023)..................................................14

*Rahaman v. State Farm Mut. Ins. Co.* (6th Cir. Mar. 29, 2024)...............................14

*Randleman v. Fid. Nat. Title Ins. Co.,*
    646 F.3d 347 (6th Cir. 2011) .............................................................................29

*Richards v. Fashion Nova, LLC,*
    2026 WL 847568 (S.D. Ind. Mar. 26, 2026) .....................................................23

*Richards v. Shein Distribution Corp.,*
    2026 WL 847584 (S.D. Ind. Mar. 26, 2026) .....................................................23

*Roehrman v. McAfee, LLC,*
    758 F. Supp. 3d 889 (S.D. Ind. 2024)................................................................21

*Sayed v. Naturopathica Holistic Health, Inc.,*
    2025 WL 2997759 (M.D. Fla. Oct. 24, 2025)............................................. 23, 24

*Selou v. Integrity Sol. Servs. Inc.,*
    2016 WL 612756 (E.D. Mich. Feb. 16, 2016)....................................................13

vii

*Stockdale v. Skymount Prop. Grp., LLC*,
　2026 WL 591842 (N.D. Ohio Mar. 3, 2026)...........................................23, 24, 26

*Thomas v. Taco Bell Corp.*,
　879 F. Supp. 2d 1079 (C.D. Cal. 2012)................................................................16

*Toney v. Quality Res., Inc.*,
　75 F. Supp. 3d 727 (N.D. Ill. 2014)....................................................................21

*Trim v. Reward Zone USA LLC*,
　76 F.4th 1157 (9th Cir. 2023) .............................................................................25

*United States v. Choice*,
　201 F.3d 837 (6th Cir. 2000) ....................................................................... 25, 28

*United States v. Ferguson*,
　681 F.3d 826 (6th Cir. 2012) ................................................................................4

Usanovic v. Americana, L.L.C.,
　775 F. Supp. 3d 1133 (D. Nev. 2025)..................................................................13

*Warciak v. Subway Rests., Inc.*,
　949 F.3d 354 (7th Cir. 2020) ...............................................................................19

*Williams v. CitiMortgage, Inc.*,
　498 F. App'x 532 (6th Cir. 2012).........................................................................15

*Wilson v. Better Mortg. Corp.*,
　2025 WL 3493815 (S.D.N.Y. Dec. 5, 2025) .......................................................25

*Young v. Nationwide Mut. Ins. Co.*,
　693 F.3d 532 (6th Cir. 2012) ........................................................................ 11, 29

## Statutes

47 C.F.R. § 64.1200 ......................................................................... 3, 8, 9, 22

47 U.S.C. § 227 ................................................................................. passim

Va. Code Ann. §§ 59.1-510 *et seq.* ...................................................1, 12

## Rules

Fed. R. Civ. P. 12(b)(6)..................................................................................6, 10

Fed. R. Civ. P. 12(f) ........................................................................................10

**Other Authorities**

*In re Rules & Regulations Implementing the TCPA*,
  FCC 03-153, 18 FCC Rcd. 14014 ........................................................ 22, 24, 26

*In the Matter of the Joint Petition Filed by Dish Network, LLC*,
  28 F.C.C.R. 6574 (2013)..................................................................................12

Merriam-Webster New Collegiate Dictionary (9th ed. 1990) ................................24

Restatement (Third) Agency § 1.01 (2006) ..........................................................3, 13

## STATEMENT OF ISSUES PRESENTED

1. Whether the Court should dismiss Plaintiffs' claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Virginia Telephone Privacy Protection Act, Va. Code Ann. §§ 59.1-510 *et seq.* ("VTPPA") for failure to state a claim of direct or vicarious liability where: (a) UWM is not alleged to have initiated the calls or text messages; (b) pursuant to its standard broker contract, UWM expressly designates its broker clients as independent contractors required to follow all applicable laws and prohibits them from representing that they are agents of UWM or using UWM's name; (c) the FAC includes no facts suggesting that UWM managed the third-party brokers' day-to-day activities; (d) any supposed claim of "apparent authority" arises solely from brokers' conduct, not, as required, from UWM's manifestations, and in any event, UWM's alleged conduct (i.e., provision of certain tools and support) was not consumer-facing or alleged to have been relied upon by Plaintiffs; (e) Plaintiffs do not plausibly allege that UWM had full knowledge of brokers' communications with Plaintiffs and that, notwithstanding such knowledge, UWM accepted and retained any resulting benefit—both of which are needed to ratify the brokers' acts; and (f) routine features of UWM's wholesale lending operations referenced in the FAC are not alleged to give UWM control over brokers' placing the calls and cannot create an agency relationship.

        Defendant's Answer:         Yes.

2. Whether the Court should dismiss Plaintiffs' TCPA claims insofar as they are predicated on text messages, where 47 U.S.C. § 227(c)(5), by its plain terms, applies only to "telephone calls," the FCC's prior guidance applying § 227(c)(5) to text messages is no longer entitled to *Chevron* deference, and district courts in the Sixth Circuit and across the country held that text messages are not "telephone calls" under § 227(c)(5) of the TCPA.

        Defendant's Answer:         Yes.

3. Whether the Court should dismiss Plaintiffs' TCPA claims in Counts I and III of the FAC because they are based on calls to cellular phones rather than residential landlines where: (a) 47 U.S.C. § 227(c) giving rise to DNC Provisions applies only to "residential telephone subscribers," and the statute draws a textual distinction between "residential telephone" and "cellular telephone service"; (b) the ordinary meaning of "residential telephone" in

1991 referred to a landline hardwired into a residence rather than a cellular device; and (c) prior decisions extending § 227(c) to cell phones relied on FCC guidance no longer entitled to deference after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024).

> Defendant's Answer:                 Yes.

4.     Whether the Court should strike Plaintiffs' class allegations where: the proposed classes—the National DNC Registry Class, VTPPA Sub-Class, and Internal DNC Class—are impermissible fail-safe classes defined by whether UWM is vicariously liable under any theory of agency.

