# **<u>EXHIBIT 2</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549
# FORM 10-K

**(Mark One)**

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the fiscal year ended December 31, 2025**

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period from _____ to _____**

**Commission file number 001-39189**

# UWM HOLDINGS CORPORATION

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **84-2124167** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **585 South Boulevard E.**      **Pontiac,**    **MI** | **48341** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(800) 981-8898**

Registrant's telephone number, including area code

**N/A**

(Former name, former address and former fiscal year, if changed since last report)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $0.0001 per share | **UWMC** | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's voting stock held by non-affiliates on June 30, 2025 was $828,651,516 based on the closing price on the New York Stock Exchange on that date of $4.14. (Does not include shares issuable upon exercise of warrants).

As of February 23, 2026, the registrant had 294,864,131 shares of Class A common stock outstanding and 1,305,082,620 shares of Class D common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement for use in connection with its 2026 Annual Meeting of Stockholders, which is to be filed no later than 120 days after December 31, 2025, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Case 2:25-cv-13865-SKD-KGA   ECF No. 17-3, PageID.211   Filed 04/23/26   Page 3 of 29

As of February 23, 2026, the registrant had 294,864,131 shares of Class A common stock outstanding and 1,305,082,620 shares of Class D common stock outstanding.

Portions of the registrant's definitive proxy statement for use in connection with its 2026 Annual Meeting of Stockholders, which is to be filed no later than 120 days after December 31, 2025, are incorporated by reference into Part III of this Annual Report on Form 10-K.

**Table of Contents**

| Section Name | Page |
|---|---|
| Glossary of Terms | 1 |
| Cautionary Note Regarding Forward-Looking Statements | 2 |
| Risk Factor Summary | 2 |
| **PART I** | |
| Item 1. Business | 5 |
| Item 1A. Risk Factors | 13 |
| Item 1B. Unresolved Staff Comments | 36 |
| Item 1C. Cybersecurity | 36 |
| Item 2. Properties | 38 |
| Item 3. Legal Proceedings | 38 |
| Item 4. Mine Safety Disclosures | 40 |
| **PART II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| Item 6. Reserved | 41 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 42 |
| Item 7A. Quantitative and Qualitative Disclosures about Market Risk | 61 |
| Item 8. Financial Statements and Supplementary Data | 63 |
| Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 94 |
| Item 9A. Controls and Procedures | 94 |
| Item 9B. Other Information | 95 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 95 |
| **PART III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 95 |
| Item 11. Executive Compensation | 95 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 96 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 96 |
| Item 14. Principal Accountant Fees and Services | 96 |
| **PART IV** | |
| Item 15. Exhibits and Financial Statement Schedules | 97 |
| Item 16. Form 10-K Summary | 101 |
| Signatures | 102 |

Table of Contents

**GLOSSARY OF TERMS**

| Terms | Definitions |
| --- | --- |
| "Fannie Mae" | The Federal National Mortgage Association is a government-sponsored enterprise that purchases qualifying mortgage loans from mortgage lenders, packages them together, and sells them as a mortgage-backed security to investors on the secondary market. |
| "FHA" | The Federal Housing Administration is a governmental agency that provides mortgage insurance on loans made by FHA-approved lenders. |
| "Forward-settling Loan Sale Commitment" or "FLSC" or "TBA" | A forward-settling Loan Sale Commitment (also referred to as a FLSC or a TBA) is a forward derivative that requires a mortgage lender to commit to deliver at a specific future date a mortgage-backed security issued by Fannie Mae, Freddie Mac or guaranteed by Ginnie Mae which is collateralized by an undesignated pool of mortgage loans. |
| "Freddie Mac" | The Federal Home Loan Mortgage Corporation is a government-sponsored enterprise that purchases qualifying mortgage loans from mortgage lenders, packages them together, and sells them as a mortgage-backed security to investors on the secondary market. |
| "Ginnie Mae" | Government National Mortgage Association (GNMA) is a government-owned corporation that guarantees mortgage-backed securities that have been guaranteed by a government agency, mainly the Federal Housing Administration (FHA) and the Veterans Administration (VA). |
| "GSE" | Government-sponsored enterprises, such as Fannie Mae and Freddie Mac. |
| "interest rate lock commitment" or "IRLC" | An interest rate lock commitment is a binding agreement by a mortgage lender with a borrower to extend a mortgage loan at a specified interest rate and term within a specified period of time. |
| "loan officers" | We use the term loan officers to refer to the individual employees of our clients. Each loan officer is licensed, or exempt from licensure, in the state or states in which he or she operates. |
| "mortgage-backed security" or "MBS" | Mortgage-backed securities, or MBSs, are securities that are secured by a pool of mortgage loans, which does not include the MSRs which are separated from the mortgage loan prior to the mortgage loan being placed in the pool and are therefore not part of the collateral. |
| "mortgage servicing rights" or "MSRs" | Mortgage servicing rights, or MSRs, are the right to service a mortgage loan for a fee, which rights are separated from the mortgage loan once the mortgage loan is sold in the secondary market. |
| "UPB" | Unpaid principal balance. |
| "USDA" | The U.S. Department of Agriculture is a government agency that provides mortgage insurance on loans made by USDA-approved lenders. |
| "VA" | The U.S. Department of Veteran Affairs is a government agency that provides mortgage insurance on loans made by VA-approved lenders. |

Table of Contents

**Cautionary Note Regarding Forward-Looking Statements**

This report contains "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. These forward-looking statements relate to expectations for future financial performance, business strategies or expectations for our business. Specifically, forward-looking statements in this report include statements relating to:

- our financial and operational performance;
- future loan originations;
- our client-based business strategies, strategic initiatives, competitive advantages;
- the impact of interest rate risks on our business;
- the benefits and risks associated with an Exchange Transaction;
- our hedging and risk mitigation strategies and the impacts of defaults on our business;
- the timing and impact of our transition to servicing in-house;
- the potential impact of technological developments on our operations;
- the impact of new tax laws and regulations on our financial results;
- potential disputes with sub-servicers and the purchasers of our loans, MSRs and excess servicing;
- our accounting policies and the impacts to our agreements and financial results;
- the renewal of our sale and repurchase and other financing agreements upon their maturity;
- the quality of our loan portfolio;
- political and geopolitical conditions that may affect our business and the mortgage industry in general;
- our ability to increase or decrease the size of our warehouse lines to reflect anticipated increases or decreases in volume;
- macroeconomic conditions that may affect our business and the mortgage industry in general;
- the opportunity to sell our MSRs and excess servicing;
- the impact of pending litigation on our financial position and the outcome of such litigation;
- the sufficiency of our liquidity;
- our repurchase and indemnification obligations for loans sold to investors and other contractual indemnification obligations; and
- other statements preceded by, followed by or that include the words "may," "can," "should," "will," "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "target" or similar expressions.

These forward-looking statements involve estimates and assumptions which may be affected by risks and uncertainties in our business, as well as other external factors, which could cause future results to materially differ from those expressed or implied in any forward-looking statement including those risks set forth below in Risk Factor Summary and the other risk and uncertainties indicated in this report, including those set forth under the section titled "Risk Factors."

All forward-looking statements speak only as of the date of this report and should not be relied upon as representing our views as of any subsequent date. We do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

**RISK FACTOR SUMMARY**

An investment in our securities involves substantial risk. Our ability to execute on our strategies is also subject to certain risks. The risks described under the heading "Risk Factors" following the summary below may cause us not to realize the full benefits of our competitive strengths or may cause us to be unable to successfully execute all or part of our strategies. Some of the more significant challenges and risks we face include the following:

- our dependence on macroeconomic and U.S. residential real estate market conditions, including changes in U.S. monetary policies that affect interest rates and inflation;
- our reliance on our warehouse and other short-term financing facilities to fund mortgage loans and otherwise operate our business, leveraging of assets under these facilities and the risk of a decrease in the value of the collateral underlying certain of our facilities causing an unanticipated margin call;

2

Table of Contents

- our ability to sell loans in the secondary market, including to GSEs, and to securitize our loans into mortgage-backed securities through the GSEs and Ginnie Mae, and our ability to sell MSRs in the bulk MSR secondary market;

- our dependence on the GSEs and the risk of changes to these entities and their roles, including, as a result of GSE reform, termination of conservatorship or efforts to increase the capital levels of the GSEs;

- changes in the GSEs', FHA, USDA and VA guidelines or GSE and Ginnie Mae guarantees;

- our ability to consummate the merger with Two Harbors and achieve the anticipated benefits;

- our ability to successfully transition to in-house servicing operations and the new risks that may be presented as a result of the transition;

- our ability to access, and increase, warehouse lines to meet our anticipated growth;

- our dependence on licensed residential mortgage officers or entities, including brokers that arrange for funding of mortgage loans, or banks, credit unions or other entities that use their own funds or warehouse facilities to fund mortgage loans, but in any case do not underwrite or otherwise make the credit decision with regard to such mortgage loans to originate mortgage loans, as well as changes in banking regulations and capital requirements which may impact the availability of warehouse financing or otherwise affect liquidity in the residential mortgage industry;

- the impact of actions taken by the Presidential Administration, including actions that could adversely impact inflation, interest rates, consumer discretionary income and confidence and home building starts, which could adversely affect our loan origination volume and profitability;

- the risk that the hedging strategies that we utilize to mitigate against interest rate risks associated with interest rate locks, loans at fair value, or other assets or liabilities prove to be ineffective or result in unanticipated margin calls that could adversely affect our liquidity or our results of our operations;

- our inability to continue to grow, or to effectively manage the growth of, our loan origination volume as well as our inability to effectively manage a decline in our loan origination volume;

- our ability to continue to attract and retain our Independent Mortgage Broker relationships;

- the occurrence of a data breach or other failure of our cybersecurity or information security systems;

- loss of key management;

- reliance on third-party software and services;

- reliance on a third-party sub-servicer to service our mortgage loans or our mortgage servicing rights;

- the occurrence of data breaches or other cybersecurity failures at our third-party sub-servicers or other third-party vendors;

- intense competition in the mortgage industry;

- our ability to implement and maintain technological innovations such as artificial intelligence ("AI") in our operations;

- the risk that we are or may become subject to legal actions that if decided adversely, could be detrimental to our business;

- our ability to continue to comply with the complex state and federal laws, regulations or practices applicable to mortgage loan origination and servicing in general, including maintaining the appropriate state licenses, managing the costs and operational risk associated with material changes to such laws and the impact of recent changes in federal and state government administrations;

- fines or other penalties associated with the conduct of Independent Mortgage Brokers;

- errors or the ineffectiveness of internal and external models or data we rely on to manage risk and make business decisions;

- the dilutive effect that resales of the outstanding shares of Class A common stock, future issuances of Class A common stock or shares issuable upon Exchange Transactions may have on our stockholders;

- loss of or inability to enforce intellectual property rights or contractual rights;

3

Table of Contents

- risk of counterparty terminating servicing rights and contracts; and

- the possibility that we may be adversely affected by other economic, business, and/or competitive factors.