> Defendant's Answer:                 Yes.

xi

## I.   <u>INTRODUCTION</u>

This putative class action seeks to stretch the bounds of vicarious liability under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Virginia Telephone Privacy Protection Act, Va. Code Ann. §§ 59.1-510 *et seq.* ("VTPPA"), far beyond its reach. Plaintiffs Andrew James McGonigle (a serial TCPA litigant who filed at least 34 TCPA lawsuits) and Joshua Hester seek to hold United Wholesale Mortgage, LLC ("UWM") liable for calls and text messages made by independent mortgage brokers, without offering any facts that UWM controlled these brokers' day-to-day operations, authorized these brokers to act as UWM's agents, caused Plaintiffs to view these brokers as authorized to represent UWM, or that UWM benefitted from these communications—such as by closing a new mortgage loan with Plaintiffs. UWM, as a wholesale mortgage lender, works with some 13,000 independent mortgage broker clients and 57,000 associated loan officers nationwide, and it does not—and cannot—monitor and police their day-to-day activities or communications. Absent such control over day-to-day activities, the law does not permit imposition of vicarious liability on UWM.

The FAC fails to offer sufficient facts to support a claim of vicarious liability under the three theories of agency:

- *Actual Authority.* The FAC does not allege that UWM authorized any brokers to act as its agents or had the power to give the brokers interim instructions on how to run their day-to-day operations. Indeed, UWM's Broker Agreement disclaims any agency relationship with brokers,

1

prohibits brokers from holding themselves out as UWM employees or representatives and from using UWM's name in marketing without UWM's consent, and requires brokers to comply with applicable law. Given the express negation of agency in the Broker Agreement, the suggestion of brokers' actual authority is implausible.

- ***Apparent Authority.*** This doctrine depends on ***manifestations by the principal*** that the agent can act as the principal's agent. Yet, Plaintiffs rely solely on what unidentified callers supposedly said—for example, calling themselves "UWM Partner[s]." The FAC fails to identify ***UWM's*** communications or conduct upon which Plaintiffs relied to view the callers UWM's agents.

- ***Ratification.*** The FAC does not offer facts to support ratification. Ratification requires the principal's knowledge of wrongful conduct (here, allegedly unlawful calls or texts) and acceptance of the benefits of this unlawful conduct in the face of this knowledge. The FAC alleges in a conclusory fashion that UWM "knew or should have known" brokers used telemarketing generally. That allegation, even if credited, does not establish UWM's knowledge of the particular communications to Plaintiffs. Regardless, the FAC does not allege that Plaintiffs obtained a UWM mortgage loan, so there can be no allegation that UWM accepted any benefit from the brokers' communications.

Plaintiffs point to ordinary features of a wholesale lending relationship—training, technology access, product information, compliance tools, and underwriting standards—as supposed indicators of agency. But the FAC does not allege that brokers had to use these tools and systems or actually used these tools and systems to communicate with Plaintiffs. And reference to these tools and systems does not establish the critical element of UWM's ***control*** over brokers' day-to-day communications and the power to give brokers interim instructions—the hallmark of agency. *Imhoff Inv., LLC v. SamMichaels, Inc.*, 2014 WL 172234, at \*6

(E.D. Mich. Jan. 15, 2014) (the principal's "power to give interim instructions" is what "distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents") (citing Restatement (Third) Agency § 1.01, cmt. f(1) (2006)).

Separately, Plaintiff McGonigle's TCPA claim in Count I and part of Plaintiff Hester's TCPA claim in Count III must be dismissed because they are based on text messages, while the private right of action under 47 U.S.C. § 227(c)(5) exists only as to "telephone call[s]." After the Supreme Court's abolition of *Chevron* deference, the term "telephone call" should be given its ordinary meaning, which does not now and certainly did not in 1991, when the TCPA was passed, include text messages.

Counts I and III also fail because § 227(c) of the TCPA giving rise to Do-Not-Call regulations at 47 C.F.R. § 64.1200(c)-(d) ("DNC Provisions") protects only "residential telephone subscribers," while Plaintiffs allege calls and texts to cellular phones. The statute treats residential telephones and cellular phones separately, and after the abolition of *Chevron* deference, contrary FCC guidance does not control. Because Plaintiffs allege only communications to cell phones, they cannot state a claim for violations of the DNC Provisions under § 227(c).

Finally, even if any claim survived, the Court should strike the class allegations. The proposed classes are fail-safe because they define membership by whether communication was made by or "on behalf of" UWM or was "delivered, or

3

caused to be delivered" by UWM. Thus, a proposed class member's claim is either viable and thus included in the class or fails the agency test and thus excluded from the class—a classic example of a failsafe class that should be stricken at the outset.

## II.   FACTUAL BACKGROUND

### A.   Communications With Named Plaintiffs.

The FAC alleges that Plaintiffs received communications from four separate numbers, not counting calls from spoofed numbers.

***Plaintiff McGonigle.*** The FAC portrays Plaintiff Andrew McGonigle as an inexperienced consumer who "was not aware of the TCPA or other remedies to stop the calls" and had to "research[] how to address the unwanted spam." (FAC ¶¶ 60-61.) Yet, McGonigle is a serial TCPA claimant, having filed at least 34 TCPA actions in at least 16 federal districts since October 1, 2024. (*See* Ex. 1.)[3] McGonigle allegedly registered his number on the Do Not Call ("DNC") Registry on August 5, 2024—about two months before filing his first TCPA claim. (FAC ¶ 50.) McGonigle claims that between August 12 and August 22, 2025, he received seven unsolicited marketing text messages—six from phone number (248) 780-8661 ("Originating Phone No. 1") and one from phone number (248) 988-9183 ("Originating Phone No. 2")—all intended for someone else. (*Id.* ¶¶ 62-65.)

---

[3] This Court may take notice of judicial records, like filings and docket entries. *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012).

The FAC includes screenshots of three texts. "Nick from UWM Partner" sent two texts from Originating Phone No. 1. (*Id.* ¶¶ 64-67). The FAC does not include the other messages from Originating Phone No. 1, but alleges that they were sent by "brokers and/or 'UWM Partners' on Defendant's behalf." (*Id.* ¶¶ 62, 75-76.) The final text—and the only one from Originating Phone No. 2—does not identify the sender but was sent "by Defendant brokers and/or 'UWM Partners.'" (*Id.* ¶¶ 66-67.)

After filing this action, McGonigle claims to have received additional text messages from phone number (248) 573-3829 ("Originating Phone No. 3") on January 5, 7-9, and 12, 2026. (*Id.* ¶¶ 95-96.) The messages promoted mortgage products, and the sender identified himself as "J Alan," another "UWM Partner." (*Id.* ¶¶ 97-98.) The FAC does not allege that the same brokers who sent the pre-filing texts sent the post-filing texts. Nor does the FAC quote the post-filing texts.