4

**PART I**

**Item 1. Business**

*Unless otherwise indicated or the context otherwise requires, when used in this Annual Report, the term "UWMC" means UWM Holdings Corporation, "UWM" means United Wholesale Mortgage, LLC and the "Company," "we," "our" and "us" refer to UWM Holdings Corporation and our subsidiaries.*

**Overview**

We are the publicly traded indirect parent of United Wholesale Mortgage, LLC ("UWM"). UWM is the largest overall residential mortgage lender as well as the largest purchase lender in the U.S., by closed loan volume, despite originating loans exclusively through the wholesale channel. We originate primarily conforming and government loans across all 50 states and the District of Columbia.

Founded in 1986 and headquartered in Pontiac, Michigan, we have built a client-focused, team-oriented culture that strives to bring superior customer service, efficiency and operational stability to our clients, the Independent Mortgage Brokers. After being privately owned for 35 years, on January 21, 2021, UWM completed its business combination with Gores Holdings IV, Inc. and changed its name to UWM Holdings Corporation. We began trading on the New York Stock Exchange ("NYSE") on January 22, 2021 under the ticker symbol "UWMC".

**Strategy**

Our principal strategy that has driven our substantial growth over the past years, is our strategic decision to operate solely as a Wholesale Mortgage Lender—thereby avoiding conflict with our partners, the Independent Mortgage Brokers and their direct relationship with borrowers. Unlike "Retail Mortgage Lenders" that offer mortgage loans directly to individual borrowers and underwrite the mortgage loans, we do not work directly with the borrower during the mortgage loan financing process. We believe that by not competing for the borrower connection and relationship, we are able to generate significantly higher loyalty and satisfaction from our clients, the Independent Mortgage Brokers, who, in turn, armed with our partnership tools, are positioned to direct a growing share of the residential mortgage volume nationwide. Our model is focused on the origination business, with a specific focus on purchase loans. Historically, residential purchase mortgage loan origination volume has experienced less volatility in response to interest rate movements than the refinancing mortgage loan origination volume. Consequently, we believe that by focusing on the purchase business we will be better positioned to deliver more consistent volume in increasing and decreasing interest rate environments.

Integral components of our strategy are (1) continuing our leadership position in the growing wholesale channel by investing in technology, including AI, and partnership tools designed to meet the needs of Independent Mortgage Brokers and their customers, (2) capitalizing on our strategic advantages which include a singular focus on the wholesale channel, that allows us to quickly adapt to market conditions and opportunities, and ample capital and liquidity, (3) employing our six pillars to drive a unique culture that we believe results in a durable competitive advantage, (4) originating high quality loans, the vast majority of which are backed directly or indirectly by the federal government, and (5) to minimize market risks and to maximize opportunities in different macroeconomic environments.

The residential mortgage loan financing process typically involves three stages:

- *Initiate Borrower Connection*. A broker or other party is either approached by or reaches out to a potential borrower for a mortgage loan. This party advises the borrower on loan options, runs the initial credit check, gathers the borrower's information for the loan application and submits the loan application.

- *Underwrite, Close and Fund*. The borrower's loan application is reviewed, the mortgage loan is underwritten, the borrower is approved, the closing is arranged and the loan is funded, collectively referred to as loan origination.

- *Portfolio or Package and Sell Mortgage Loan into Secondary Market Sales*. The loan is either placed into an investment portfolio (in the case of banks and typically only for certain loans with variable or shorter term fixed interest rates) or packaged together with other loans and sold as MBS to investors in the secondary market.

**Leader in the Wholesale Channel**

UWM has been the largest wholesale lender in the U.S. since 2015, and through the first nine months of 2025, originated 42.5% of the loans closed through the wholesale channel and 8.4% of the first lien residential mortgages that closed during the first nine months of 2025 in all origination channels (based on data from Inside Mortgage Finance). According to the Nationwide Multistate Licensing System ("NMLS"), as of September 30, 2025, there were approximately 358,000 federally registered mortgage loan officers in the U.S. Our exclusive focus on the wholesale channel has resulted in relationships with over 13,000 independent broker businesses throughout the U.S., with over 57,000 associated loan officers—of which approximately 35,000 submitted a loan to us during 2025. Because we exclusively work through the wholesale channel, loan officers that are not currently affiliated with independent brokers do not submit any loans to us. For the last four years, we have been the largest overall originator of residential mortgage loans in the country despite only doing business with a fraction of the market.

Our business is premised on our belief that the fastest, cheapest and easiest way for a borrower to obtain a residential mortgage is through the wholesale channel. In large part due to our investments in technology and service, the wholesale channel's share of the market has almost doubled from a low point in 2014, and we believe that there remains ample room for growth in this channel as more consumers become educated on the benefits of the wholesale channel. Currently, approximately 2 of every 10 loans are originated through the wholesale channel. If the wholesale channel share continues to grow, we believe that we will continue to materially grow our loan production volume due to our leadership position within the channel. For example, if, over time, UWM maintains a 40% market share in the wholesale channel, but the wholesale channel grows from 20% of the overall market to 30% of the overall market, UWM would be in the position to grow from 8% to 12% of the overall market.

**Our Loan Programs**

We focus primarily on originating conventional, agency-eligible loans that can be sold to Fannie Mae, Freddie Mac or transferred to Ginnie Mae pools for sale in the secondary market. Our conventional agency-conforming loans meet the general underwriting guidelines established by Fannie Mae and Freddie Mac. Loans that are written under the FHA program, the VA program or the USDA program are guaranteed by the governmental agencies and then transferred to Ginnie Mae pools for sale in the secondary market. The vast majority of our mortgage loans are underwritten to the "Qualified Mortgage" underwriting standards established by the Consumer Financial Protection Bureau ("CFPB"). For the year ended December 31, 2025, approximately 90% of loans originated by UWM were sold to Fannie Mae or Freddie Mac, or were transferred to Ginnie Mae pools in the secondary market, while the remainder primarily include non-agency jumbo loans that are underwritten to the same "Qualified Mortgage" underwriting standards and have a similar risk profile but are sold to third party investors primarily due to loan size, construction loans, and non-qualified mortgage products, including home equity lines of credit (which in many instances are second liens).

**Our Mortgage Lending Process**

We believe that our highly scaled, efficient and centralized mortgage lending processes are key to our success. Utilizing our proprietary system, "Easiest Application System Ever" (EASE™), and our dedicated team members, we focus on client service and loan quality throughout the entire loan origination, underwriting and closing processes. EASE™ automates the process and, based on the jurisdictional requirements of the client and borrower, automatically generates the necessary documents required by us and by the clients for applications. The entire origination, underwriting and preparation of closing documents takes place in our centralized, paperless work environment where documents and data are entered into EASE™ and are reviewed, processed and analyzed based on a set of pre-determined, rules-based workflows. We focus on speed to close as it is one of the primary metrics for client satisfaction. We believe our closing process is the most efficient in the industry and results in shorter application to clear-to-close times than any of the other major Retail Mortgage Lenders or Wholesale Mortgage Lenders. For the years ended December 31, 2025 and December 31, 2024, we delivered an average of 15 and 16 business days, respectively, from loan application to clear to close, as compared to management's estimates of the industry average of 39 and 41 calendar days for the years ended December 31, 2025 and December 31, 2024, respectively. We delivered this speed while receiving an 87.5% average monthly client Net Promoter Score ("NPS") for the year ended December 31, 2025, as well as an 87% average monthly client NPS for the past five years.

Loan closing speeds and costs to consumers are also positively impacted for clients who use our innovative Title Review and Closing ("TRAC+") service, which provides an efficient alternative to utilizing a traditional lender title policy and title company. By leveraging in-house review of title related documents and where applicable, issuing attorney title opinion letters ("ATOL(s)"), UWM is able to streamline the title review process and facilitate a faster and easier experience for the borrower. With TRAC+, UWM also handles the loan closing and disbursement processes normally managed by a title

6

Table of Contents

company, giving Independent Mortgage Brokers the option to close a loan without working with a third-party title company or settlement agent.

Our rules-based mortgage loan origination system, or LOS allows multiple teams to work on the same loan at the same time, to track and be alerted to missing or incomplete items, to flag items in order to alert other team members of possible deficiencies and to have visibility into the history, status and progress of loans in process. We use advanced technologies and workflow systems to assist underwriting and operations team members in prioritizing which loans require their immediate attention and to monitor each team's progress so workload-balancing decisions can be made among the operation teams in real time and avoid bottlenecks. We also provide our clients access to our proprietary communication tool, Client Request ("CR"), that allows them to ask general or loan-specific questions, submit requests, and escalate potential issues, which provides a transparent and consistent line of communication between the client and the various internal UWM teams. UWM follows four-hour response time service level agreement for initially responding to CRs submitted during normal office hours. The CR system allows clients to track their requests, add comments, upload images, and provide satisfaction feedback after their issue is resolved. We believe that our CR communication platform and process is a competitive differentiator for UWM, and contributes positively to our strong client service scores, via NPS.

**Underwriting**

Our underwriting process is one of our key strategic advantages as our extensive training program and technology platforms allow us to produce a portfolio of high-quality loans, with an industry-leading time from application to clear to close and maintain the superior level of client service that allows us to attract and retain our clients. All mortgage loans that we originate are underwritten in-house by our underwriting team. We invest significant time and resources in our underwriters through our robust training process to help them and us succeed. We believe that our intensive training program is an integral component of our scalability as we are able to materially increase our underwriting resources, at a consistent quality, with less labor constraints and complications than our competitors.

Our clients, the Independent Mortgage Brokers, have the initial communication with a potential borrower, obtain relevant financial and property information to run a credit check, and obtain a pre-approval through one of the automated underwriting systems, where applicable. Once a pre-approval has been received, an Independent Mortgage Broker is able to seamlessly import the borrower's information and documentation into our EASE™ Loan Origination System without the need for extra data entry. One of our underwriters then reviews the file and, based on the loan product and the financial and other information provided, makes an initial underwriting decision. If the mortgage loan is conditionally approved, our system generates a "conditions to close" list based on the specifics of the borrower, the property, and the loan product. An underwriter takes ownership of the file ensuring that each of these conditions is met prior to granting a "clear-to-close" or final approval.

In 2020, we launched DocHub, which is a proprietary document management system, automating document classification and data extraction for mortgage underwriting workflows.

In 2021, we launched BOLT, an industry-first technology tool designed to speed up the mortgage approval process for conventional and FHA loans by allowing Independent Mortgage Brokers to obtain initial underwriting approval for qualified borrowers in as little as 15 minutes. BOLT is also utilized by our underwriters, providing them an intuitive platform for a more efficient review of the loan. While underwriters remain responsible for the overall risk assessment of and underwriting decision for the loan, BOLT's AI and data extraction capabilities reduce much of the manual review of documentation and corresponding data entry redundancies. This technology, in turn, creates a more streamlined loan underwriting experience and accurate approval for our brokers, all while maintaining continued compliance with our investors' guidelines and requirements.

In 2021, we launched UWM Appraisal Direct, UWM's appraisal ordering and tracking service in which we directly engage appraisers rather than utilizing an appraisal management company. We believe that UWM Appraisal Direct streamlines the ordering and completion of property appraisals as part of the underwriting process, leading to high-quality, faster appraisals, and cost savings for borrowers.

In 2023, we launched PA+, which is a service that offers an additional level of loan processing support for our clients when needed. When an Independent Mortgage Broker or their loan processor uses PA+, a dedicated UWM Loan Coordinator will work with them and their borrower to help order, review, and send UWM documents to support the underwriting process. We believe that PA+ will help our clients scale their businesses during periods of increased volume.