***Plaintiff Hester.*** Plaintiff Joshua Hester, who does not allege that his number was on the DNC Registry or that he did not previously consent to receive the calls, nevertheless complains of "numerous calls from Defendant," prompting him to send "Defendant" a letter requesting no further contact. (*Id.* ¶ 84.) Plaintiff allegedly received at least seven additional "calls from telephone numbers used by or on behalf of Defendant" between October 3 and October 13, 2025, all promoting mortgage loan products. (*Id.* ¶¶ 84-85.) The FAC alleges that the calls came from "various spoofed telephone numbers." (*Id.* ¶ 86.) The FAC does not specify how much time

had passed between Plaintiff's alleged letter to UWM and the renewed calls, or allege that the new calls came from the same broker who called Plaintiff before.

Hester allegedly spoke with an individual named "Nikolai" twice, first on October 6, 2025, and again on October 8, 2025, asking not to be called, to no avail. (*Id.* ¶¶ 88-93.) The FAC alleges, offering no details, that the calls to Hester were made by "Defendant's agents, including brokers and/or 'UWM Partners,' or otherwise on Defendant's behalf." (*Id.* ¶ 87.) Despite Hester apparently having spoken to Nikolai several times (*id.* ¶¶ 88-92), the FAC says nothing about who "Nikolai" is or what his relationship with UWM is, if any. Hester claims that on February 3, 2026, after filing this action, Hester received a text from (313) 338-9567 ("Originating Phone No. 4"), promoting UWM products. (*Id.* ¶¶ 100-102.)

## B.    Allegations About UWM And UWM's Business Model.

As the FAC acknowledges, UWM is a wholesale mortgage lender that works exclusively with "a nationwide network of mortgage brokers who originate mortgage applications for UWM loan products." (FAC ¶¶ 8-9; *see also* Ex. 2, UWM 2025 Annual 10-K Report ("10-K"), p. 6, 17.)[4] Unlike retail lenders, which sell loans to consumers directly, UWM works with independent mortgage broker clients, who "have the initial communication with a potential borrower." (Ex. 2, 10-K at pp. 5, 7,

---

[4] When considering a motion to dismiss under Rule 12(b)(6), the Court "may consider the full text of the SEC filings … 'integral to the complaint,' even if not attached." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001).

17; FAC ¶¶ 9, 19.) These brokers act as advisors for consumers, comparing rates and products from multiple lenders. (Ex. 2, 10-K, at pp. 5, 7, 17.) They are licensed professionals representing the borrower, not the lender, and they are not obligated to submit any particular mortgage loan applications or any minimum number of loan applications to UWM. (Ex. 3, UWM Broker Agr. ¶ 7.03.)[5] UWM's broker clients are in the business of selecting loan products and processing mortgage applications in exchange for a fee. (*Id.*, Recitals.) The broker's relationship with UWM is not mandatory and not exclusive. (*Id.*, ¶¶ 3.03(x), 7.03.)

UWM's clients include over 13,000 independent mortgage brokers and 57,000 associated loan officers nationwide. (Ex. 2, 10-K, p. 6.) All brokers with a business relationship with UWM must sign a Wholesale Broker Agreement, which states that broker clients are ***independent contractors*** and ***not UWM's agents***. (Ex. 3, Broker Agr. ¶ 7.04.) The Broker Agreement expressly forbids brokers from holding themselves out as UWM's agents, representatives, or affiliates. (*Id.*, ¶ 7.04.) Although the FAC alleges that brokers frequently introduce themselves as "UWM

---

[5] The Broker Agreement may also be considered on a Rule 12(b)(6) motion. It is incorporated by reference and integral to the FAC, which asserts that UWM "markets its loan products through a nationwide network of mortgage brokers who originate mortgage applications for UWM loan products," and that UWM "requires brokers to comply with UWM's policies, procedures, and performance standards." (FAC ¶¶ 9, 28.) *See Mediacom Se. LLC v. BellSouth Telecomms., Inc.,* 672 F.3d 396, 400 (6th Cir. 2012) (documents "integral to the complaint may be relied upon, even if they are not attached or incorporated by reference") (cleaned up).

7

Partners" and reference UWM's products (FAC ¶¶ 16-17), it does not allege that UWM authorized this conduct. To the contrary, the UWM Broker Agreement affirmatively prohibits brokers' use of UWM's name in marketing without prior written consent (Ex. 3, Broker Agr., ¶ 7.11) and requires compliance with applicable laws and regulations (*id*., ¶ 3.03).

UWM provides its broker clients with resources to help originate mortgages, including what the FAC vaguely describes as "mandatory onboarding and training," "proprietary tools and software platforms," "operational tools used in the mortgage loan origination process," and "marketing materials, scripts, rate sheets, product information, and compliance guidance." (FAC ¶¶ 10-13.) The FAC does not allege UWM *required* brokers to use these tools or that the tools were used by callers who called Plaintiffs. And although the FAC alleges that UWM "retains the right to control key aspects of the origination process—including underwriting, rate locking, document generation, closing approval, and funding" (*Id.* ¶ 22), it notably does not allege that UWM controlled brokers' communications, including those at issue, or brokers' daily activities.

## C.  Plaintiffs' Claims And Class Allegations.

The FAC asserts three claims: (1) a claim under the TCPA Do-Not-Call ("DNC") Registry regulations, 47 C.F.R. § 64.1200(c), based on alleged calls to numbers registered on the DNC Registry without consent; (2) a VTPPA claim based

on alleged solicitation of Virginia residents without permission; and (3) a claim under the TCPA internal DNC regulations, 47 C.F.R. § 64.1200(d), based on alleged failure to honor opt-out requests and maintain proper policies, procedures and training.

Plaintiff McGonigle purports to bring this putative class action on behalf of the following nationwide class and Virginia subclass:

> **National Do Not Call Registry Class**: All persons throughout the United States (1) who did not provide their telephone number to Defendant, (2) to whom Defendant delivered, or caused to be delivered, more than one voice message or text message within a 12-month period, promoting Defendant's goods or services, (3) where the person's residential or cellular telephone number had been registered with the National Do Not Call Registry for at least thirty days before Defendant delivered, or caused to be delivered, at least two of the voice messages or text messages within the 12-month period, (4) within four years preceding the date of this complaint and through the date of class certification. (FAC ¶ 106.)