**Capital Markets and Secondary Marketing**

Our capital markets team is dedicated to maximizing loan sale profitability while at the same time minimizing operational, interest rate and market risks. This team manages the interest rate risk for the business and is responsible for

7

Table of Contents

interest rate lock management policies and procedures, hedging the pipeline, managing warehouse facilities and associated facility utilization and managing risk and sales of MSRs. We aggregate our loan production into pools that are (i) sold to Fannie Mae or Freddie Mac or securitized through the issuance of Fannie Mae or Freddie Mac bonds, (ii) transferred into Ginnie Mae pools and securitized by us into government-insured mortgage-backed securities, or (iii) sold outright or securitized to investors in the secondary mortgage market. Our primary access to the secondary market comes from pooling and selling eligible loans that we originate through Fannie Mae, Freddie Mac, and Ginnie Mae's securitization programs. The goal of the capital markets team is to protect margin at origination, and to maximize execution at sale. We believe that our technologies, automated workflow and experienced capital markets team allow us to quickly aggregate and sell pools of loans in order to make efficient use of our capital and warehouse facilities. Our focus on agency deliverable originations and speed to sale reduces our exposure to market volatility, liquidity risk and credit risk.

When we have identified a pool of mortgage loans to sell to the agencies, non-governmental entities, other investors, or through our private label securitization transactions, we typically repurchase such loans from our warehouse lender and sell the pool of mortgage loans into the secondary market, but generally retain the MSRs associated with those loans. To the extent we generate non-agency loans, these loans are sold servicing released, or servicing retained which permits us to control the borrower experience. We retain MSRs for a period of time depending on business and liquidity considerations. When we sell MSRs, we typically sell them in the bulk MSR secondary market.

**Infrastructure, Systems and Technologies**

*Advanced technologies and systems*

We are a technology-driven company focused on continuous innovation and operational efficiency. As of December 31, 2025, we had approximately 2,200 team members dedicated to technology and information systems at our Pontiac, Michigan headquarters, compared to approximately 1,800 as of December 31, 2024.

Our technology strategy centers on building and automating loan processing functions, including lead management, loan origination, underwriting, closing, and post-closing activities. We automate to provide advanced capabilities and capacity to our clients, while also driving efficiency and productivity for our internal team members. We believe our integrated platforms deliver a scalable, standardized, and controlled end-to-end origination process that embeds agency guidelines and program requirements into rules-based workflows. This ensures loans advance only when all conditions are met and required information is verified, while accounting for variations in state laws, loan programs, and property types.

We continue to invest in emerging technologies, including AI, to further automate and optimize operations while enhancing the client experience. Our proprietary, in-house systems are designed for scalability and rapid modification, enabling us to implement new features and adapt to market, industry, and regulatory changes efficiently without reliance on third-party vendors.

**AI & Automation**

- **Mia (Most Intelligent Assistant)** – A voice-enabled AI assistant that makes outbound calls for borrower outreach and refinance opportunities, and answers inbound borrower calls via a dedicated loan officer number to handle mortgage questions, provide guideline clarity, and deliver real-time updates.

- **ChatUWM** – AI-driven mortgage assistant automating loan tasks, document analysis, income calculation, and providing loan process and guideline navigation.

- **LEO (Loan Estimate Optimizer)** – A ChatUWM agent that helps loan officers analyze and optimize loan estimates by analyzing loan estimate details and suggesting improvements (lock or float status, optimal lock period length, title fee charges, plus many other loan terms and conditions).

- **Loan Lab** – A platform that helps loan officers restructure loans on the fly to optimize terms, pricing, and product eligibility. Loan Lab uses AI to recommend smart adjustments to deliver better borrower outcomes and faster closings.

- **Income Calculators** – An AI-powered product that identifies and classifies documents, automatically extracts income data, and performs accurate income calculations, making the process fast, easy, and more accurate.

- **BOLT** – Underwriting platform that delivers initial approvals in minutes. BOLT pairs streamlined data intake with automation and AI-assisted checks to verify documents, run automated underwriting systems, and surface pricing options - giving loan officers speed, accuracy, and a clear path to closing.

- **KEEP** – AI-driven engine that finds potential savings and uses automation to send possible refinance options to borrowers on behalf of loan officers, and then move those refinance offers smoothly through UWM's systems, ensuring speed and accuracy. KEEP manages execution workflows for scalability, flexibility, and seamless integration.

- **DocHub** – A proprietary document management system, automating document classification and data extraction for mortgage underwriting workflows. It enables secure ingestion, indexing, and retrieval, integrates with UWM's loan origination system and enterprise systems, and supports scalable, cost-efficient processes.
- **Operations Automation** – A machine learning / robotic process automation solution that categorizes inbound emails, extracts key data, and sets follow up actions without team member interaction.

**Core Origination & Integration**

- **Blink+** – White-labeled point-of-sale system integrated with EASE and Brand 360 for lead conversion and digital loan origination.

- **Boost** – Lead acquisition and engagement platform offering loan officers tailored leads and live call transfers.

- **EASE (Easiest Application System Ever)** – UWM's flagship loan origination system for product selection, rate locking, and automated underwriting.

- **UClose** – Loan closing technology that gives loan officers full control over closing timelines, document generation, and title company collaboration. UClose enables same-day closings, real-time updates, and secure interaction with title companies and settlement agents, streamlining the process for speed and accuracy.

- **InTouch Mobile App** – A mobile solution that lets loan officers manage the entire lending process end-to-end, with real-time access to pipelines, documents, and borrower communication - no desktop required.

- **Brand 360** – A marketing platform for loan officers that drives borrower engagement and lead nurturing through automated campaigns, configurable alerts, and real-time performance dashboards for actionable market insights.

- **UWM Portal** – A bi-directional application that exposes UWM application programming interface endpoints, allowing clients to easily connect their loan origination system for seamless integration with UWM's systems. It enables two-way data exchange and keeps loan officers up to date on all the latest changes for efficient, compliant workflows.

**Enterprise Infrastructure & Data**

- **Comprehensive Data Lake** – A large-scale data lake built to power AI and automation, enabling advanced analytics, predictive modeling, and real-time decision-making.

- **Work Queue & Operational Visibility Platform** – A centralized platform that automates task prioritization, monitors SLAs, and provides real-time dashboards to detect bottlenecks, optimize workflows, and enhances operational efficiency.

- **Enterprise Training Platform** – An interactive learning system for loan officers and internal teams, offering desktop modules on new programs, guideline updates, and system enhancements. It provides role-based training paths, progress tracking, and on-demand access to drive fast technology adoption and ensure compliance.

- **Enterprise Data & Analytics Warehouse** – A centralized hub for loan, loan officer, and operational data, delivering advanced analytics, real-time KPIs, and dashboards to optimize mortgage processes and decision-making.

**Loan Servicing**

In addition to loan origination, we derive revenue from MSRs related to our loan originations. After a loan is originated, loan servicers manage payments, delinquencies, and other administrative functions of mortgages for third party investors. Servicers derive contractual revenue from servicing fees, generally based on the UPB of the loans in their servicing portfolio as well as other ancillary income. The net present value of these expected future cash flows is represented on the balance sheet as MSRs. MSR valuations have traditionally increased with increased interest rates because higher interest rates lead to decreased prepayments, thereby extending the average life of the asset and increasing related expected cash flows. Conversely, decreases in interest rates generally result in a decrease in the value of the MSR portfolio due to the expectation of

9

higher prepayments. As such, MSR cash flows and fair value provide a natural hedge to originations, as origination volumes tend to decline in rising interest rate environments and increase in declining interest rate environments.

We currently retain the majority of the MSRs associated with our production, but we have, and intend to continue to opportunistically sell MSRs depending on business and liquidity considerations. We believe that this approach has provided us funding flexibility, and reduced legacy MSR asset exposure. When we sell MSRs, we typically sell them in the bulk MSR secondary market. We currently utilize one sub-servicer to service the loans for which we have retained servicing rights. Our in-house servicing team is responsible for monitoring our sub-servicer. Their goal is to ensure a high level of borrower satisfaction and to support the relationships between those borrowers and our clients. Our in-house servicing team performs daily, monthly and quarterly testing to determine performance metrics and ensure agency and regulatory compliance and provides regular updates to our executive leadership team. We contractually obligate our sub-servicer to maintain appropriate licenses where required, maintain its approved servicer status with the applicable agencies and adhere to the applicable agency, investor or credit owner servicing guidelines and requirements in its servicing of mortgage loans for us. We are in the process of building an in-house servicing platform, and currently expect to transition the servicing of substantially all of the loans in our servicing portfolio to this platform by the end of 2026.

Our servicing, quality control, internal audit, vendor relations, and legal and compliance teams perform various reviews of our servicing oversight program and operations. Our servicing team addresses deficiencies with sub-servicers to ensure corrective action and controls are implemented.

*Advance obligations*

As a servicer, we are obligated to service the loans according to the applicable agency, investor or credit owner guidelines and law. These obligations may require that we advance certain funds to securitization trusts and to others in the event that the borrowers are delinquent on their monthly mortgage payments. When a borrower remains delinquent, we may be required to advance principal and interest payments to the securitization trusts on the scheduled remittance date. We may also be required to advance taxes, insurance payments, legal fees, and maintenance and preservation costs with respect to property that is subject to foreclosure proceedings. These advances create a receivable due to us from the securitization trusts and/or borrower, and we recover these funds from the securitization trusts, from the borrower or from the proceeds of the sale of property in foreclosure. We had receivables of $151.6 million and $124.0 million as of December 31, 2025 and December 31, 2024, respectively, which are due to us from the securitization trusts and/or borrowers.

**Competition**

Competition in the residential mortgage loan origination market is intense. Institutions offering to make residential mortgage loans, regardless of the channel, include regional and community banks, thrifts, credit unions, mortgage banks, mortgage brokers, brokerage firms, insurance companies, and other financial institutions.

Some of our competitors may have more name recognition and greater financial and other resources than we have (including access to capital). Other competitors, such as lenders who originate mortgage loans using their own funds, or retail mortgage lenders, may have more operational flexibility in approving loans, may have advantages in soliciting home loans from their clients or have access to capital through deposits at lower costs than our warehouse facilities. Additionally, we arguably operate at a competitive disadvantage in some respects to U.S. federal banks and thrifts and their subsidiaries because they enjoy federal preemption and, as a result, conduct their business under relatively uniform U.S. federal rules and standards and are generally not subject to the laws of the states in which they do business (including state "predatory lending" laws). Unlike our federally chartered competitors, we are generally subject to all state and local laws applicable to lenders in each jurisdiction in which we originate and service loans. To compete effectively, we must have a very high level of operational, technological and managerial expertise, as well as access to capital at a competitive cost.

Competition for mortgage loan originations takes place on various levels, including brand awareness, marketing, convenience, pricing, and range of products offered. We have increased our share of the residential mortgage market over time due to a client-centric, disciplined, centralized approach to origination. In the face of significant changes in the mortgage market, we have maintained our commitment to high credit quality loans. Our focus on technology and process improvements creates a more efficient origination system for both us and our clients. This has been rewarded with strong client service scores, via our NPS, which we believe is a significant competitive advantage.