> **VTPPA Sub-Class**: All persons residing in the Commonwealth of Virginia (1) whose telephone numbers are or were assigned Virginia area codes, (2) who did not provide their telephone number to Defendant (3) to whom Defendant delivered or caused to be delivered one or more unsolicited text messages promoting its goods or services, (4) where the person's telephone number had been registered on the National Do Not Call Registry for at least thirty (30) days before the text message was delivered, and (5) within four years preceding the filing of this Complaint. (*Id.*)

Plaintiff Hester also seeks to bring the following nationwide class:

> **Internal Do Not Call Class**: All persons within the United States who, (1) within the four years prior to the filing of this lawsuit through the date of class certification, (2) who received more than one telemarketing call from or on behalf of Defendant promoting Defendant's goods or services to said person's residential telephone number (3) within a 12-month period, (4) including at least one call after communicating to Defendant that they did not wish to receive such

9

calls. (*Id.*)

## D.   Procedural History.

Plaintiffs filed their initial Complaint on December 2, 2025. (ECF No. 1.) That Complaint tried to state a direct liability claim against UWM. UWM moved to dismiss the initial Complaint on January 16, 2026. (ECF No. 9.) In response, Plaintiffs amended their Complaint. (ECF No. 14.) In their FAC, Plaintiffs appear to have abandoned their direct liability claim in favor of a vicarious liability theory. (*Id.*) The FAC fares no better than the Original Complaint.

## III.   STANDARD OF REVIEW.

***Motion to Dismiss.*** To avoid dismissal under Rule 12(b)(6), a complaint must allege facts creating a "plausible inference" of legally cognizable harm. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. The Court "need not accept as true legal conclusions or unwarranted factual inferences …." *D'Ambrosio v. Marino,* 747 F.3d 378, 383 (6th Cir. 2014). Allegations "merely consistent with" liability "stop short of the line between possibility and plausibility …." *Gavitt v. Born*, 835 F.3d 623 (6th Cir. 2016). A court should not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

***Motion to Strike.*** Under Rule 12(f), the Court may strike class allegations before discovery where the facts alleged in a complaint cannot maintain a class action. *Pilgrim v. Universal Health Card., LLC*, 660 F.3d 943, 949 (6th Cir. 2011)

10

(affirming striking of district court's judgment striking class allegations). The purpose of such a motion "is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with them early in the case." *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.,* 783 F.3d 1045, 1050 (6th Cir. 2015). A court may strike class allegations where the proposed class is "fail-safe", *i.e.*, class "'cannot be defined until the case is resolved on its merits.'" *Boyer v. Diversified Consultants, Inc.,* 306 F.R.D. 536, 538 (E.D. Mich. 2015) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)).

## IV.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM.

### A.   The FAC Fails To State A Claim Of Vicarious Liability Against UWM.

To state a claim for ***direct*** liability under the TCPA and the VTPPA, Plaintiffs must allege that UWM took the steps necessary to physically place a telephone call. *Dobronski v. Anthony J. Russo, Jr., PA*, 2024 WL 4363118, at *4 (E.D. Mich. Sept. 30, 2024) (DeClercq, J.).[6] The FAC fails to do so. Although the FAC avers that the offending texts and calls were "made ***by*** or on behalf of UWM" (*see, e.g.*, FAC ¶¶ 26, 68, 84-85, emphasis added), it includes zero facts to support the suggestion that UWM itself initiated the communications. In fact, the FAC acknowledges that the communications were made by independent mortgage brokers (FAC ¶¶ 19-20), and

---

[6] *See also Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 371 (6th Cir. 2015); *Bryant v. Byron Udell & Assocs. Inc.*, 2023 WL 5180351, *5-6 (E.D. Va. Aug. 11, 2023).

that, absent discovery, Plaintiffs cannot suggest that UWM made those communications directly (*id.* ¶ 25). Accordingly, Plaintiffs do not assert a direct liability claim and/or do not allege facts supporting it.

The TCPA and the VTPPA appear to contemplate vicarious liability. For example, § 227(c)(5) of the TCPA provides a private right of action for telephone calls in violation of the DNC Provisions "by *or on behalf of* the same entity." 47 U.S.C. § 227(c)(5) (emphasis added). Courts have interpreted this language to permit vicarious liability based on federal common law agency principles of actual authority, apparent authority, or ratification.[7] *Keating*, 615 F. App'x at 371. Likewise, to state a claim under the VTPPA, a telephone solicitor must "initiate, *or cause to be initiated*, a telephone solicitation call." Va. Code Ann. § 59.1-514(A) (emphasis added). Courts have interpreted the VTPAA to include similar principles of direct and vicarious liability as the TCPA.[8]

---

[7] Initially, these principles were reflected in the FCC's 2013 ruling. *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6584-86 (2013). Although *Loper Bright* ended judicial deference to FCC interpretations, post-*Loper Bright* decisions have found the direct/vicarious liability framework sound based on the "by on or behalf of" language in 47 U.S.C. § 227(c)(5). *See, e.g., Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 213 (S.D.N.Y. 2024) (collecting cases).

[8] *Bryant*, 2023 WL 5180351, *5-6 (the "same requirements" for establishing direct and vicarious liability claims "apply to the VTPPA"); *Hicks v. Alarm.com Inc.*, 2020 WL 9261758, at *5 (E.D. Va. Aug. 6, 2020) ("there are no facts detailing [defendant's] involvement in *placing* any calls," and therefore a "parallel" VTPPA claim failed for the same reasons) (emphasis in original).

12

To plead a claim for vicarious liability, Plaintiffs must allege that UWM "delegated actual or apparent authority to place those calls" or "ratified the act through acceptance of benefits," despite the knowledge that the calls were unlawful. *Dobronski v. Tobias & Assocs., Inc.*, 769 F. Supp. 3d 681, 698 (E.D. Mich. 2025); *Keating*, 615 F. App'x 365 at 371-72. The FAC is devoid of any non-conclusory facts satisfying these three agency principles. Courts routinely dismiss such unsupported claims of vicarious liability. *See Selou v. Integrity Sol. Servs. Inc.*, 2016 WL 612756, at *5 (E.D. Mich. Feb. 16, 2016) (vicarious liability claim fails where the complaint did not plead any fact that allows the court to draw the reasonable inference that defendant is vicariously liable for the misconduct); *Usanovic v. Americana, L.L.C.*, 775 F. Supp. 3d 1133, 1141-42 (D. Nev. 2025) (dismissing vicarious liability claim where plaintiff asserted defendant was "directing, apparently authorizing, ratifying, and/or negligently supervising their agents" without offering supporting facts).