10

**Government Regulations**

We operate in a heavily regulated industry that is highly focused on consumer protection. Our business is subject to extensive oversight and regulation by federal, state and local government authorities. Both the scope of the laws and regulations and the intensity of the supervision to which we are subject have increased in recent years, initially in response to the financial crisis, and more recently in light of other factors such as technological and market changes. We expect to continue to face regulatory scrutiny as a participant in the mortgage sector.

Our loan origination and loan servicing operations are primarily regulated at the state level by state financial services authorities and administrative agencies, and at the federal level by the CFPB. The CFPB has federal regulatory, supervisory and enforcement authority over the residential mortgage loan origination and servicing industry, including residential mortgage lenders and servicers, such as UWM. Specifically, the CFPB has rulemaking authority with respect to the federal consumer financial services laws applicable to mortgage lenders and servicers. These laws include (i) the Truth-In-Lending Act (TILA), (ii) the Homeowners Protection Act (HPA), (iii) the Real Estate Settlement Procedures Act (RESPA), (iv) the Home Mortgage Disclosure Act (HMDA), and (v) the Fair Debt Collections Practices Act (FDCPA); and the respective implementing regulations of each of these laws. The CFPB's enforcement jurisdiction is broad, and it has the ability to initiate or refer investigations and enforcement actions against mortgage lenders and servicers for violations of applicable consumer financial services laws, including, but not limited to, the Dodd-Frank Act's prohibitions on unfair, deceptive or abusive acts and practices. As part of its enforcement authority, the CFPB can order, among other things, rescission or reformation of contracts, the refund of moneys or the return of real property, restitution, disgorgement or compensation for unjust enrichment, the payment of damages or other monetary relief, public notifications regarding violations, remediation of practices, external compliance monitoring and civil money penalties. Since its inception in 2011, the CFPB has exercised its enforcement jurisdiction aggressively with respect to mortgage industry participants, initiating investigations, entering into consent orders with significant monetary and injunctive relief, and initiating litigation. Often these matters have involved differing theories and interpretations of long-existing laws without first issuing industry guidance or rules. In addition, the CFPB shares jurisdiction with the FTC with respect to (i) the Equal Credit Opportunity Act (ECOA) and its implementing regulation, Regulation B, promulgated by the CFPB pursuant to ECOA, (ii) the Fair Housing Act (FHA) and (iii) the GLBA. Moreover, the U.S. Department of Justice ("DOJ") has authority to enforce ECOA and other fair lending laws alongside these agencies.

We are also subject to the laws, regulations and rules of the fifty states in which we operate and the District of Columbia. These laws, regulations and rules may differ by state and sometimes differ from federal standards, and are sometimes vague and subject to differing interpretations – all of which exposes us to legal and compliance risks.

In addition to the CFPB, we are subject to a variety of regulatory and contractual obligations imposed by credit owners, insurers and guarantors of the mortgages we originate and service including, but not limited to, Fannie Mae, Freddie Mac, Ginnie Mae, FHFA, FHA, VA and USDA. We periodically receive requests from federal, state, and local agencies for records, documents, and information relating to the policies, procedures and practice of our loan servicing, origination and collection activities. The agencies as well as GSEs and Ginnie Mae, and various investors and lenders also subject us to periodic reviews and audits and examinations. We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate.

Our clients, the Independent Mortgage Brokers, are also subject to extensive regulation at the state level by state licensing authorities and administrative agencies. In certain circumstances, we may be alleged to be responsible for the acts and practices of our clients for violations of various federal and state consumer protection and other laws and regulations, including but not limited to (i) RESPA and its implementing regulation, Regulation X, (ii) the Federal Trade Commission Act (FTC Act), the FTC Credit Practices Rules and the FTC Telemarketing Sales Rule, each of which prohibit unfair or deceptive acts or practices and certain related practices; and (iii) the Telephone Consumer Protection Act (TCPA), which restricts telephone solicitations and the use of certain automatic telephone equipment. As a part of our enterprise risk management approach, we monitor our clients' compliance with applicable laws and regulations. We dedicate substantial resources to regulatory compliance while ensuring that we meet the needs and expectations of our clients.

With the second term of the Trump Administration, a level of heightened uncertainty exists with respect to the future of the CFPB, including its leadership. However, the CFPB has signaled it intends to maintain a level of ongoing oversight and enforcement. Notably, the CFPB has indicated that it is considering new rule making in several areas that could impact our business, with a particular focus on mortgage origination and mortgage servicing. There can be no assurance of the timing, substance or impact of these potential substantive regulations, how they will affect our costs of compliance or whether they will conflict with the obligations of our state-level licenses, which may increase the complexity and costs of our compliance programs. Further, state regulators and state Attorneys General continue to be active in examining, investigating and enforcing

11

federal and state real estate, mortgage and consumer protection laws, at times advancing conflicting interpretations of the laws they ostensibly seek to administer.

**Cyclicality and Seasonality**

The demand for loan originations is affected by consumer demand for home loans and the market for buying, selling, financing or re-financing residential real estate, which is primarily driven by interest rates and employment levels. Interest rates and employment levels are, in turn, affected by the national economy, regional trends, property valuations, and socio-economic trends, and by state and federal regulations and programs which may encourage or discourage certain real estate trends.

**Talent Management**

We are more than just a mortgage company, we are a team of focused professionals making dreams come true for hopeful homebuyers across the country. We have created a culture that celebrates team spirit and an environment where work-life balance is more than lip-service.

*Team Members*

Our team members are the secret to our success, and we believe our team is only as strong as we make it. As of December 31, 2025, we had approximately 9,100 team members, substantially all of whom are based in our corporate campus in Pontiac, Michigan. We celebrate our team members and all of their accomplishments through various events throughout the year. From our annual company-wide family fair with thousands of smiling faces to the annual holiday party, we believe that it is important to focus on the health and happiness of our team members and their families.

We provide a combination of health and retirement benefits to our eligible team members, including, but not limited to, coverage for medical care, vision, dental, life insurance, disability, 401(k) and paid time off. Our campus also offers team members easy ways to manage their health and welfare with a full-size indoor basketball court, an outdoor sand volleyball court, a large, state-of-the-art fitness center with a variety of fitness classes, a game room, featuring arcade games and table tennis, a primary care doctor's office, physical therapy studio, chiropractor and a full-time massage therapist.

We believe this commitment to our team members is why we have been recognized again in 2025 for being a top workplace in the financial services industry. In a 2025 employee engagement survey, 97% of team members responded that they felt they belonged at UWM from a diversity and inclusion standpoint.

We strive to foster a culture of diversity and inclusion so that all team members feel respected and no team member feels discriminated against. Our diverse, inclusive culture was built to promote positive attitudes, strong work ethics and individual authenticity. We believe a diverse workforce fosters innovation and cultivates an environment of unique perspectives. As of December 31, 2025, approximately 43% of our team members were female and 40% of our team members that choose to identify their ethnicity identified as ethnically diverse.

Continuous improvement is a primary focus of our strategic plan and one of our core pillars. We believe personal and professional growth accelerates careers while promoting productivity and innovation. We heavily invest in the development of each team member. We have approximately 240 training team members dedicated to providing our new hires and existing team members with the trainings and resources necessary to pursue their career paths and ensure compliance with our policies. In 2025, approximately 1.0 million training hours were delivered to team members. We are dedicated to increasing team member engagement by strategically aligning talent within UWM as well as ensuring that our team members have clear pathways to advance their careers within UWM.

*Community Outreach*

We recognize that our team members are part of the greater community in which they live and work and we are committed to giving back and making a positive impact on these communities around us and supporting our team members in their efforts to do the same. We believe in providing our team members the opportunity to do a lot of good and support the causes they care about. Team members receive paid-time off that they can use to specifically volunteer. We and our team members partner with charities such as Adopt-A-Family, Breast Cancer Awareness and the American Red Cross, and sponsor local backpack, bike and coat drives to provide opportunities to give back. Our unique Pay It Forward program allows everyone the chance to earn points that direct where our Company charity dollars are spent — ensuring that even small gestures can be turned into generous contributions, and the opportunity to choose where our charitable dollars go.

**Available Information**

Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements and amendments to those reports filed with or furnished to the SEC pursuant to Section 13(a) or 15(d) of the Exchange Act are available free of charge through the investor relations section of our website at www.uwm.com as soon as reasonably practicable after electronically filing such material with the SEC. The SEC maintains an internet site that contains reports, proxy and information statements and other information regarding our filings at www.sec.gov. The above references to our website and the SEC's website do not constitute incorporation by reference of the information contained on those websites and should not be considered part of this Annual Report.

**Item 1A. Risk Factors**

*You should carefully review and consider the following risk factors and the other information contained in this Annual Report, including the financial statements and notes to the financial statements included herein. The following risk factors apply to our business and operations. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances, may have an adverse effect on our business, cash flows, financial condition and results of operations. You should also carefully consider the following risk factors in addition to the other information included in this Annual Report, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements; Risk Factor Summary." We may face additional risks and uncertainties that are not presently known to us, or that we currently deem immaterial, which may also impair our business or financial condition.*

**Risks Related to Our Business**

***Our loan origination volume is highly dependent on macroeconomic and U.S. residential real estate market conditions which is outside of our control.***

Our financial results are highly dependent on the size of the overall loan origination market, which depends largely on macroeconomic conditions outside of our control. Our purchase volume is driven by consumers ability and willingness to purchase a new home, whether for the first time or as a move from their current home, while our refinance volume is driven by consumers being able and willing to refinance their home into a new, typically lower interest rate, mortgage. Purchase volume is highly dependent on the health of the U.S. residential real estate industry, which is seasonal, cyclical, and affected by changes in general economic conditions. Specifically, higher mortgage rates have, and may continue to adversely affect demand for new mortgage originations because existing homebuyers are hesitant to move and give up their current low interest rate loan and the higher cost of home ownership adversely impacts move-up or new homebuyers. In addition, other economic factors, such as slow economic growth or inflationary conditions, the pace of home price appreciation or the lack thereof, changes in household debt levels, and increased unemployment, stagnant or declining wages or decreased purchasing power due to inflation, consumer debt levels, and consumer confidence, affect borrowers' ability and willingness to purchase new homes and therefore reduce demand for purchase mortgages. Similarly, refinance mortgage volume is principally driven by mortgage rates, which in turn are influenced by interest rates, and the ability and willingness of homeowners to refinance their current mortgages. Generally, the refinance market experiences more significant fluctuations than the purchase market as a result of interest rate changes. With higher interest rates, refinancing activity declines as fewer consumers are interested in refinancing their mortgages. At present, a substantial percentage of outstanding mortgage loans have fixed interest rates significantly below current market interest rates. Although the Federal Reserve continued reducing overnight interest rates during 2025, these actions have not yet had a material impact on reducing mortgage rates. In addition, it is unclear how governmental actions or the threats of certain actions, such as tariffs, reductions of governmental employees and governmental spending, tax reform, and actions taken to address the debt ceiling, will impact the U.S. economy and the residential real estate market. Any uncertainty or deterioration in market conditions that leads to a decrease in loan originations would likely have an adverse effect on our revenue and profitability. Lower loan origination volumes in the industry also generally place downward pressure on margins, thus compounding the effect of the deteriorating market conditions.