## 1. The FAC Fails To Plausibly Allege Actual Authority.

"An essential element of agency is the principal's right to control the agent's actions." *Kern v. VIP Travel Servs.*, 2017 WL 1905868, at *6 (W.D. Mich. May 10, 2017) (quoting Restatement (Third) of Agency § 1.01 cmt. f(1)). Actual authority exists when an "agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating*,

615 F. App'x at 373. Alleging "some degree of control" is not enough; agency requires the principal's control of the agent's "**day-to-day operations** with respect to the instrumentality, conduct, or specific aspect of the [agent's] business that caused the plaintiff's injury." *Doe v. G6 Hosp. Prop. LLC*, 2025 WL 3537626, at *7 (W.D. Wash. Dec. 10, 2025); *cf. Hoffman v. JDM Assocs., Inc.*, 213 Mich. App. 466, 473, 540 N.W.2d 689, 693 (1995) (vicarious liability does not exist where "defendant did not exercise or retain any day-to-day control or supervision of [alleged agent's] specific work activities"). "[T]he power to give *interim instructions* distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Kern*, 2017 WL 1905868, at *6 (emphasis added). "[N]ot just any type of control will suffice to transform an independent contractor into an employee or agent; rather, the control must relate to the method of the work being done." *Rahaman v. State Farm Mut. Ins. Co.*, 2023 WL 5439212, at *7 (E.D. Mich. Aug. 23, 2023), *aff'd*, 2024 WL 4109395 (6th Cir. Mar. 29, 2024).

Plaintiffs do not and cannot allege that UWM actually authorized brokers to place the calls on UWM's behalf. Indeed, UWM's Broker Agreement expressly defines brokers as independent contractors and **not UWM agents**, and forbids the use of UWM's name in marketing without prior written approval. (Ex. 3, Broker Agr. ¶¶ 7.04, 7.11.) The Agreement also prohibits brokers from violating applicable law in procuring loans. (*Id.* ¶ 3.03.) And if the FAC contradicts the Broker

14

Agreement (it does not), "the Court is to accept the facts as stated" in the Broker Agreement. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012).

Plaintiffs claim that "UWM's mortgage brokers and/or 'UWM Partners'" acted "within the scope of authority granted by UWM" because UWM provided them with access to technology, onboarding and training resources, marketing materials, compliance guidance, and because UWM retains authority over certain lending functions such as underwriting, rate locking, and closing approval. (FAC ¶¶ 10-13, 21-22, 27-29, 31-33.) However, the existence of "constraints on the service provider does not mean that the service recipient has an interim right to give instructions." *Fisher v. Le Vian Corp.*, 815 F. App'x 170, 171 (9th Cir. 2020). Despite the availability of certain tools the brokers can use, nothing in the FAC suggests that UWM gave brokers any interim instructions or controlled these brokers' day-to-day operations—let alone that UWM was in any way involved with the communications at issue. Courts have consistently rejected claims of vicarious liability where the complaint lacks plausible allegations that the principal controlled the calls made or had authority to give interim instructions. *See Kern*, 2017 WL 1905868, at *6 (finding that hiring marketers did not establish actual authority, where telemarketers were independent contractors required to comply with the law and retained control over how they performed their work); *DeClements v. RE/MAX LLC*, 2020 WL 9259326, at *3 (D. Colo. Oct. 13, 2020) (finding no actual authority

15

where plaintiffs failed to allege defendant controls "the calls its franchisees make, specifically"); *Jones v. Royal Admin. Servs., Inc*., 887 F.3d 443, 451 (9th Cir. 2018) (rejecting actual authority despite oversight and script approval by defendant where defendant lacked control over hours, call or sales quotas, and required compliance with law); *Thomas v. Taco Bell Corp*., 879 F. Supp. 2d 1079, 1086 (C.D. Cal. 2012) (no agency for text message campaign run by franchisee where defendant, though aware of and funding the campaign, did not create or control its content); *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig*., 223 F. Supp. 3d 514, 521 (N.D.W. Va. 2016) ("assisting a party in setting up telemarketing centers or providing scripts for in-person calls is not evidence of agency."). This is particularly so where the alleged principal requires the alleged agent's compliance with applicable law. *Callier v. Wide Merch. Inv., Inc*., 671 F. Supp. 3d 736, 744 (W.D. Tex. 2023) (no actual authority because the independent agent worked for multiple companies, could not use defendants' name without consent, and was not controlled in its marketing or communications); *In re: Monitronics*, 223 F. Supp. 3d at 522-23 (rejecting TCPA vicarious liability in part because contracts required compliance with all laws). In sum, Plaintiffs failed to allege facts supporting actual authority.

### 2. The FAC Fails To Plausibly Allege Apparent Authority.

Under an apparent authority theory, a principal will incur liability for the acts of an "agent" only if the principal "held the agent out to third parties as possessing

16

sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority." *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998). "The apparent power of an agent is to be determined by the ***act of the principal and not by the acts of the agent***." *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (emphasis added).

Here, Plaintiffs contend that UWM is "liable under principles of apparent authority" because "Plaintiffs reasonably believed the communications were made by UWM-authorized brokers and 'UWM Partners' acting for UWM, because the ***senders*** identified themselves as 'UWM Partner' and promoted UWM mortgage products." (FAC ¶¶ 35-38, emphasis added.) The FAC thus turns the inquiry on its head by relying on the brokers' conduct, not the principal's (UWM's) manifestations of agency. *Brainard*, 432 F.3d at 663.

The FAC alleges that "UWM's conduct created the appearance that the telemarketers were authorized representatives of UWM," (*id.* ¶¶ 38-39), but identifies no conduct by UWM that did so. Although Plaintiffs reference UWM's tools, training, and administrative support in the FAC (at ¶¶ 10-13, 21-22, 27-29, 31-33), they do not allege that the brokers used any of UWM's tools/support or that the availability of such tools/support conveyed to ***Plaintiffs*** brokers' association with UWM. In fact, these tools/support are broker-facing rather than consumer-facing, and Plaintiffs do not allege they knew of, much less relied on, any UWM tools,

17

support, or other conduct in concluding that the brokers acted on UWM's behalf. Even if UWM "said or did things that could have given rise to apparent authority, that apparent authority can only be asserted by someone who actually relied on it." *Eight Mile Style, LLC v. Spotify USA Inc.*, 745 F. Supp. 3d 632, 657 (M.D. Tenn. 2024). Plaintiffs do not allege any such reliance.