***Volatility from changes in prevailing interest rates can adversely affect the value of our MSR portfolio and servicing revenue and changes in the value, or inaccuracies in the estimates of their value, could adversely affect our financial condition and liquidity.***

Fluctuations in interest rates are a key driver of the performance of our servicing portfolio, particularly because our portfolio includes MSRs, the values of which are highly sensitive to changes in interest rates. The value of our MSRs is based on the cash flows projected to result from the right to service of the related mortgage loans and continually fluctuates due to a

13

number of factors, such as prepayment speeds, costs to service the loan and other market conditions. The primary factor driving the value of MSRs is interest rates, which impact the likelihood of loan prepayments through refinancing and estimated float earnings on custodial deposits. Historically, the value of MSRs has increased when interest rates rise, as higher interest rates lead to decreased prepayment rates and higher float earnings, and the value of MSRs has decreased when interest rates decline as lower interest rates lead to increased prepayment rates and lower float earnings. In addition, increased prepayment rates may lead to increased asset decay and a decrease in servicing revenue. Available borrowings, as well as mandatory curtailments, under our MSR financing facilities are based on the fair value of the underlying collateral. Accordingly, decreases in MSR values could decrease the available borrowing capacity under these facilities, or require mandatory repayments of outstanding borrowings on these facilities, which could adversely affect our financial condition and liquidity.

*We face intense competition that could adversely affect our business.*

Competition in the mortgage lending space is intense and could become even more competitive as a result of economic, political, legislative, regulatory, and technological changes. As we depend solely on third parties to deliver us mortgage loans, we may, in certain market conditions, be at a competitive disadvantage to financial institutions or direct-to-consumer mortgage lenders that market to, and have a direct relationship with, the borrower. In addition, some of our competitors may have greater financial and other resources than we have (including access to capital) and may have locked in lower cost of funds which can provide a competitive advantage. Our other competitors, such as financial institutions who originate mortgage loans using their own funds, may have more flexibility in holding loans. Additionally, we arguably operate at a competitive disadvantage to U.S. federal banks and thrifts and their subsidiaries because they enjoy federal preemption and, as a result, conduct their business under relatively uniform U.S. federal rules and standards and are generally not subject to the laws of the states in which they do business (including state "predatory lending" laws). Unlike our federally chartered competitors, we are generally subject to all state and local laws applicable to lenders in each jurisdiction in which we originate and service loans. To compete effectively, we must have a very high level of operational, technological and managerial expertise, as well as access to capital at a competitive cost.

Competition in our industry can take many forms, including the variety of loan programs being made available, interest rates and fees charged for a loan, convenience in obtaining a loan, client service levels, the amount and term of a loan, as well as access to marketing and distribution channels, including Independent Mortgage Brokers that generate mortgage loan applications. Claims of collusion and other anti-competitive conduct have also become more common, and many financial institutions and lenders have been the subject of legal claims by regulatory agencies and consumers. As the largest residential mortgage lender in the country, we have been, and may in the future be accused of anti-competitive actions. Such litigation, even if it is without merit, would cause us to incur costs, fines and legal expenses in connection with these matters, regardless of any eventual ruling in our favor, and could also harm the reputation of our brand, any of which could have a materially adverse effect on our business, financial condition or results of operations.

*Our business is highly dependent on Fannie Mae and Freddie Mac and certain U.S. government agencies, and any changes in these entities or their current roles could be detrimental to our business.*

We primarily originate loans eligible for sale to Fannie Mae and Freddie Mac, and government insured or guaranteed loans, such as the FHA, the VA and the USDA, which are eligible for Ginnie Mae securities issuance. If we lose approvals with these agencies or our relationships with these agencies is otherwise adversely affected, we would need to seek alternative secondary market participants to acquire our mortgage loans at a volume sufficient to sustain our business. In addition, we also derive other material financial benefits from these relationships, including the assumption of credit risk on securitized loans in exchange for the payment of guarantee fees and the ability to avoid certain loan inventory finance costs through streamlined loan funding and sale procedures. If such participants are not available or not available on reasonably comparable economic terms, the above changes could have a material effect on our ability to profitably sell loans we originate that are securitized through Fannie Mae, Freddie Mac or Ginnie Mae.

If the role of the GSEs and governmental agencies in the mortgage industry is materially changed or curtailed, it could adversely affect our future operations. In 2008, the Federal Housing Finance Agency ("FHFA") placed Fannie Mae and Freddie Mac into conservatorship and these two GSEs are currently controlled by the FHFA. These two GSEs create financial products that support the mortgage market, reduce risks for investors and may influence mortgage rates in the U.S. In connection with the recent change in the federal government administration, there has been discussion regarding the privatization of these GSEs and it is unclear the impact, if any, that such privatization would have on mortgage rates and the mortgage market in general. Any proposed regulatory reform or funding changes could affect the other governmental agencies that support the mortgage industry, such as FHA, HUD, VA or USDA, and if such regulatory reforms, funding limitations or program discontinuations could affect the availability of these programs, the cost and availability of mortgage loans, the MBS market or the housing

14

market in general. As the extent and timing of any proposed regulatory or funding reform regarding the GSEs and the U.S. housing finance market are uncertain, we cannot anticipate the impact, if any, that it would have on our business operations and financial results.

***Changes in the GSEs, FHA, VA, and USDA guidelines or GSE and Ginnie Mae guarantees could adversely affect our business.***

We are required to follow specific guidelines and eligibility standards that impact the way we originate and service GSE and U.S. government agency loans, including guidelines and standards with respect to:

- eligible borrowers;

- credit standards for mortgage loans;

- our staffing levels and other servicing practices;

- the servicing and ancillary fees that we may charge;

- our modification standards and procedures;

- the amount of reimbursable and non-reimbursable advances that we may make; and

- the types of loan products that are eligible for sale or securitization.

These guidelines provide the GSEs and other government agencies with the ability to provide monetary incentives for loan servicers that perform well and to assess penalties for those that do not. At the direction of the FHFA, Fannie Mae and Freddie Mac have aligned their guidelines for servicing delinquent mortgages, which could result in monetary incentives for servicers that perform well, and which may also result in assessing compensatory penalties against servicers in connection with the failure to meet specified timelines relating to delinquent loans and foreclosure proceedings, and other breaches of servicing obligations. We generally cannot negotiate these terms with the agencies and they are subject to change at any time without our specific consent. A significant change in these guidelines, that decreases the fees we charge or requires us to expend additional resources to provide mortgage services, could decrease our revenues or increase our costs. Further changes in GSE or agency guidelines regarding non-citizen borrower eligibility could reduce the pool of eligible borrowers for whom we are able to originate loans, require modifications to our origination and compliance procedures, or expose us to regulatory risk if our practices are found to be inconsistent with applicable requirements.

In addition, changes in the nature or extent of the guarantees provided by Fannie Mae, Freddie Mac, Ginnie Mae, the USDA or the VA, or the insurance provided by the FHA, or coverage provided by private mortgage insurers, could also have broad adverse market implications. Any future increases in guarantee fees or changes to their structure or increases in the premiums borrowers are required to pay to the FHA or private mortgage insurers for insurance or to the VA or the USDA for guarantees could increase mortgage origination costs. These industry changes could negatively affect demand for our mortgage services and consequently our origination volume, which could be detrimental to our business.

***If the mortgage loans originated and sold by us do not comply with the guidelines established by the GSEs, Ginnie Mae or private investors to whom they are sold, we are required to repurchase or substitute these loans or indemnify for related losses.***

Substantially all of our mortgage loans are sold to GSEs, insured by FHA or VA and sold into Ginnie Mae securities or sold to private investors. In connection with such sales and insuring, we make representations and warranties to the GSE, FHA or VA or the private investor that the mortgage loans conform to their respective standards. These standards include, among other items, adherence to origination guidelines and compliance with applicable federal, state and local laws and regulations, underwriting in conformity with the applicable guidelines, and conformity with guidelines relating to, appraisals, insurance and legal documents generally. In addition, we are contractually obligated, in certain circumstances, to refund to the purchasers certain premiums paid to us on the sale if the mortgagor prepays the loan within a specified period of time.

If a mortgage loan does not comply with the representations and warranties that we made with respect to it at the time of our sale or insuring, we are required to repurchase the loan, replace it with a substitute loan and/or indemnify the applicable agency for losses. In the case of repurchases, we typically repurchase such loan and resell it into a non-conforming market at a discount from the repurchase price. As of December 31, 2025, we had accrued a $102.3 million reserve for repurchase and indemnification obligations. Actual repurchase and indemnification obligations could materially exceed the reserves recorded in our consolidated financial statements. Any significant repurchases, substitutions, indemnifications or premium recapture could be detrimental to our business and financial condition.

15

***Our business is dependent on our ability to maintain and expand our relationships with our clients, the Independent Mortgage Brokers.***

Our clients are the Independent Mortgage Brokers who refer us mortgage loans to originate. Consequently, our results of operations are dependent, in large part, on our ability to maintain and expand our relationships with Independent Mortgage Brokers. If we are unable to attract Independent Mortgage Brokers to join our network and to provide a level of service such that our clients remain with the network or refer a greater number of their mortgage loans to us, our ability to originate loans will be significantly impaired. The willingness of Independent Mortgage Brokers to originate mortgage loans with us is dependent on (i) the rates that we are able to offer our clients' borrowers for mortgage loans, (ii) our customer service, and (iii) compensation. In determining with whom to partner, Independent Mortgage Brokers are also focused on the technological services and platforms we can provide so that the Independent Mortgage Brokers can best attract and serve consumers. If our clients are dissatisfied with our services or platform or technological capabilities, or they cannot offer prospective borrowers competitive rates, we could lose a number of clients which would have a negative impact on our business, operating results and financial condition. Moreover, if economic conditions, regulation or other changes materially impact the ability of Independent Mortgage Brokers to continue to operate, it could be detrimental to our business.

***Our acquisition of Two Harbors may not be consummated and we may incur significant time and expenses to consummate this strategic acquisition.***

The closing of the merger (the "Merger") with Two Harbors Investment Corp. ("Two Harbors") is contingent upon a number of customary closing conditions, some of which are beyond our control. For example, the Merger is subject to regulatory clearances from governmental authorities, including those under the Hart-Scott-Rodino Act. Therefore, we are unable to accurately predict when, or if, the Merger will close. If we are unable to close the Merger for any reason, we will not realize the potential benefits of the Merger which result in a material adverse effect on our business. In addition, we can provide no assurance that any required regulatory approval will not contain material condition or restrictions. There also can be no assurance as to the cost, scope or impact on our business, results of operations, financial condition or prospects of the actions that may be required in order to obtain the necessary regulatory approvals.

We expect to incur a significant amount of non-recurring expenses in connection with the Merger, including legal, accounting, integration and other expenses. The amounts of these expenses will be based on a variety of factors but may be material individually or in aggregate. Many of these expenses are payable by us whether or not the Merger is completed. Our management is also devoting a significant proportion of their time and resources to consummate the Merger, however, there can be no assurance that such activities will result in the consummation of this transaction.

In the event that any of these closing conditions are not satisfied, we may not be able to consummate the Merger, despite the cost and time involved in pursuing this strategic acquisition.