The FAC alleges no facts showing that **UWM** held these unnamed brokers out as its agents; in fact, the opposite is true. (Ex. 3, Broker Agr. ¶¶ 3.03, 7.04, 7.11) (disclaiming any agency relationship and requiring compliance with applicable laws and regulations). Plaintiffs' allegations about acts by independent brokers (FAC ¶¶ 62, 64, 66, 87, 95, 97) are legally insufficient to establish apparent authority. *See Abolaji v. Parker 1833 LLC*, 2025 WL 2379644, at *5 (D. Colo. Jan. 8, 2025) ("use of a franchisor's name by a franchisee alone is not sufficient to state a claim for vicarious liability"); *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) (no apparent authority because plaintiff "has not alleged any statements by [defendant], as apparent principal, that would manifest that Safeguard America or any other relevant person was its agent for the purpose of the calls"); *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 357 (7th Cir. 2020) (apparent authority requires principal manifestations; agent statements alone are insufficient in TCPA cases).

### 3. The FAC Fails To Plausibly Allege Ratification.

"Ratification occurs where the principal receives and retains the benefits of a transaction with full knowledge of all material facts." *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 374 (6th Cir. 1993). Here, ratification fails for two reasons.

***No Knowledge of Specific Wrongful Conduct.*** Plaintiffs have not plausibly alleged that UWM knew of the material facts surrounding the communications, or that they are unlawful. *See Cacho*, 739 F. Supp. 3d at 218 (rejecting ratification theory upon observing that the complaint is "bereft of any allegation from which one could reasonably infer that Defendant knew or should have known that the telemarketers were violating the TCPA"); *Keating*, 615 F. App'x at 374 (to establish ratification, the principal must know or reasonably should have known that the agent was violating the TCPA on the principal's behalf). Plaintiffs allege that "UWM knew or should have known" that the brokers placed calls and texts "to numbers registered on the DNC Registry," to generate loan applications. (FAC ¶ 24.) Setting aside that this unsupported statement does not deserve to be credited under *Iqbal*, the FAC does not allege that UWM knew of the specific communications directed at Plaintiff McGonigle or, as required, that they violated the TCPA.[9] UWM's alleged

---

[9] Indeed, the FAC can only allege that UWM knew of McGonigle's number being on the DNC Registry "upon information and belief." (FAC ¶ 74.) Such "upon information and belief" allegations are the exact "conclusory allegations that *Iqbal* and *Twombly* … told us to ignore." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.,* 727 F.3d 502, 506 (6th Cir. 2013).

19

knowledge that some of its brokers may place calls "to numbers registered on the DNC Registry" (which may not be unlawful if they have consent) is insufficient to establish ratification. The principal must "knowingly accept[] the benefits of another's actions 'through conduct justifiable only on the assumption that the [principal] consents to be bound by the act's legal consequences.'" *Dobronski*, 769 F. Supp. 3d at 699. Having general knowledge of a potential wrongdoing unrelated to Plaintiffs cannot give rise to ratification. *See Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 588 (S.D. Ohio 2016) (generalized knowledge of potential wrongdoing cannot establish ratification).

Plaintiffs may argue that Hester's letter to UWM and the subsequent filing of this lawsuit should have alerted UWM to put a stop to the calls. (FAC ¶¶ 84, 95-104.) But Plaintiffs do not allege that they sufficiently identified the callers. The FAC does not explain how UWM can identify the offending brokers (including those who used spoofed numbers to place the calls) out of more than 13,000 independent mortgage broker businesses and 57,000 associated loan officers with whom UWM does business. (*Id.* ¶ 86; Ex. 2, 10-K, p. 6.) Ratification is further negated by UWM's Broker Agreement, which prohibits the brokers' use of UWM's name in marketing without prior written consent (Ex. 3, Broker Agr. ¶ 7.11) and requires full compliance with all applicable laws and regulations (*id.*, ¶ 3.03). *See Johansen,* 218

20

F. Supp. 3d at 588 (contract requiring full legal compliance constituted reasonable steps to prevent TCPA violations and vicarious liability under a ratification theory).

*No Alleged Benefit from Communications.* More importantly, UWM did not close a mortgage loan with Plaintiffs or otherwise benefit from the brokers' calls to Plaintiffs. UWM thus had no opportunity to knowingly "retain[] the benefits of a transaction with full knowledge of all material facts." *Davis*, 6 F.3d at 374 . General marketing alone does not establish ratification absent acceptance of the benefits of the transaction—such as a loan here. *Moore v. Charter Commc'ns, Inc.*, 523 F. Supp. 3d 1046, 1052-54 (N.D. Ill. 2020) (rejecting ratification even though defendant may have accepted business from telemarketing calls because plaintiff did not allege defendant knowingly accepted any benefit from the calls made to him specifically); *Roehrman v. McAfee, LLC*, 758 F. Supp. 3d 889, 899-900 (S.D. Ind. 2024) (no ratification where plaintiff "purchased no product in response to the offending text messages"); *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 745-46 (N.D. Ill. 2014) (rejecting ratification argument where plaintiff did not allege any benefit derived by defendant from calls to her); *Gonzales v. Cordoba Legal Grp., LLC*, 2026 WL 772359 (W.D. Tex. Feb. 5, 2026), at *4, *R&R adopted,* 2026 WL 790575 (W.D. Tex. Feb. 21, 2026) ("Speculation or inference based on the existence of a marketing relationship or the receipt of business opportunities is insufficient to establish ratification.").

21

## B.    Text Messages Are Not Actionable Under the DNC Provisions.

Count I and part of Count III of the FAC separately fail because McGonigle's claims are based entirely on text messages (FAC ¶¶ 62-71, 95-96), and Hester's claims rely on text messages in part (*id*. ¶¶ 100-03). Because TCPA violations at issue apply solely to "telephone calls," not text messages, the Court should dismiss Plaintiffs' text-based claims as a matter of law.

By its plain language, 47 U.S.C. § 227(c)(5), which provides the private right of action for violations of the DNC Provisions (based on 47 C.F.R. § 64.1200(c) and 64.1200(d), respectively), is limited to "telephone call[s]." 47 U.S.C. § 227(c)(5) (private right of action to "[a] person who has received more than one telephone call within any 12-month period").[10] Before the Supreme Court abolished *Chevron* deference in *Loper Bright*, courts followed the 2003 FCC Order declaring, in the context of § 227(b)(1) (a different provision than § 227(c)(5)), that telephone calls as referenced in TCPA included texts. *See* 2003 Order, 18 FCC Rcd. 14014, 14116 ¶ 165. But as the Supreme Court has made clear just last year, district courts are not "bound by the FCC's interpretation of the TCPA," and instead must interpret the statute "under ordinary principles of statutory interpretation." *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 158 (2025). Prior

---

[10] In addition, § 64.1200(d) at issue in Count III of the FAC prohibits initiation of "any call for telemarketing purposes"—not any text. 47 C.F.R. § 64.1200(d).