***We may fail to realize all of the anticipated benefits of the Merger, or those benefits may take longer to realize than expected.***

We believe that there are significant benefits and synergies that may be realized through leveraging the processes and scale of UWMC and Two Harbors. However, the efforts to realize these benefits and synergies will be a complex process and may disrupt our existing operations if not implemented in a timely and efficient manner. The full benefits of the Merger, including the anticipated growth opportunities, may not be realized as expected or may not be achieved within the anticipated time frame, or at all. Failure to achieve the anticipated benefits of the Merger could adversely affect our results of operations, financial position or cash flows, cause dilution to our earnings per share, decrease or delay any accretive effect of the Merger and negatively impact the price of our Class A common stock.

Following completion of the Merger, our success will depend, in part, on our ability to manage the expansion, which poses numerous risks and uncertainties, including the need to integrate the operations and business of Two Harbors into our existing business in an efficient and timely manner, to combine systems and management controls and to integrate relationships with industry contacts and business partners.

We will be required to devote significant attention and resources prior to the closing of the Merger to prepare for the post-closing integration and operations. In addition, we will be required to devote significant attention and resources post-closing to successfully align our business practices and operations with Two Harbors. This process may disrupt our business and, if ineffective, would limit the anticipated benefits of the Merger.

16

*Our transition to in-house servicing operations for our MSR portfolio and the commencement of serving as a subservicer for third party owned MSRs may expose us to new and additional risks.*

As previously disclosed, we have begun transitioning mortgage servicing operations in-house, and we will soon begin directly servicing a portion of the mortgage loans underlying our MSRs as well as mortgage loans underlying MSRs owned by third parties in connection with the Merger. We have not previously directly conducted mortgage servicing operations, instead relying on entities whose primary business was the servicing of mortgage loans. We have less experience in directly managing the risks associated with servicing including regulatory compliance and meeting the processing times and quality standards established by GSEs and Ginnie Mae and expected by borrowers.

If we are unable to (i) manage these new risks, (ii) retain experienced personnel, (iii) successfully integrate these operations and technologies into our operations and technologies or (iv) expand servicing operations to support our MSR portfolio, our ability to recognize the anticipated benefits of the merger with Two Harbors may be adversely impacted. Furthermore, our ability to attract and retain customers and deliver anticipated growth is highly dependent upon the external perceptions of our quality and responsiveness of our service, trustworthiness, business practices, financial condition and other subjective qualities. If we are unable to maintain our high level of service during the implementation and expansion of the new in-house servicing operations, it could damage our reputation among our Independent Mortgage Brokers and existing and potential customers. In turn, this could decrease the demand for our loans, increase regulatory scrutiny and detrimentally effect our business.

*All of our mortgage loans are initiated by third parties, which exposes us to business, competitive and underwriting risks.*

As a Wholesale Mortgage Lender, we market and originate mortgage loans exclusively through independent third-parties, comprised of Independent Mortgage Brokers. While we believe using Independent Mortgage Brokers best serves mortgage consumers, our reliance on third parties presents risks and challenges, including the following:

- Our business depends in large part on the marketing efforts of our clients and on our ability to offer loan products and services that meet the requirements of our clients and their borrowers. However, loan officers are not obligated to sell or promote our products and many sell or promote competitors' loan products in addition to our products. Some of our competitors may have higher financial strength ratings, may offer a larger variety of products, and/or may offer higher incentives than we do. Therefore, we may not be able to continue to attract and retain clients to originate loans for us. The failure or inability of our clients to successfully market our mortgage products to prospective borrowers could, in turn, have a material adverse impact on our business, financial condition and results of operations.

- Communication with prospective borrowers is primarily made through loan officers employed by third parties. Consequently, we rely on our clients and their loan officers to provide us accurate information on behalf of borrowers, including financial statements and other financial information, for us to use in deciding whether to approve loans. If any of this information is intentionally or negligently misrepresented and such misrepresentation is not detected prior to loan funding, the fair value of the loan may be significantly lower than expected. Whether a misrepresentation is made by the borrower, the loan officer or one of our team members, we generally bear the risk of loss associated with the misrepresentation. Our controls and processes may not have detected or may not detect all misrepresented information in our loan originations. Likewise, our clients may also lack sufficient controls and processes. Any such misrepresented information could have a material adverse effect on our business and results of operations.

- Some borrowers do not differentiate between their loan officer (or the employer of the loan officer) and their mortgage lender, therefore (i) developing brand recognition can be challenging and requires us to coordinate with our clients and (ii) poor customer service, customer complaints or negative word-of-mouth or publicity resulting from the performance of our clients could severely diminish consumer confidence in and use of our services. To maintain good customer relations, we must ensure that our clients provide prompt, accurate and differentiated customer service. Effective customer service requires significant personnel expense and investment in developing programs and technology infrastructure to help our clients carry out their functions. These expenses, if not managed properly, could significantly impact our profitability. Failure to properly manage our clients could compromise our ability to handle customer complaints effectively. If we do not handle borrower complaints effectively, our reputation and brand may suffer and we may lose our borrowers' confidence which could have a material adverse impact on our results of operations and profitability.

17

- Growth in our market share is principally dependent on growth in the market share controlled by the wholesale channel. Continued advancements or the perception of efficiency in "direct-to-the-consumer" distribution models may impact the overall market share controlled by our clients and make it more difficult for us to grow, or require us to establish relationships with more clients.

***Our products rely on software and services from third-party vendors and if any of these services became unavailable or unreliable, it could adversely affect the quality and timeliness of our mortgage origination process.***

In addition to our proprietary software, we license third-party software and depend on services from various third parties for use in our products. For example, we rely on third-party vendors for our online mortgage application services, to generate the documents required for closing the mortgage, to generate flood certifications, to confirm employment, and to facilitate appraisal services for borrowers. While there are other providers of these services in the market, any loss of the right to use any of the software or services could result in decreased functionality of our products until equivalent technology is either developed by us or, if available from another provider, is identified, obtained and integrated, which could adversely affect our reputation and our future financial condition and results of operations.

Additionally, we will rely on third-party software in our new in-house servicing operations. For example, in 2025 we made a strategic investment in BILT Technologies, Inc. ("BILT"), which provides us with strategic opportunities for broker loyalty and borrower engagement services as we continue to transition servicing in-house. BILT will act as an important component of our new servicing operations and any loss of the right to use the BILT platform or failure in BILT's software or programming could adversely affect our servicing operations.

Furthermore, we remain responsible for ensuring our loans are originated in compliance with applicable laws. Despite our efforts to monitor such compliance, any errors or failures of such third-party vendors or their software to perform in the manner intended could result in loan defects potentially requiring repurchase or incurring costs to respond to alleged regulatory violations. In addition, any errors or defects in or failures of the other software or services we rely on, whether maintained by us or by third parties, could result in errors or defects in our products or cause our products to fail, which could adversely affect our business and be costly to correct. Many of our third-party vendors attempt to impose limitations on their liability for such errors, defects or failures, and if enforceable, we may have additional liability to our clients, borrowers or other third parties that could harm our reputation and increase our operating costs. Any failure to do so could adversely affect our ability to deliver effective products to our clients, borrowers and loan applicants and adversely affect our business.

***The conduct of the Independent Mortgage Brokers through whom we originate mortgage loans could subject us to fines or other penalties.***

We depend exclusively on Independent Mortgage Brokers for our loan originations. These clients are subject to parallel and separate legal obligations. While these laws may not explicitly hold the originating lenders responsible for the legal violations of such entities, U.S. federal and state agencies increasingly have sought to impose such liability. For example, the DOJ, through its use of a disparate impact theory under the Fair Housing Act, has held originating lenders responsible for the pricing practices of third parties, alleging that the lender is directly responsible for the total fees and charges paid by the borrower even if the lender neither dictated what the third party could charge nor kept the money for its own account. See "—*Regulatory agencies and consumer advocacy groups are asserting claims that the practices of lenders and loan servicers violate anti-discrimination laws.*" In the past few years, there were a number of actions brought by the DOJ and other federal and state agencies under ECOA that allege that lenders have engaged in "redlining" by engaging in acts or practices directed at discouraging potential loan applicants from seeking financing. Even though we do not market directly to consumers, the failure or inability of our clients and their loan officers to attract certain classes of borrowers could result in actions being brought against us. In addition, under the TILA-RESPA Integrated Disclosure ("TRID") rule, we may be held responsible for improper disclosures made to borrowers by our clients. While we seek to use technology, such as our LOS, to monitor whether these clients and their loan officers are complying with their obligations, our ability to ensure the Independent Mortgage Brokers who refer loans to us remain compliant across their operations is extremely limited. Consequently, we may be subject to claims for fines or other penalties based upon the conduct of our clients and their loan officers with whom we do business, which could have a material effect on our operating results and financial condition.

***The mortgage industry can be very cyclical, with loan origination volumes varying materially based on macroeconomic conditions. If we are unable to effectively manage our team members during periods of volatility, it could adversely affect our current business operations and our growth.***

18

The mortgage industry can be very cyclical, with loan origination volumes varying materially based largely on macroeconomic conditions. Our ability to effectively manage significant increases and decreases in loan origination volume will depend on our ability to hire, integrate, train and retain highly-qualified personnel for all areas of our organization during these periods of changing volume. Any talent acquisition and retention challenges or mismanagement of our personnel needs in these situations could reduce our operating efficiency, increase our costs of operations and harm our overall financial condition. As the pool of qualified candidates has continued to be limited and there continues to be significant competition for talent, we may face challenges in hiring and retaining highly qualified personnel in changing environments. Additionally, we invest heavily in training our team members, which increases their value to competitors who may seek to recruit them. If we do not effectively manage our pool of team members in times of volatility, it could disrupt our business operations and have a negative impact on our long-term growth.

The Presidential Administration continues to make significant changes to the structure and activities of the federal government. The Administration has indicated a desire to swiftly implement an "affordability agenda" meant to counter inflation, make daily expenditures more accessible for consumers and address the cost of homeownership. The scope, timing, and substance of these efforts remain unclear and are subject to change. For example, the Federal Reserve has announced that it wants to make mortgage originations cheaper and more appealing to banks by removing the requirement to deduct mortgage servicing assets from regulatory capital. To the extent that these changes are not successful or increase costs on us or the Independent Mortgage Brokers who partner with us, they could have an adverse effect on our growth.

***We may not be able to detect or prevent cyberattacks and other data and security breaches, which could adversely affect our business and subject us to liability to third parties.***

We are dependent on information technology networks and systems, particularly for our loan origination systems and other technology-driven platforms, designed to provide best-in-class service and experience for clients and to ensure adherence to regulatory compliance, operational governance, training and security. In the ordinary course of our business, we receive, process, retain and transmit proprietary information and sensitive or confidential data, including the public and non-public personal information of our team members, clients and loan applicants. Despite devoting significant time and resources to ensure the integrity of our information technology systems, we have not always been able to, and may not be able to in the future, anticipate or implement effective preventive measures against all security breaches or unauthorized access of our information technology systems or the information technology systems of third-party vendors that receive, process, retain and transmit electronic information on our behalf.