22

to *McLaughlin*, courts viewed FCC orders as effectively dispositive at the district-court level under a statute known as the Hobbs Act. *See, e.g.*, *Adamchik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 748 & n. 13 (W.D. Tex. 2011) ("under the Hobbs Act, this Court has no jurisdiction to review the FCC's rule"). *McLaughlin* eliminated this line of authority. *McLaughlin*, 606 U.S. at 168.

This shift in the legal landscape has left district courts to reassess whether Section 227(c)(5)'s reference to "telephone call[s]" also encompasses text messages. While there is some disagreement, many district courts across the nation have held that text messages are ***not*** actionable under the DNC Provisions.[11] The Northern District of Ohio—the only district court within the Sixth Circuit to address this issue after *McLaughlin*—adopted this interpretation. *Stockdale*, 2026 WL 591842, at *3.

And rightfully so. Because "every statute's meaning is fixed at the time of enactment," *Loper Bright,* 603 U.S. at 400, the Court must interpret the term

---

[11] *Stockdale v. Skymount Prop. Grp., LLC*, 2026 WL 591842, at *3 (N.D. Ohio Mar. 3, 2026); *Davis v. CVS Pharmacy, Inc*., 797 F. Supp. 3d 1270, 1275-76 (N.D. Fla. 2025); *James v. Smarter Contact, Inc*., --- F. Supp. 3d ---, 2026 WL 879244, at *4-5 (M.D. Fla. Mar. 31, 2026); *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 898-902 (C.D. Ill. 2025); *Sayed v. Naturopathica Holistic Health, Inc.,* 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025) (same); *Radvansky v. 1-800-Flowers.com, Inc*., 2026 WL 456919, at *4 (N.D. Ga. Feb. 17, 2026); *Richards v. Shein Distribution Corp*., 2026 WL 847584, at *2 (S.D. Ind. Mar. 26, 2026); *Lopresti v. Nouveau Essentials Mtkg. LLC*, 2026 WL 964758, at *5 (M.D. Fla. Feb. 26, 2026); *Richards v. Fashion Nova, LLC,* 2026 WL 847568, at *5 (S.D. Ind. Mar. 26, 2026); *Radvansky v. Kendo Holdings, Inc*., 3:23-cv-00214-LLM, slip op. (N.D. Ga. Feb. 12, 2026).

"telephone call" used in the statute as it was defined when Congress enacted the TCPA. *Stockdale*, 2026 WL 591842, at *3. When Congress enacted the TCPA in 1991, Webster's Dictionary defined "call" as "the act of calling on the telephone" and "telephone" as "an instrument for reproducing sounds at a distance." *Stockdale*, 2026 WL 591842, at *3 (quoting Merriam-Webster New Collegiate Dictionary (9th ed. 1990)). Because text messaging did not exist in 1991, "'telephone call' would not have included text messages." *Jones*, 792 F. Supp. 3d at 899. Even if text messages existed then, "[n]o normal person refers to a text message, or thinks of a text message, as a 'call.'" *Davis*, 797 F. Supp. 3d at 1273; *see also Sayed*, 2025 WL 2997759, at *2 (granting motion to dismiss DNC provision claim and noting that, "in common American English usage, a 'telephone call' and a 'text message' are separate and distinct forms of communication").

This interpretation is reinforced by Congress's 2019 amendment, adding "text message" to Section 227(e)(8)(C), governing caller ID requirements, while leaving Section 227(c)(5) unchanged. *Radvansky*, 2026 WL 456919, at *3; *see Bruce v. Adams & Reese, LLP,* 168 F.4th 367, 383 (6th Cir. 2026) ("when Congress deliberately uses different words, we presume those words to have different meanings.").[12] Congress's use of the term "text message" in other provisions of the

---

[12] While some courts have held that text messages are actionable under § 227(c)(5), those decisions got it wrong. The FCC's 2003 Order interpreted § 227(b), not § 227(c), and thus "does not even address the specific provisions of the TCPA" at issue

24

TCPA also weighs heavily against interpreting the term "call" to also include text messages. "In a given statute, … different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2004). Interpreting "call" to include "text messages" would render meaningless Congress's delineation between calls and text messages in Section 227(e). *See Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1162 (9th Cir. 2023) ("If voice calls encompassed text messages, the inclusion of the term text message would be surplusage").

Because the TCPA's language is clear, the Court's analysis must end here. *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000). While this interpretation may stand in contrast to FCC guidance and judicial precedent relying on the FCC, that is "the natural consequence of the Supreme Court overruling *Chevron …* and creating a gap between long-standing agency interpretations that Congress may have presumed to be valid and the plain text of statutes." *Stockdale*, 2026 WL 591842, at *3. But that is for Congress, not this Court, to resolve. *Cf. Jones*, 792 F. Supp. 3d at 901 ("It is for Congress to … address the realities of today's technology").

---

here. *Jones*, 792 F. Supp. 3d at 899. Other decisions rely on post-enactment definitions of "call," fail to account for the modifying term "telephone," or reason too broadly from the capabilities of modern cell phones. *See Mujahid v. Newity, LLC*, 2025 WL 3140725, *2 (N.D. Ill. Nov. 10, 2025); *Wilson v. Better Mortg. Corp.*, 2025 WL 3493815, at *5 (S.D.N.Y. Dec. 5, 2025); *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930, at *4–5 (S.D. Tex. Jan. 26, 2026); *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119 (9th Cir. 2026). Again, Congress repeatedly revisited the TCPA without amending § 227(c) to expressly include text messages, reinforcing that omission as intentional. *See Bruce*, 168 F.4th at 383.

25

**C.    TCPA Claims Must Be Dismissed Because Plaintiffs Own Cell Phones, and Cell Phone Users Are Not "Residential Telephone Subscribers" Under the DNC Provisions.**

Plaintiffs' DNC Provision claims in Counts I and III of the FAC fail for one additional reason: because the communications at issue were sent to Plaintiffs' cellular phones, not to a "residential telephone." (FAC ¶¶ 47, 77.)