Cybersecurity risks for lenders have significantly increased in recent years, in part, because of the proliferation of new technologies, the use of the internet and telecommunications technologies to conduct financial transactions, and the increased sophistication and activities of computer hackers, organized crime, terrorists, and other external parties, including foreign state actors. Additionally, the evolution and increased adoption and widespread availability of new AI technologies may increase our cybersecurity risks, including the potential ability to bypass encryption protections. We, our clients, borrowers and loan applicants, regulators and other third parties have been subject to, and are likely to continue to be the target of, cyberattacks and other security breaches. Security breaches, cyberattacks such as computer viruses, malicious or destructive code, phishing attacks, denial of service or information, acts of vandalism, natural disasters, fire, power loss, telecommunication failures, team member misconduct, human error and developments in computer intrusion capabilities could result in a compromise or breach of the technology that we or our third-party vendors use to collect, process, retain, transmit and protect the personal information and transaction data of our team members, clients, borrowers and loan applicants. Similar events outside of our control can also affect the demands we and our vendors may make to respond to any security breaches or similar disruptive events.

We invest in industry-standard security technologies designed to protect our data and business processes against risk of data security breaches and cyberattacks. Our data security management program includes identity, trust, vulnerability and threat management business processes as well as the adoption of standard data protection policies. We measure our data security effectiveness through industry-accepted methods and remediate significant findings. The technologies and other controls and processes designed to secure our team member, client, borrower and loan applicant information and to prevent, detect and remedy any unauthorized access to that information were designed to obtain reasonable, but not absolute, assurance that such information is secure and that any unauthorized access is identified and addressed appropriately. Such controls may have not always prevented or detected, and may in the future fail to prevent or detect, unauthorized access to our team member, client, borrower and loan applicant information.

The techniques used to obtain unauthorized, improper or illegal access to our systems and those of our third-party vendors, our data, our team members', clients', borrowers' and loan applicants' data or to disable, degrade or sabotage service are constantly evolving, and have become increasingly complex and sophisticated. Furthermore, such techniques change frequently and are often not recognized or detected until after they have been launched. Therefore, we may be unable to

anticipate these techniques and may not become aware of such a security breach in a timely manner, which could exacerbate any damage we experience. Security attacks can originate from a wide variety of sources, including third parties such as computer hackers, persons involved with organized crime or associated with external service providers, or foreign state or foreign state-supported actors. Those parties may also attempt to fraudulently induce team members, clients, borrowers and loan applicants or other users of our systems to disclose sensitive information in order to gain access to our data or that of our team members, clients, borrowers and loan applicants. Our failure to detect or prevent a cyberattack or other data or security breach could adversely affect our business.

The occurrence of any of the foregoing events could subject us to increased costs, litigation, disputes, damages, and other liabilities. In addition, the foregoing events could result in violations of applicable privacy and other laws. If this information is inappropriately accessed and used by a third party or a team member for illegal purposes, such as identity theft, we may be responsible to the affected individuals for any losses they may have incurred as a result of such misappropriation. In such an instance, we may also be subject to regulatory action, investigation or liability to a governmental authority for fines or penalties associated with a lapse in the integrity and security of our team members', clients', borrowers' and loan applicants' information. We may be required to expend significant capital and other resources to protect against and remedy any potential or existing security breaches and their consequences. In addition, our remediation efforts may not be successful and we may not have adequate insurance to cover these losses. Furthermore, any publicized security problems affecting our businesses and/or those of such third parties may negatively impact the market perception of our products and discourage clients or borrowers from doing business with us.

***Technology disruptions or failures, including a failure in our operational or security systems or infrastructure, or those of third parties with whom we do business, could disrupt our business, cause legal or reputational harm and adversely impact our results of operations and financial condition.***

We are dependent on the secure, efficient, and uninterrupted operation of our technology infrastructure, including computer systems, related software applications and data centers, as well as those of certain third parties and affiliates. Our websites and computer/telecommunication networks must accommodate a high volume of traffic and deliver frequently updated information, the accuracy and timeliness of which is critical to our business. Our technology must be able to facilitate a loan application experience that equals or exceeds the experience provided by our competitors. We have or may in the future experience service disruptions and failures caused by system or software failure, fire, power loss, telecommunications failures, team member misconduct, human error, computer hackers, computer viruses and disabling devices, malicious or destructive code, denial of service or information, as well as natural disasters, health pandemics and other similar events and our disaster recovery planning may not be sufficient for all situations. The implementation of technology changes and upgrades to maintain current and integrate new technology systems, such as AI, may also cause service interruptions. Any such disruption could interrupt or delay our ability to provide services to our clients and could also impair the ability of third parties to provide critical services to our business.

Additionally, the technology and other controls and processes we have created to help us identify misrepresented information in our loan origination operations were designed to obtain reasonable, not absolute, assurance that such information is identified and addressed appropriately. Accordingly, such controls may not have detected, and may fail in the future to detect, all misrepresented information in our loan origination operations. If our operations are disrupted or otherwise negatively affected by a technology disruption or failure, this could result in client dissatisfaction and damage to our reputation and brand, and have a material impact on our business.

***The development, proliferation and use of AI could give rise to legal and/or regulatory action, damage our reputation or otherwise materially harm our business.***

We believe the development and proliferation of AI will have a significant impact in our industry; however, the incipient nature of AI presents risks, challenges, and unintended consequences, including potential defects in the design and development of the technologies used to automate processes, misapplication of technologies, the reliance on data, rules or assumptions that may prove inadequate, information security vulnerabilities and failure to meet customer expectations, among others. For example, the use of AI algorithms may raise ethical concerns and legal issues due to perceived or actual unintentional bias in the processing and servicing of mortgage loans. While we aim to develop and use AI responsibly, we may be unsuccessful in identifying or resolving issues before they arise. AI-related issues, including potential government regulation of AI, deficiencies or failures could give rise to legal and regulatory actions, damage our reputation or otherwise materially impact our business, financial condition, and liquidity. Further, it is possible that AI could meaningfully impact the labor market, unemployment rates and consumer savings, which in turn could negatively impact our business or our prospects for future growth.

20

Laws and regulations related to AI are evolving, and there is uncertainty as to potential adoption of new laws and regulations that may restrict or impose burdensome and costly requirements on our ability to use AI. We may receive claims from third parties, including our competitors, alleging that the use of AI technology infringes on or violates such third party's intellectual property rights. Adverse consequences of these risks related to AI could undermine the decisions, predictions or analyses such technologies produce and subject us to competitive harm, legal liability, heightened regulatory scrutiny and brand or reputational harm.

We may face significant competition in the market and may be unable to develop and implement AI at the same rate to keep pace with our competitors.

***We could be adversely affected if we do not adequately obtain, maintain, protect and enforce our intellectual property and proprietary rights and may encounter disputes from time to time relating to our use of the intellectual property of third parties.***

Our proprietary technology platforms and other proprietary rights are important to our success and our competitive position. We rely on intellectual property to protect our proprietary rights. Despite these measures, third parties may attempt to disclose, obtain, copy or use intellectual property rights owned or licensed by us and these measures may not prevent misappropriation, infringement, reverse engineering or other violation of intellectual property or proprietary rights owned or licensed by us. Furthermore, confidentiality procedures and contractual provisions can be difficult to enforce and, even if successfully enforced, may not be entirely effective. In addition, we cannot guarantee that we have entered into confidentiality agreements with all team members, partners, independent contractors or consultants that have or may have had access to our trade secrets and other proprietary information. Any issued or registered intellectual property rights owned by or licensed to us may be challenged, invalidated, held unenforceable or circumvented in litigation or other proceedings, and such intellectual property rights may be lost or no longer provide us with meaningful competitive advantages. Third parties may also independently develop products, services and technology similar to or duplicative of our products and services.

Our success and ability to compete also depends in part on our ability to operate without infringing, misappropriating or otherwise violating the intellectual property or proprietary rights of third parties. We may encounter disputes from time to time concerning intellectual property rights of others, including our competitors, and we may not prevail in these disputes. Third parties may raise claims against us alleging an infringement, misappropriation or other violation of their intellectual property rights, including trademarks, copyrights, patents, trade secrets or other intellectual property or proprietary rights. An assertion of an intellectual property infringement, misappropriation or other violation claim against us could result in adverse judgments, settlement on unfavorable terms or cause us to spend significant amounts to defend the claim, even if we ultimately prevail and we may have to pay significant money damages, lose significant revenues, suffer harm to our reputation, be prohibited from using the relevant systems, processes, technologies or other intellectual property, cease offering certain products or services, or incur significant license, royalty or technology development expenses.

***Loss of our key management could result in a material adverse effect on our business.***

Our future success depends to a significant extent on the continued services of our senior management, including Mat Ishbia, our Chairman, President and Chief Executive Officer. The experience of our senior management is a valuable asset to us and would be difficult to replace. The loss of the services of our Chairman, President and Chief Executive Officer or other members of senior management could disrupt and have a detrimental effect on our business.

***We rely on a third party sub-servicer who services all the mortgage loans for which we hold MSRs, and our financial performance may be adversely affected by its inability to adequately perform its servicing functions.***

We contract with a third party sub-servicer for the servicing of the portion of the mortgage loans in our portfolio for which we retain MSRs. Although we use a third-party servicer, we, as master servicer, retain primary responsibility to ensure these loans are serviced in accordance with the contractual and regulatory requirements.

Therefore, the failure of our sub-servicer to adequately perform its servicing obligations may subject us to liability for their improper acts or omissions and adversely affect our financial performance. Specifically, we may be adversely affected:

- if our sub-servicer breaches its servicing obligations or is unable to perform its servicing obligations properly, which may subject us to damages or termination of the servicing rights, and cause us to lose loan servicing income and/or require us to indemnify an investor or securitization trustee against losses as a result of any such breach or failure;

21

- by regulatory actions taken against our sub-servicer, which may adversely affect its licensing and, as a result, its ability to perform their servicing obligations under GSE and U.S. government agency loans which require such licensing;

- by a default by our sub-servicer under its debt agreements, which may impact its access to capital to be able to perform its obligations;

- if our sub-servicer was to face adverse actions from the GSEs or Ginnie Mae due to economic or other circumstances that are difficult to anticipate and is terminated as a servicer under its agreements with the GSEs or Ginnie Mae;

- if as a result of poor performance by our sub-servicer, we experience greater than expected delinquencies and foreclosures on the mortgage loans being serviced, which could lead to liability from third party claims or adversely affect our ability to access the capital and secondary markets for our loan funding requirements;

- if our sub-servicer was the target of a cyberattack or other security breach, resulting in the unauthorized release, misuse, loss or destruction of information related to our current or former borrowers, or material disruption of our or our clients network access or business operations;

- if our sub-servicer becomes subject to bankruptcy proceedings; or

- if our sub-servicer terminates its agreement with us.

We currently rely on one nationally-recognized sub-servicer as we continue to transition servicing in-house. This sub-servicer counterparty concentration subjects us to a potentially greater impact if any of the risks described above were to occur, and any delay in transferring servicing to a new sub-servicer could further adversely affect servicing performance and cause financial losses. Any of these risks could adversely affect our results of operations, including our loan servicing income and the cash flow generated by our MSR portfolio. Any of these risks may be further exacerbated to the extent we materially increase our MSR portfolio in the future.