The FCC promulgated the DNC Provisions in order to "protect *residential telephone subscribers*' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1) (emphasis added); *Cunningham v. Sunshine Consulting Grp., LLC*, 2018 WL 3496538, at *6 (M.D. Tenn. July 20, 2018); *see also Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (explaining that Congress enacted the TCPA to protect consumers from "the proliferation of intrusive, nuisance [telemarketing] calls *to their homes*") (emphasis added). While some courts held that cell phone users can be "residential telephone subscribers," these decisions heavily rely on FCC guidance that is no longer entitled to deference. *See e.g., Dobronski v. CHW Grp., Inc.*, 2025 WL 2426370, at *6 (E.D. Mich. Aug. 21, 2025) (deferring to the 2003 Order, 18 FCC Rcd. 14014, 14038 ¶¶ 34-36). As explained in Section IV.B *supra*, the Supreme Court has made clear that since *Loper Bright*, the FCC's interpretations are not binding, and courts must use their own independent best judgment when determining the meaning of a statute. *McLaughlin*, 606 U.S. at 168.

26

The TCPA does not define "residential telephone subscribers," so this Court must look to the meaning of the term in 1991, when the TCPA was enacted. *Loper Bright*, 603 U.S. at 400. In 1991, a "residential telephone" referred to a "land line at a residence." *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1234 (9th Cir. 2022) (Ikuta, J., dissenting in part). The phrase "residential telephone" describes a telephone that is hardwired into a building. *Moore v. Triumph CSR Acquisition, LLC*, 2023 WL 8601528, at *2 (N.D. Ill. Dec. 12, 2023) (holding that a residential phone is "***residential*** in a very literal sense") (emphasis added). A cellular device, by definition, lacks this characteristic. *Id.* (stressing that "even the strongest addiction to a cell phone cannot transform it into a residential phone"). "A cellular phone and a residential phone are not the same thing." *Moore*, 2023 WL 8601528, at *2. As discussed in Section IV.B *supra*, cellular phones did not even exist in 1991 and could not have been intended to be referenced in the statute.

Indeed, Congress used the term "residential telephone" in § 227(b)(1)(B) and 227(c)(1), while elsewhere expressly referring to "cellular telephone service." *See* 47 U.S.C. §§ 227(b)(1)(A)(iii), (b)(2)(C), (b)(2)(H). Courts have recognized this "clear distinction" between TCPA provisions governing cell phones and those limited to residential lines. *See Iniguez v. CBE Grp.*, 969 F. Supp. 2d 1241, 1249 (E.D. Cal. 2013); *Kapp v. E. Wisc. Water Conditioning Co.*, 2021 WL 778168, at *4 (E.D. Wisc. Mar. 1, 2021) ("While the defendants cite many cases that support the

proposition that cell phones and residential landlines are distinct under the TCPA, they need not: such a distinction is clear from the text of the statute").

The reading cabining DNC Provisions to residential phones as opposed to cell phones follows basic canons of statutory construction: "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006). As one court put it, "[c]ell phones do not present the same concerns as residential phones" because their "mobility and functionality to silence or decline calls alleviate the concerns inherent with a home telephone." *Gaker v. Q3M Ins. Sols.*, 2023 WL 2472649, at *3 (W.D.N.C. Feb. 8, 2023). Consequently, to state a claim under § 227(c) of the TCPA, Plaintiffs must allege that they received UWM's texts on a residential telephone line. Plaintiffs cannot do so. (FAC ¶¶ 47, 44.) Thus, Counts I and III in the FAC should be dismissed. *Choice*, 201 F.3d at 840.

## V.    **THE COURT SHOULD STRIKE CLASS ALLEGATIONS.**

The FAC also proposes to certify the following three classes: (a) National DNC Registry Class (McGonigle); (b) VTPPA Sub-Class (McGonigle); and (c) Internal DNC Class (Hester). (FAC ¶ 58.) Because it is apparent that, regardless of any discovery that may occur, none of the proposed classes can be certified, class allegations should be stricken. *See Pilgrim*, 660 F.3d at 949.

The proposed classes are textbook examples of impermissible fail-safe

classes. A "fail-safe" class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). A fail-safe class "includes *only* those who are *entitled* to relief." *Young*, 693 F.3d at 538 (emphasis in original). Classes defined this way are forbidden because "either class members win or, by virtue of losing, they are not in the class and are not bound." *Id.* (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)).

The fail-safe defect here is obvious. Each class is defined by reference to whether a member received a call made "from or on behalf of Defendant" or "Defendant delivered, or caused to be delivered" the offending solicitations. (FAC ¶ 106.) That definition makes class membership depend on the merits: a person is a class member only if the Court finds UWM directly or vicariously liable. If not, the person falls outside the class and is not bound by the judgment. That is the hallmark of an impermissible fail-safe class. *See Boyer*, 306 F.R.D. at 540 (striking proposed classes as impermissible fail-safes because they include only people who did not consent to defendants' contact and thus can prove a TCPA violation); *Bryant v. King's Creek Plantation, L.L.C.*, 2020 WL 6876292, at *3 (E.D. Va. June 22, 2020) (striking nearly identical National DNC Registry and VTPPA classes as impermissibly fail-safe); *Beck v. Cuyahoga Cnty.*, 2022 WL 4363562, at *6 (N.D. Ohio Sept. 16, 2022) (class failsafe where the court's determination on the merits

29

determines class membership); *cf. Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 132 (N.D. Tex. 2020) (denying certification of similar TCPA classes because"[f]ailure to show that each class member was called by the defendant's agent kills certification."); *Chinitz v. NRT W., Inc.*, 2019 WL 4142044, at *5 (N.D. Cal. Aug. 30, 2019) (denying certification of TCPA class where differing levels of control over alleged agents created individualized determinations of liability).

## VI.    CONCLUSION

For the foregoing reasons, and because Plaintiffs have already amended their Complaint once, the Court should dismiss the FAC with prejudice. To the extent any claims survive, this Court should strike class allegations at this stage.

Dated: April 23, 2026                                      Respectfully submitted,

By: */s/ Irina Kashcheyeva*
Irina Kashcheyeva (P72575)
Amir El-Aswad (P86092)
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100
ikashcheyeva@foley.com
ael-aswad@foley.com
*Counsel for Defendant*

30

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2026, I caused to be electronically filed the foregoing paper with the Clerk of the Court, which will send notification of such filing to all counsel of record via the Court's ECF system.

By: */s/ Irina Kashcheyeva*
Irina Kashcheyeva (P72575)
Amir El-Aswad (P86092)
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
(313) 234-7100
(313) 234-2800
ikashcheyeva@foley.com
ael-aswad@foley.com
*Counsel for Defendant United*
*Wholesale Mortgage, LLC*