***We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable in certain circumstances and could have a material adverse effect on our cash flows, business and financial condition.***

During any period in which one of our borrowers is not making payments on a loan we service, we are required under most of our servicing agreements to advance our own funds to meet some combination of contractual principal and interest remittance requirements, pay property taxes and insurance premiums, legal expenses and other protective advances. We also advance funds to maintain, repair and market real estate properties. In certain situations, our contractual obligations may require us to make certain advances for which we may not be reimbursed. In addition, in the event a loan serviced by us defaults or becomes delinquent, or the mortgagee is allowed to enter into a forbearance, the repayment of advances may be delayed, which may adversely affect our liquidity. Any significant increase in required servicing advances or delinquent loan repurchases, could have an adverse impact on our cash flows, even if they are reimbursable.

With delinquent VA guaranteed loans, the VA guarantee may not make us whole on losses or advances we may have made on the loan. In addition, for certain loans sold to Ginnie Mae, we, as the servicer, have the unilateral right to repurchase any individual loan in a Ginnie Mae securitization pool if that loan meets defined criteria, including being delinquent for longer than 90 days. Once we have the unilateral right to repurchase the delinquent loan, we have effectively regained control over the loan and we must recognize the loan on our balance sheet and recognize a corresponding financial liability. Any significant increase in seriously delinquent Ginnie Mae loans could have an adverse impact on our balance sheet, as well as our financial covenants that are based on balance sheet ratios.

Servicers of mortgage loans are often times contractually bound to advance monthly payments to investors, insurers and taxing authorities regardless of whether the borrower actually makes those payments. While Fannie Mae and Freddie Mac issued guidance limiting the number of payments a servicer must advance in the case of a forbearance, we expect that a borrower who has experienced a loss of employment or a reduction of income may not repay the forborne payments at the end of the forbearance period. Approximately 1.62% of our serviced loans were 60+ days delinquent and 0.26% were in forbearance as of December 31, 2025.

Government intervention also occurs periodically as a result of natural disasters or other events that cause widespread borrower harm. Similar challenges and risks to servicers, including us, will likely occur when such events transpire in the future.

22

Table of Contents

***The success and growth of our business will depend upon our ability to be a leader in technological innovation in our industry.***

We operate in an industry experiencing rapid technological change and frequent product introductions. In order to succeed, we must lead our peers in designing, innovating and introducing new technology and product offerings to make the mortgage origination process cheaper, faster and easier. The process of developing new technologies and products is complex, and if we are unable to successfully innovate and continue to deliver a superior client experience, the demand for our products and services may decrease, we may lose market share and our growth and operations may be harmed. We and many of our competitors are beginning to deploy AI and machine learning technology into systems and processes, and our ability to successfully adopt and implement AI and other technological advancements into our processes efficiently and effectively will impact our future competitiveness.

The origination process is increasingly dependent on technology, and our business relies on our continued ability to process loan applications over the internet, accept electronic signatures, provide instant process status updates and other client- and loan applicant-expected conveniences. Our proprietary and exclusively licensed technology is integrated into all steps of the loan origination process, from the original submission, to the underwriting to the closing. Our dedication to incorporating technological advancements into our loan origination and servicing platforms requires significant financial and personnel resources. For example, we have invested, and will continue to invest, significant capital resources on developing, maintaining and improving our proprietary technology platforms, including through the integration of AI into these platforms and processes.

To the extent we are dependent on any particular technology or technological solution, we may be harmed if such technology or technological solution (1) becomes non-compliant with existing industry standards, (2) fails to meet or exceed the capabilities of our competitors' equivalent technologies or technological solutions, (3) becomes increasingly expensive to service, retain and update, (4) becomes subject to third-party claims of intellectual property infringement, misappropriation or other violation, or (5) malfunctions or functions in a way we did not anticipate or that results in loan defects potentially requiring repurchase or originated loans which are alleged to violate consumer financial laws. As such, it is difficult to predict the problems we may encounter in improving the functionality of our websites and other technologies. If we are unable to successfully develop or adopt new technology as critical systems and applications become dated or obsolete and better options become available, or to respond to technological developments and changing client and borrower needs in a cost-effective manner, we may experience disruptions in our operations, lose market share or incur substantial costs.

***Fraud could result in significant financial losses and harm to our reputation.***

We use automated underwriting engines from Fannie Mae and Freddie Mac to assist us in determining if a loan applicant is creditworthy, as well as other proprietary and third-party tools and safeguards to detect and prevent fraud. We are unable, however, to prevent every instance of fraud that may be engaged in by our clients, borrowers or team members, and any seller, real estate broker, notary, settlement agent, appraiser, title agent, or third-party originator that misrepresents facts about a loan, including the information contained in the loan application, property valuation, title information, employment and income stated on the loan application. If any of this information was intentionally or negligently misrepresented and such misrepresentation was not detected prior to the acquisition or closing of the loan, the value of the loan could be significantly lower than expected, resulting in a loan being approved in circumstances where it would not have been, had we been provided with accurate data. A loan subject to a material misrepresentation is typically unsalable to the GSEs or subject to repurchase if it is sold before detection of the misrepresentation. In addition, the persons and entities making a misrepresentation are often difficult to locate and it is often difficult to collect from them any monetary losses we have suffered.

High profile fraudulent activity also could negatively impact our brand and reputation, which could impact our business. In addition, significant increases in fraudulent activity could lead to regulatory intervention, which could increase our costs and negatively impact our business.

***Our counterparties may terminate our servicing rights, which could have a material adverse effect on our revenues.***

The majority of the mortgage loans we service are serviced on behalf of Fannie Mae, Freddie Mac and Ginnie Mae. These entities establish the base service fee to compensate us for servicing loans as well as the assessment of fines and penalties that may be imposed upon us for failing to meet servicing standards.

As is standard in the industry, under the terms of our master servicing agreements with the GSEs, the GSEs have the right to terminate us as servicer of the loans we service on their behalf at any time and have the right to cause us to sell the MSRs to a third party. In addition, failure to comply with servicing standards could result in termination of our agreements with the GSEs with little or no notice and without any compensation. If any of Fannie Mae, Freddie Mac or Ginnie Mae were to

terminate us as a servicer, or increase our costs related to such servicing by way of additional fees, fines or penalties, such changes could have a material adverse effect on the revenue we derive from servicing activity, as well as the value of the related MSRs. These agreements, and other servicing agreements under which we service mortgage loans for non-GSE loan purchasers, also require that we service in accordance with the GSE servicing guidelines and contain financial covenants. If we were to have our servicing rights terminated on a material portion of our servicing portfolio, this could adversely affect our business.

***If we cannot maintain our corporate culture, we could lose the innovation, collaboration and focus on the mission that contributes to our business.***

We believe that a critical component of our success is our corporate culture and our deep commitment to our mission. We believe this mission-based culture fosters innovation, encourages teamwork and cultivates creativity. Our mission defines our business philosophy as well as the emphasis that it places on our clients, our people and our culture and is consistently reinforced to and by our team members. As we have significantly increased our team members it may be harder to maintain our corporate culture. If we are unable to preserve our culture, this could negatively impact our future success, including our ability to attract and retain team members, encourage innovation and teamwork, and effectively focus on and pursue our mission and corporate objectives.

***Substantially all of our operations are housed on one campus, and if the facilities are damaged or rendered inoperable by natural or man-made disasters, our business may be negatively impacted.***

Substantially all of our operations are housed on one campus in Pontiac, Michigan. Our campus could be harmed or rendered inoperable by natural or man-made disasters, including tornadoes, earthquakes, fires, power shortages, telecommunications failures, water shortages, floods, extreme weather conditions, and other natural or man-made disasters, pandemics, or other business interruptions. If due to such disaster a significant portion of our team members must work remotely for an extended period of time, our business may be negatively impacted. See "*—If we cannot maintain our corporate culture, we could lose the innovation, collaboration and focus on the mission that contribute to our business.*" In addition, it could be costly and time-consuming to repair or replace our campus.

**Risks Related to our Financing**

***We rely on our warehouse facilities, structured as repurchase agreements, to finance our loan originations. These instruments are short-term and subject us to various risks different from other types of credit facilities.***

We fund a vast majority of the mortgage loans we originate through borrowings under our short-term warehouse facilities and funds generated by our operations. Our ability to fund our loan originations may be impacted by our ability to secure further such borrowings on acceptable terms. Our warehouse facilities typically renew annually, although as of December 31, 2025, one of our facilities ($4.5 billion in available credit) had a two year renewal term. As of December 31, 2025, all but $900.0 million of our warehouse facilities were uncommitted and can be terminated by the applicable lender at any time. Our warehouse facilities are generally structured in the form of repurchase agreements. We currently leverage and, to the extent available, intend to continue to leverage the mortgage loans we originate with borrowings under these repurchase agreements. When we enter into repurchase agreements, we sell mortgage loans to other lenders, which are the repurchase agreement counterparties, and receive cash from these lenders. These lenders are obligated to resell the same assets back to us at the end of the term of the transaction, which typically ranges from 30 to 90 days, but may have terms of up to 364 days or longer. These repurchase agreements subject us to various risks:

- If we default on one of our obligations under a repurchase transaction, the lender will be able to terminate the transaction and cease entering into any other repurchase transactions with us. Our repurchase agreements also typically contain cross default provisions, so that if a default occurs under any one agreement, the lenders under our other agreements could also declare a default. If a default occurs under any of our repurchase agreements and the lenders terminate one or more of our repurchase agreements, we may need to enter into replacement agreements with different lenders.

- If the market value of the loans pledged or sold by us under a repurchase agreement borrowing to a counterparty lender declines, the lender may initiate a margin call and require us to either post additional collateral to cover such decrease or repay a portion of the outstanding borrowing. We may not have the funds available to do so, and we may be required to liquidate assets at a disadvantageous time to avoid a default, which could cause us to incur further losses and limit our ability to leverage our assets. If we are unable to satisfy a margin call, our counterparty may accelerate repayment of our indebtedness, increase interest rates,

24

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**UWM HOLDINGS CORPORATION**

Date: February 25, 2026        By:        /s/ Mathew Ishbia

Mathew Ishbia

Chairman, President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on the 25th day of February, 2026.

| Name | Position | Date |
|---|---|---|
| /s/ Mathew Ishbia<br>Mathew Ishbia | Chairman, President and Chief Executive Officer (Principal Executive Officer) | February 25, 2026 |
| /s/ Rami Hasani<br>Rami Hasani | Executive Vice President, Chief Financial Officer (Principal Financial Officer) | February 25, 2026 |
| /s/ Stacey Coopes<br>Stacey Coopes | Director | February 25, 2026 |
| /s/ Kelly Czubak<br>Kelly Czubak | Director | February 25, 2026 |
| /s/ Alex Elezaj<br>Alex Elezaj | Director | February 25, 2026 |
| /s/ Jeffrey A. Ishbia<br>Jeffrey A. Ishbia | Director | February 25, 2026 |
| /s/ Justin Ishbia<br>Justin Ishbia | Director | February 25, 2026 |
| /s/ Laura Lawson<br>Laura Lawson | Director | February 25, 2026 |
| /s/ Isiah Thomas<br>Isiah Thomas | Director | February 25, 2026 |
| /s/ Robert Verdun<br>Robert Verdun | Director | February 25, 2026 |
| /s/ Melinda Wilner<br>Melinda Wilner | Director | February 25, 2026 |

102