# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ANDREW JAMES MCGONIGLE AND JOSHUA HESTER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br><br>UNITED WHOLESALE MORTGAGE, LLC,<br><br>Defendant. | No. 2:25-cv-13865-SKD-KGA<br><br>Hon. Susan K. DeClercq<br>Mag. Kimberly G. Altman |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS

Plaintiffs McGonigle and Hester hereby submit their opposition to Defendant United Wholesale Mortgage, LLC's motion to dismiss the first amended complaint and to strike class allegations. ECF No. 17. For the reasons explained in the accompanying brief in opposition, Defendant's motion should be denied in its entirety.

Dated: May 12, 2026

Respectfully submitted,

/s/ Anthony I. Paronich
PARONICH LAW, P.C.
Anthony I. Paronich
350 Lincoln St., Suite 2400
Hingham, MA 02043

617-485-0018
anthony@paronichlaw.com
*Attorneys for Plaintiff and proposed class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 12, 2026, I filed the Plaintiffs'

Response in Opposition to Defendant's Motion to Dismiss and to Strike Class

Allegations with the Clerk of the Court using its CM/ECF system, which

automatically sends electronic notifications of this filing to all attorneys of record in

this action.

*/s/ Anthony I. Paronich*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| ANDREW JAMES MCGONIGLE AND JOSHUA HESTER, individually and on behalf of all others similarly situated, | No. 2:25-cv-13865-SKD-KGA |
| | Hon. Susan K. DeClercq |
| | Mag. Kimberly G. Altman |
| Plaintiff, | |
| v. | |
| UNITED WHOLESALE MORTGAGE, LLC, | |
| Defendant. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS**

**Table of Contents**

ISSUES PRESENTED............................................................................................ i

CONTROLLING OR MOST APPROPRIATE AUTHORITIES........................... ii

INTRODUCTION .................................................................................................1

ARGUMENT .........................................................................................................2

   I.   Plaintiffs Sufficiently Allege UWM's Vicarious Liability ...........................2

     A.   Actual Authority..................................................................................4

     B.   Apparent Authority and Ratification....................................................6

   II.   The TCPA's do-not-call provisions authorize the FCC to prohibit text messages .......................................................................................................8

     A.   The plain meaning of the word "call" includes text messages ...................9

     B.   That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions .........................................................11

     C.   UWM's case for a narrower interpretation is unpersuasive.......................14

     D.   Any doubt that section 227(c) covers text messages should be resolved by deference to the FCC's longstanding interpretation..........................................19

   III.   The do-not-call registry provision protects cellphone subscribers...............21

   IV.   Plaintiffs' class allegations should not be stricken.....................................25

     A.   The proposed classes are not fail-safe.....................................................27

     B.   In the alternative, the Court should modify the class definitions, not strike them .....................................................................................................................30

CONCLUSION.....................................................................................................30

## ISSUES PRESENTED

1.     Whether Plaintiffs' state a claim on which relief can be granted when Plaintiffs alleged UWM's vicarious liability under all theories available under the Telephone Consumer Protection Act, including actual authority, apparent authority, and ratification, with specific and plausible facts.

**Plaintiffs' answer: Yes.**

2.     Whether the private right of action in section 227(c)(5) of the Telephone Consumer Protection Act permits enforcement of FCC rules that prohibit sending commercial text messages to telephone numbers on the national Do Not Call List.

**Plaintiffs' answer: Yes.**

3.     As to Counts I and III, whether the TCPA's do-not-call provisions govern calls and text messages to cellular phones that are used for residential and household purposes?

**Plaintiffs' answer: Yes.**

4.     Whether Plaintiffs' class allegations should be stricken at the pleading stage where all three proposed classes are not fail-safe and are defined using objective criteria such that membership is not precluded on the basis of finding vicarious liability.

**Plaintiffs' answer: No.**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

- *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)

- *Pickens v. Hamilton-Ryker IT Solutions, LLC*, 133 F.4th 575 (6th Cir. 2025)

- *Keating v. Peterson's Nelnet, Inc.*, 615 F. App'x 365 (6th Cir. 2015)

- *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009)

- *Mujahid v. Newity, LLC*, 2025 WL 3140725 (N.D. Ill. 2025)

- *Wilson v. Medvidi*, 2025 WL 2856295 (N.D. Cal. 2025)

- *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274 (D. Or. 2025)

## INTRODUCTION

The Court should deny Defendant United Wholesale Mortgage, LLC's ("UWM") motion to dismiss in all regards.

First, Plaintiff McGonigle and Hester ("Plaintiffs") sufficiently allege UWM's vicarious liability for its mortgage broker's and other "UWM Partners" TCPA violative conduct based on all theories of vicarious liability (actual authority, apparent authority, and ratification). The TCPA violative calls and text messages at issue were made by or on behalf of UWM, under UWM's control and direction, and based on the extensive training and tools UWM provides to its brokers and "UWM Partners." UWM also directly benefited from the solicitation calls and texts. UWM also represents to consumers that its brokers and partners are its representatives with authority to solicit business on its behalf. Plaintiffs alleging vicariously liability are not expected to know more at the pleadings stage.

Second, as the majority of district courts to evaluate the issue post *McLaughlin Chiropractic* has concluded, text messages qualify as "calls" under the TCPA's National Do Not Call Registry provision and are subject to the same restrictions as voice solicitations. Excluding texts would nullify Congress's protections, allow telemarketers to exploit the dominant form of communication today, and erode consumer trust.

Next, as every court examining the issue has concluded post-*McLaughlin* (and pre-*McLaughlin*), residential telephone numbers encompasses both cellular phone numbers and landline phone numbers within the meaning of section 227(c). UWM's argument to the contrary is without merit.

Finally, UWM's alternative request that the class definitions be stricken as fail-safe is without merit.

## ARGUMENT

### I.   Plaintiffs Sufficiently Allege UWM's Vicarious Liability

"[A] party may be liable under the TCPA in accordance with tort-related vicarious liability rules," including actual authority, apparent authority, and ratification principles. *Klein v. Just Energy Grp., Inc.*, No. 14-1050, 2016 U.S. Dist. LEXIS 84447, at *27 (W.D. Pa. June 29, 2016) (citing *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016)); *see also In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6588 (F.C.C. 2013). The existence of an agency relationship is normally one for the trier of fact to decide. *See Ward v. Mgmt. Analysis Co. Emp. Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988), *rev'd in part on other grounds, UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358 (1999).

A plaintiff is required to allege a sufficient basis for any "one of the common law agency theories." *Cunningham*, 2018 U.S. Dist. LEXIS 197590, at *17-21. "[A]

plaintiff is not required to plead all of its evidence in the complaint in order to plausibly allege agency." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 996 (N.D. Ill. 2016) (relying on the FCC's *Dish Network* opinion issued in a telemarketing context in evaluating vicarious liability for non-telemarketing, TCPA violative calls, like UWM's prerecorded voice calls). A plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016).

For TCPA claims specifically, there is a low bar to pleading vicarious liability, as a plaintiff is not expected to allege "facts suggesting that" the defendant: (1) "instructed" the putative agent "to make the call to" the plaintiff, (2) "had any authority over the time, means and manner of" the putative agent's solicitations, or (3) "had the ability to issue instructions … on these subjects." *Dolemba*, 213 F. Supp. 3d at 997 ("But Farmers does not suggest how Dolemba could reasonably be expected to know those facts at this stage in the litigation. Indeed, it is likely that all of the documents and information that establish (or refute) the details of the agency relationship between Farmers and the Lombardi Agency are exclusively within the Defendants' custody and control."); *see Cunningham v. Rapid Response Monit. Servs.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) ("Cunningham has investigated the parties extensively, but inevitably some aspects of their relationships

will only come to light in discovery.").

In this case, as discussed below, Plaintiff pleads robust facts giving rise to an inference that UWM is vicariously liable for the campaigns calls to Plaintiff based on all three agency theories (actual agency, apparent agency, and ratification).

**A.** *Actual Authority*

"Actual authority is the authority that a principal expressly or implicitly gives an agent." *United States v. Martinez*, 613 F.2d 473, 481 (3d Cir. 1980); *Lind v. Schenley Indus.*, Inc., 278 F.2d 79, 85 (3d Cir. 1960) ("'Actual authority' means, as the words connote, authority that the principal, expressly or implicitly, gave the agent."); *see Cunningham*, 251 F. Supp. 3d at 1199 ("The question of whether implied authority may have existed would require the Court to know more about the course of the parties' dealings and the generally expected course of business ….."). An agent acts with actual authority if it "reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01; *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014) (citing Restatement (Third) of Agency § 2.01)).

Actual agency "does not require the principal to specify the singular acts for which his or her authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." *Harrington v. Roundpoint Mortg. Servicing Corp.*, 2017 U.S. Dist. LEXIS 55023, at *21 (M.D. Fla. Apr. 10, 2017).

"The concept of scope of authority is broad. An agent has authority to act to further the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives. The principal is liable for the acts of the agent to further the principal's purposes unless the agent acts entirely for the agent's benefit only." *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 923 (C.D. Ill. 2017) (citing Restatement (Third) of Agency § 2.02(1)).

Thus, for a TCPA claim, a plaintiff sufficiently pleads that a defendant directed an agent's calls by alleging facts giving rise to an inference that the defendant was "heavily involved" in the circumstances surrounding the calls. *United States*, 256 F. Supp. at 922-923; *Dolemba*, 213 F. Supp. 3d at 997 ("Of course, these facts may not be sufficient to prove any theory of vicarious liability. They are more than sufficient, however, to entitle Dolemba to further discovery.").

UWM claims the FAC rests of allegations of tools typical of the loan industry and training made available to its brokers and "partners," but that the FAC does not allege sufficient "control" to plead vicarious liability. UWM is wrong.

Plaintiffs allege[1] that UWM authorized and directed the challenged solicitations through its nationwide broker network. FAC ¶¶ 9–31. UWM provided

---

[1] Plaintiffs also allege that, in the alternative and in the event discovery shows that UWM itself transmitted the calls and texts at issue rather than the brokers and/or "UWM Partners," UWM is directly liable for the TCPA violative communications. FAC ¶ 25. This theory was not abandoned, despite what UWM misrepresented in its motion to dismiss. ECF 17 at 2, 30.

mandatory onboarding, scripts, marketing materials, proprietary software platforms, lead-management tools, and performance-based incentives designed to generate UWM loan applications. *Id*. ¶¶ 9–18. Brokers identified themselves as "UWM Partners," referenced UWM products, and operated within a loan-origination process over which UWM retained significant control, including underwriting, funding, closing approval, and document generation. *Id*. ¶¶ 15–31. Plaintiffs further allege that UWM knew or should have known its brokers were engaging in TCPA-violative conduct yet failed to stop it while continuing to benefit financially from the solicitations. *Id*. ¶¶ 24–46. At this early stage of the proceedings, Plaintiffs sufficiently pled that UWM is vicariously liable for any TCPA violative calls and text messages made by brokers and "UWM Partners" on an actual authority theory.

### B. *Apparent Authority and Ratification*

UWM next claims Plaintiffs did not sufficiently allege liability under apparent authority or ratification theories of vicarious liability. Again, UWM's arguments fall short. Plaintiffs' apparent authority or ratification allegations do not focus solely on representations made by UWM's agents or brokers. Rather, Plaintiffs specifically plead how UWM effectively represented to Plaintiffs and other consumers like them how UWM actions and knowledge of the TCPA violative conduct, and benefiting from the wrongdoing, give rise to liability based on apparent authority and

ratification.

Apparent authority "arises when a third-party reasonably believes that the []
agent had authority to act on behalf of the principal and that belief can be traced to
the principal's own manifestations." *In re Fresh & Process Potatoes Antitrust Litig.*,
834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011). The FCC has explained that
apparent authority may be shown through use of the principal's trade name, approval
of scripts, or knowledge of TCPA violations coupled with a failure to stop them.
*Dish Network,* 28 F.C.C. Rcd. at 6592.

"Ratification occurs when a principal knowingly chooses to accept the
benefits of unauthorized actions an agent takes on the principal's behalf." *Aranda v.
Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016); Restatement
(Third) of Agency § 4.01(1) & cmt. d ("Ratification does not require a pre-existing
formal agency relationship."). "[R]atification may create a relationship of agency
when none existed between the actor and the ratifier at the time of the act.  It is
necessary that the actor have acted or purported to act on behalf of the ratifier."
Restatement (Third) of Agency § 4.01 cmt. b; *see Henderson v. United Student Aid
Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019) (citing the Restatement and holding
in a TCPA action that "ratification may create an agency relationship when none
existed before the acts are 'done by an actor … who is not an agent but pretends to
be.'").  To demonstrate prospective ratification, a plaintiff must show that a principal

had full knowledge of all the facts, *or* was willfully ignorant of those facts, and manifested an intention to ratify the act in question, or that an agent acted for a principal's benefit and the principal "fail[ed] to object or repudiate an action." *Henderson*, 918 F.3d at 1074-75; *Aranda*, 179 F. Supp. 3d at 831.

Plaintiffs also sufficiently plead apparent authority and ratification based on the same facts supporting actual authority, including UWM's branding requirements, training, scripts, oversight of the loan-origination process, and financial benefit from the solicitations. FAC ¶¶ 13–46. The text messages identified the senders as "UWM Partners," referenced UWM loan products, and solicited information necessary to originate UWM loans, creating the reasonable impression that the brokers acted on UWM's behalf. *Id*. ¶¶ 18, 20–22. Plaintiffs further allege that UWM knew or should have known its brokers were engaging in TCPA-violative conduct but failed to stop it while continuing to benefit financially from the solicitations. *Id*. ¶¶ 24–46. And consistent with this direction from UWM, Plaintiffs received multiple unsolicited calls and text messages soliciting UWM loan products from UWM's brokers and "partners," all of whom UWM leads consumers to believe are authorized to act on its behalf. *Id*. at ¶¶ 44-51. Plaintiffs therefore sufficiently plead UWM's vicarious liability for the calls and text messages to Plaintiffs under apparent authority and ratification theories.

## II.    The TCPA's do-not-call provisions authorize the FCC to prohibit text messages

UWM contends that a single use of the phrase "telephone call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. *See* ECF 17 at 4-5; 43-44.[2] That's incorrect. The plain meaning of the word "call," long recognized by other courts and the FCC, refutes that argument. The statutory context confirms that a text can be a "call." And UWM's arguments in support of its contrary interpretation do not withstand scrutiny.

### A. *The plain meaning of the word "call" includes text messages*

To interpret a statutory term, courts look to its "ordinary meaning" when the statute was enacted, often "by reference to dictionaries in use at the time." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022). Here, the "ordinary, contemporary, common meaning" of the word "call" in this context is "'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 & n.3 (9th Cir 2009) (quoting *Webster's Third New International Dictionary* (2002)).

Like other courts, the Sixth Circuit has held that this definition—any attempt to communicate with someone by telephone—is the meaning of "telephone call" that Congress intended in 1991, when the TCPA was enacted. *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013).

---

[2] Citations to the record are based on ECF pagination.

And texting is, of course, a means of communicating with someone by telephone. So the established definition of "telephone call" readily encompasses texts. *See, e.g.*, *Wilson v. Medvidi Inc.*, No. 5:25-cv-03996-BLF, 2025 U.S. Dist. LEXIS 198827, at *3 (N.D. Cal. Oct. 7, 2025); *Mujahid v. Newity, LLC*, No. 25 C 8012, 2025 U.S. Dist. LEXIS 221088, at *5 (N.D. Ill. Nov. 10, 2025).

The established meaning of the word "call" is especially clear in the nearby autodialer provisions in section 227(b) of the original TCPA. Absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning throughout a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). The word "call" is used extensively in the provisions of the statute that prohibit automatic dialing technology and robocalls, which were also part of the statute when it was first enacted in 1991. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any call … to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone number to call. So the use of the word "call" in connection with pagers in section 227(b) establishes "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1005 (N.D. Ill. 2010).

Courts have therefore "routinely found that the phrase 'call' in subsection (b) … includes text messages." *Hudson v. Palm Beach Tan, Inc.*, No. 1:23CV486(WO)(JEP), 2024 U.S. Dist. LEXIS 165676, at *7 (M.D.N.C. Aug. 12, 2024); *see, e.g.*, *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). And that "supports the interpretation that the term 'call' as used in § 227(c) also encompasses 'text messages.'" *Mujahid*, 2025 U.S. Dist. LEXIS 221088, at *5.

Likewise, the FCC determined as early as 2003 that, when the TCPA says "call," it "encompasses both voice calls and text calls to wireless numbers." 18 FCC Rcd. 14014, 14115 ¶ 165 (2003). The FCC first announced its interpretation of the word "call" in the context of the TCPA's autodialer provisions, presumably because those provisions of the statute use the word more extensively. *See Medvidi*, 2025 U.S. Dist. LEXIS 198827, at *3. But the FCC has since confirmed, including in a formal regulation, that the meaning of the word "call" is the same in the Do Not Call List context. *See* 47 C.F.R. § 64.1200(e); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023); *Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (F.C.C. Dec. 21, 2018). That interpretation reflects "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage." *Medvidi*, 2025 U.S. Dist. LEXIS 198827, at *5.

**B. *That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions***

UWM's argument focuses mainly on the use of the word the "call" in section 227(c)(5). *See* ECF No. 19 at 42-44. But reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call List provisions of section 227(c) further confirms that text messages are covered.

To see why, start with the core of section 227(c)—its prohibition on "making or transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are "ma[de] or transmitt[ed]" to a "telephone number." *Id.* And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers. *See, e.g.*, *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165-TPB-SPF, 2025 U.S. Dist. LEXIS 158157, at *3 (M.D. Fla. Aug. 15, 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

The term "telephone solicitation" also clearly encompasses text messages. The statute expressly defines a "telephone solicitation" to mean "a telephone *call or message* … which is transmitted to any person" for commercial purposes. 47 U.S.C. § 227(a)(4) (emphasis added). That reference to a "call or message" covers texts even more clearly than the word "call" standing alone. As explained above, "the ordinary, contemporary, and common meaning" the word "call" in the TCPA includes text messages. *Satterfield*, 569 F.3d at 953–54 & n.3; *see supra*, Part I.A. And contemporary definitions of the word "message" do too—a message was "[a]ny

notice, word, or communication, *no matter the mode and no matter how sent*." *Message*, *Black's Law Dictionary* (6th ed. 1990) (emphasis added).

More generally, the definition of "telephone solicitation" focuses not on a communication's form but on whether it has "the purpose of encouraging" various kinds of commercial transactions. 47 U.S.C. § 227(a)(4); *see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493 (7th Cir. 2025) (Do Not Call List liability turned on whether a text message had the requisite commercial purpose). At the same time, the statute uses broad, inclusive language to describe how such a communication might be conveyed—the FCC is directed to prohibit "making *or* transmitting" a telephone solicitation to "any" listed number, and a telephone solicitation is a "call *or* message" that is "transmitted to *any* person." 47 U.S.C. § 227(a)(4), (c)(3)(F) (emphases added). Congress presumably used all that broad and disjunctive language to capture a wide range of communication mediums, including text messages. *See Medvidi*, 2025 U.S. Dist. LEXIS 198827, at *5 (explaining that the "telephone solicitation" definition "makes clear that Congress was more concerned with the purpose of the telephone communications … than the form in which those communications are transmitted"); *Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023) (similar).

Finally, the purpose of the Do Not Call List provisions further supports that interpretation. Congress's stated goal was "to protect residential telephone

subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). And nothing in the TCPA suggests that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 U.S. Dist. LEXIS 198827, at *5.

### C. *UWM's case for a narrower interpretation is unpersuasive*

UWM would have this Court interpret the Do Not Call List provisions more narrowly, insisting that the words "telephone call" in section 227(c)(5) can only mean "voice call," and therefore the statute categorically excludes text messages. ECF No. 17 at 42-46. Its arguments rely primarily on three district court cases, *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270 (N.D. Fla. 2025), *Jones v. Blackstone Medical Services*, 792 F. Supp. 3d 894 (C.D. Ill. 2025), *appeal docketed*, No. 25-2398 (7th Cir. Aug. 12, 2025), *Stockdale v. Skymount Prop. Grp., LLC*, No. 1:25 CV 1282, 2026 U.S. Dist. LEXIS 42954 (N.D. Ohio Mar. 3, 2026) and their progeny. *See* ECF No. 17 at 43-44. But none of the arguments made by UWM or by those cases is persuasive.

First, UWM (echoing *Jones*), insists that "telephone call" cannot encompass text messages because "[t]ext messaging did not yet exist" in 1991. ECF 17 at 44; *see Jones*, 792 F. Supp. 3d at 899.

But that's not how statutory interpretation works. It's true that text messaging did not exist in 1991, so Congress didn't have texting specifically in mind. *See*

*Keating*, 615 F. App'x at 370; *Medvidi*, 2025 U.S. Dist. LEXIS 198827, at \*4. But statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980). "While every statute's *meaning* is fixed at the time of enactment," it is commonplace that "new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). That's why a 1991 law that said "no vehicles in the park" would prohibit Cybertrucks and Priuses, not just Mustangs and Corollas. *See Squillacote v. United States*, 739 F.2d 1208, 1213 (7th Cir. 1984) (similar example with Volkswagens).

The same is true here. "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Medvidi*, 2025 U.S. Dist. LEXIS 198827, at \*3. The 1991 meaning of "call"—which "refers to both oral and written communications"—is what matters. *Id.*; *see Lozano*, 702 F. Supp. 2d at 1007.

Next, UWM claims that even if text messaging existed in 1991, a normal person wouldn't refer to a text message as a telephone call. ECF 17 at 44. *Jones* and *Davis* also relied on that same logic—both courts found it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends there." *Davis*, 797 F. Supp. 3d at 1273.

Modern colloquial usage is irrelevant where statutory meaning was fixed at enactment. *See New Prime*, 586 U.S. at 114–16. The question is whether the 1991 meaning of "call" encompassed communications by telephone generally, and courts have repeatedly held it does. *See Satterfield*, 569 F.3d at 953–54.

UWM's interpretation fares no better when it comes to the broader statutory context. UWM cannot square its anomalous reading of section 227(c)(5)'s private right of action with the substantive Do Not Call List provisions it exists to enforce. UWM also has no good answer for nearby uses of the word "call" in section 227(b), the autodialer provisions of the original TCPA. UWM and its cases do not dispute that "call" covers text messages in the autodialer provisions. Nor could they: the meaning of "call" is especially clear in section 227(b) because it's used there to describe a (typically text-focused) transmission to a "paging service." In response, all UWM's cases say is that section 227(b) is a different provision and could in theory be broader than section 227(c). *See Jones*, 792 F. Supp. 3d at 900-01; *Davis*, 797 F. Supp. 3d at 1274.

What's missing, however, is any credible reason to think that "call" *actually does* mean something broader in section 227(b) than in section 227(c). Absent good reason to think otherwise, a statutory term is presumed to have a consistent meaning throughout a statute. *See Henson*, 582 U.S. at 85. UWM doesn't say why the meaning of "call" would differ between the two provisions. Nor does *Jones*. The

only possible distinction comes from *Davis*, which notes that 227(b) says it's unlawful to make "any call" to various kinds of devices using an autodialer, whereas section 227(c) refers to a prohibited "telephone call." *See* 797 F. Supp. 3d at 1273. But, as explained above, the word "telephone" isn't doing any work here. And "any" is hardly unique to section 227(b)(1)(A); section 227(c) uses similarly expansive modifiers, requiring the FCC to "prohibit *any* person from making or transmitting a telephone solicitation to the telephone number of *any* subscriber included" in the Do Not Call List. 47 U.S.C. § 227(c)(3)(F) (emphases added).

To the contrary, reading the word "call" differently in section 227(c)(5) than in section 227(b) would make no sense. If Congress wanted to limit *only* the private right of action in section 227(c)(5) to voice communications, implicitly doing so with the word "call" would have been a strange way to go about it. After all, the word "call" *does* include textual communication in other provisions of the statute. If Congress intended to cabin section 227(c)(5)'s private right of action to *exclude* text messages, it wouldn't have done so by using a term that elsewhere *includes* them. Congress would not have *excluded* text messages in section 227(c)(5) by using a term that in section 227(b) *includes* them. So "there is no reason to believe that ['call'] has a different meaning when used in the do-not-call provisions." *Dawson v. Porch.com*, No. 2:20-cv-00604-RSL, 2024 U.S. Dist. LEXIS 206363, at *13-14 (W.D. Wash. Nov. 13, 2024).

Finally, UWM says that an entirely separate provision, added to the statute in 2018, distinguishes between calls and text messages. ECF 17 at 44-45. Namely, UWM cites definitions of "caller identification" found in the Consolidated Appropriations Act of 2018. Pub. L. No. 115-141, div. P, § 503(a), 132 Stat. 348, 1092–93 (2018); *see* 47 U.S.C. § 227(e)(8)(A)-(B). Those provisions prohibit false or misleading "caller identification information," defined as information about the source of "a call made using a voice service or a text message sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A). UWM says that shows that a "call" and a "text message" are distinct. *See* ECF No. 17 at 44.

But, if anything, section 227(e)(8) actually shows the opposite: It reinforces that texts *are* calls in the lexicon of the TCPA. It describes a "text message" as something that comes from a "caller," just like a traditional voice call does. So the more natural takeaway is that section 227(e)(8) identifies two different types of calls—voice calls and text messages—both of which originate with a "caller" and therefore require "caller identification." Unlike UWM's interpretation, that reading of section 227(e)(8) accords with the meaning of "call" as that word is used elsewhere in the TCPA.

And even if section 227(e) did distinguish between a "text message" and a "call" as UWM contends, that wouldn't change the best reading of section 227(c). When Congress enacted section 227(e) in 2018, Congress directed that nothing

therein "shall be construed to modify, limit, or otherwise affect any rule or order adopted by the [FCC] in connection with [the TCPA]." Pub. L. No. 115-141, div. P, § 503, 105 Stat. 348, 1094. That would include the FCC rules and orders that interpreted "call" to include text messages. Moreover, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 355 (1998). Surely, that's especially true here, where the Congress that enacted original TCPA in 1991 and the Congress that enacted section 227(e)(8) in 2018 legislated on opposite sides of a seismic shift in phone technology. The more meaningful reference point is the meaning of "call" in section 227(b), which was enacted at the same time as section 227(c), and which clearly uses "call" to refer to written messages.

> **D.** ***Any doubt that section 227(c) covers text messages should be resolved by deference to the FCC's longstanding interpretation.***

The best reading of the TCPA is that the word "call" includes text messages. But even if ambiguity remained, the FCC's longstanding interpretation confirms that conclusion. Congress expressly delegated authority to the FCC to craft and implement the Do Not Call regulations, including determining the rules "most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95 (2024) (courts continue to respect express delegations of discretionary authority to agencies). As one court recently recognized post-*Loper Bright*, section 227(c)

"explicitly delegates such authority" to the FCC. *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-00376-MC, 2025 U.S. Dist. LEXIS 138638, at *11–12 (D. Or. July 21, 2025).

To be sure, *Chevron* no longer applies, and courts are not bound to adopt FCC interpretations reflexively. *See Loper Bright*, 603 U.S. at 412–13; *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,* 606 U.S. 146, 152 (2025). But where Congress delegated authority to the FCC to implement the statute through open-ended standards concerning consumer privacy and regulatory effectiveness, the FCC's reasonable interpretation remains highly persuasive. *See Loper Bright*, 603 U.S. at 395.

The FCC has consistently interpreted the TCPA's use of the word "call" to include text messages for more than two decades. *See* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023). The FCC reasonably explained that applying the Do Not Call rules to texts promotes consistent enforcement and avoids consumer and industry confusion. 38 FCC Rcd. at 12256–57 ¶¶ 26–27 & n.59. That interpretation is both reasonable and consistent with the TCPA's broader consumer protection purposes, and therefore warrants substantial respect. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,* 605 U.S. 168, 180 (2025).

In short, the statutory text, structure, purpose, and longstanding regulatory interpretation all confirm that the TCPA's Do Not Call provisions apply to text messages. UWM's contrary interpretation would create an artificial loophole that undermines Congress's consumer-privacy objectives and conflicts with how courts, consumers, and the FCC have understood the statute for decades.

### III.   The do-not-call registry provision protects cellphone subscribers

UWM next argues Plaintiffs failed to sufficiently plead a claim under Counts I and III under the DNC provisions because cellphones cannot be "residential" phones as a matter of law. ECF 17 at 46-47. In making such an argument, UWM claims that the text of § 227(c) forecloses the FCC from granting the protections of the Do Not Call Registry to cellphone subscribers. That is incorrect based on the TCPA's plain language.

And luckily for consumers nationwide, UWM's argument has been repeatedly rejected, and is at odds with every single court to consider the issue post *McLaughlin* and *Loper Bright*. "[S]ince *McLaughlin Chiropractic*, every court examining this particular issue concerning 'residential' phones has held that [47 U.S.C. § 227(c)]'s provisions apply to cellphones." *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165-TPB-SPF, 2025 U.S. Dist. LEXIS 158157, at *6 (M.D. Fla. Aug. 15, 2025).

Textually, UWM's argument conflates language Congress used in other provisions with the language Congress chose to use for the DNCR provision in §

227(c). When Congress wanted to limit the statute to a particular technology, it said so expressly (e.g., "residential telephone line" elsewhere in the TCPA). But in § 227(c), Congress protected a class of people—"residential telephone *subscribers*"—which is best read to mean subscribers who maintain and use their telephone service for residential (personal or household) purposes.

"No person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). Accordingly, "[t]he TCPA creates a private right of action for anyone who receives more than one call within a year from the same entity in violation of [the DNC Registry]." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) (citing 47 U.S.C. § 227(c)(5)).

Consistent with this, even ignoring the FCC's interpretations, all of the "district courts that have considered this issue post-*Loper* have reached the same conclusion: cellular telephone users can be considered 'residential telephone subscribers' under § 227(c)." *Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-cv02087, 2024 U.S. Dist. LEXIS 165900, at *14-19 (N.D. Ohio Sep. 16, 2024); *see also Cacho v. McCarthy & Kelly LLP*, No. 23-CV-11157 (LJL), 739 F. Supp. 3d 195, 2024 (S.D.N.Y. July 3, 2024) ("The Court therefore rejects defendant's

contention that plaintiff falls outside the TCPA's protective ambit merely because he received the challenged calls on his cellphone."); *Lyman v. Quinstreet, Inc.*, No. 23-CV-05056-PCP, 2024 U.S. Dist. LEXIS 123132, at *4 (N.D. Cal. July 12, 2024) ("[T]he statutory text does not support [defendant's] position, and instead is best read to include at least some cellular phone subscribers within the category of residential telephone subscribers.").

This is because the TCPA's National Do Not Call Registry provision "provides protections to a certain type of phone user, regardless of the technology." *Lirones*, 2024 U.S. Dist. LEXIS 165900, at *14; *see also Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 U.S. Dist. LEXIS 8811, at *13 (M.D. Pa. Jan. 17, 2024) 2024 WL 184449, at *5 (M.D. Pa. Jan. 17, 2024) ("The best reading of the word 'residential' is not that it modifies the 'telephone,' but rather that 'residential' and 'telephone' both modify the 'subscriber.' So instead of describing a 'subscriber' who owns a 'residential telephone,' Section 227(c)(1) describes a 'telephone subscriber' who has subscribed for 'residential,' i.e., personal, purposes. 'Residential' is therefore used in the broader sense of 'relating to a resident' to distinguish such a subscriber from a business or commercial telephone subscriber, who cannot be added to the Do Not Call registry.").

"The inclusion of the term 'cellular telephone' in § 227(b) and its exclusion from § 227(c) does not indicate that Congress intentionally omitted cellular

telephones from § 227(c)'s protections; 'Had Congress wished to limit section 227(c) to specified telephone technologies rather than specified telephone subscribers, it would have indicated somewhere in that section that the [Do Not Call] registry is limited to a *residential telephone **line***, as Congress used that term in the preceding subsection.'" *Id.* As another district court recently explained in holding that cellular telephone numbers are protected under the TCPA's National Do Not Call Registry provision:

> Defendant's interpretation of a residential subscriber ignores the fact that "residential" modifies "subscriber," meaning that the definition is tethered to a type of person rather than a type of technology. And although Defendant points out that Congress has occasionally used the term "cellular telephone service" and could have done so here if it intended for the TCPA to cover cell phones, Defendant overlooks the fact that Congress has also used the term "residential telephone line" elsewhere in the TCPA. Put differently, Congress has sometimes limited the scope of the TCPA to specific types of phone lines, but, in this case, has limited the TCPA only to a particular type of subscriber…In other words, Defendant's interpretation would tie residential privacy interests to an obsolete and disappearing phone technology.

*Isaacs v. USHealth Advisors, LLC*, No. 3:24-cv-00216-LMM, 2025 U.S. Dist. LEXIS 152625, at *7-9 (N.D. Ga. Aug. 7, 2025) (cleaned up); *see also McGonigle v. Shopperschoice.com, L.L.C.*, No. 25-152-SDD-RLB, 2026 U.S. Dist. LEXIS 30157, at *13-14 (M.D. La. Feb. 13, 2026) ("[Consumer's] privacy rights do not depend upon whether the undesired telephone solicitations are received on a cellular phone rather than on a landline."); *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-

00343, 2026 U.S. Dist. LEXIS 14155, at *5-6 (S.D. Tex. Jan. 26, 2026) ("[D]istrict courts that have considered this issue post-*Loper* … have reached the same conclusion: cellular telephone users can be considered 'residential telephone subscribers' under § 227(c)."); *Loudermilk v. Maelys Cosmetics USA, Inc.*, No. 1:24-cv-1866-AT, 2025 U.S. Dist. LEXIS 256097, at *8-9 (N.D.Ga. Dec. 11, 2025) ("[V]arious other courts across the nation have also reached the same determination" that "the protections of the TCPA['s DNCR provision] apply to cellphone users."); *Radvansky v. Bubolo Medical, LLC*, No. 1:24-cv-04365-SCJ, 2025 U.S. Dist. LEXIS 158564, at *2 (N.D. Ga. Aug. 15, 2025) ("[T]he type of technology—i.e., cellular or landline—is not determinative" but the plaintiff's purpose for using the phone is); *Ferrell v. Colourpop Cosmetics, LLC*, No. 2:25-cv-01324, 2025 U.S. Dist. LEXIS 140893, at *16-17 (C.D. Cal. July 22, 2025) ("In 1991, when the TCPA was enacted, Webster's Dictionary defined 'residential' as 'used as a residence or by residents.'"); *Wilson v. Hard Eight Nutrition LLC,* No. 6:25-cv-00144-AA, 2025 U.S. Dist. LEXIS 122504, at *4-6 (D. Or. June 27, 2025) (noting that defendant's interpretation—that the TCPA did not protect cell phone users—"conflicts with the express aim of the TCPA").

This Court should similarly hold that the DNCR provision of the TCPA can apply to residential cellphone subscribers.

**IV.     <u>Plaintiffs' class allegations should not be stricken</u>**

UWM argues in the alternative that, should the FAC survive dismissal, both proposed Classes are "fail-safe" classes and should be stricken. ECF 17 at 6-7. That argument fails for at least two reasons: first, the Classes are not fail-safe, and second, even if they were, the Court should modify the class definition rather than strike the class allegations at the pleading stage.

As courts around the country have held, in TCPA cases, discovery will determine if this case about making uninvited telemarketing calls and text messages to consumers without their consent is amenable to class certification, as most TCPA cases are. Indeed, if UWM's position were adopted, no TCPA class allegations would likely make it past the pleading stage. *Cf. Elliot v. Humana Inc.*, Civil Action No. 3:22-cv-00329-RGJ, 2025 U.S. Dist. LEXIS 67759, at *15 (W.D. Ky. Apr. 9, 2025) ("The Sixth Circuit has held that certification is normal in litigation under the TCPA") (citing *Ira Holtzman, CP.A. & Assocs. Ltd. v. Turza*, 729 F.3d, 682, 684 (7th Cir. 2013)).

A party moving to strike class allegations "has the burden of demonstrating from the face of the … complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiffs may be able to prove." *Schilling v. Kenton Cty.*, No. 10-143-DLB, 2011 U.S. Dist. LEXIS 8050, at *12 (E.D. Ky. Jan. 27, 2011); *see also Healey v. Jefferson Cty. Ky. Louisville Metro Gov't*, No. 3:17-cv-71-DJH, 2018 U.S. Dist. LEXIS 52571, at *6-7 (W.D. Ky. Mar. 28, 2018) (noting that

"[d]efendants fail to show that it would be impossible to certify the [p]laintiffs' proposed class as currently defined," and denying the defendants' motion to strike class allegations).

### A. *The proposed classes are not fail-safe*

A fail-safe class is one that "cannot be defined until the case is resolved on its merits." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). Stated otherwise, it is one where "[e]ither the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment." *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011).

Here, Plaintiffs' proposed classes are not fail-safe – the proposed class definitions at paragraph 106 of the Amended Complaint defines the proposed classes using objective criteria, including receipt of calls or texts within specified periods, DNC-registration status, and whether recipients requested that communications stop. As a result, they are not fail-safe because class membership does not depend on determining liability.

UWM claims that Plaintiffs' classes are fail-safe because they are defined in terms of whether UWM is actually vicariously liable because the definitions are limited to texts or calls made "from or on behalf of Defendant" or limited to texts or calls that "Defendant delivered or caused to be delivered." UWM's fail-safe argument is wrong.

First, whether a call or text message is "from" or "delivered" by a person is an objective determination; that is not a subjective question. The fact that the TCPA imposes liability for direct violations does not change that analysis. Membership in the classes is not dependent on UWM's ultimate liability, and the classes are defined using objective criteria from which members can be ascertained.

Similarly, whether a call or text message is made "on behalf" of another is also an objective analysis, and here, the text messages at issue specifically identify UWM and directly solicit UWM's loan products. As discussed in Section I.A & B, vicarious liability is a more involved analysis that does not turn exclusively on whether the texts were on behalf of another. There are multiple considerations and factors at play to determine whether UWM is vicariously liable for the TCPA violative communications at issue.

As such, Plaintiffs' class definitions are not fail-safe. Membership in all of Plaintiffs' proposed classes can be determined without reaching any legal conclusions: to determine whether someone is in the class, one simply needs to answer questions such as whether the person is on DNC registry or whether the person received a certain amount of phone calls from or on behalf of Defendant within a certain timeframe. *See Panacci v. A1 Solar Power, Inc.*, No. 15-cv-00532-JCS, 2015 U.S. Dist. LEXIS 77294, at *23-25 (N.D. Cal. June 15, 2015) (denying motion to strike DNC registry class and IDNC registry classes that were defined in

terms of vicarious liability, including "by or on behalf of," because membership could be determined by objective criteria and without reaching any legal conclusions so classes were not fail-safe). Membership for all three classes can be determined by objective criteria. *Olney v. Job.Com, Inc.*, No. 1:12-CV-01724-LJO-SKO, 2013 U.S. Dist. LEXIS 141339, at *34 (E.D. Cal. Sep. 30, 2013) (finding that class definition is not fail-safe in part because "membership in this class can be readily determined by objective criteria" where class was defined by persons "who received any telephone call/s from Defendant or its agent/s and/or employee/s").

Furthermore, the classes are not fail-safe because they do not consist of only people who would prevail on the merits: for example, National DNC Class members (and VTPPA sub-class members) would not prevail if a court found the calls or text messages were not telephone solicitations or that UWM obtained prior consent before placing their calls. *See id.* (finding that a class defined as all persons who received calls from defendant during a given timeframe through the use of an ATDS was not fail-safe, where the class definition did not impose additional requirements that would have created a class consisting of only people "who would prevail on this liability issue"). Likewise, the Internal DNC Class members would not prevail if a court found that the calls or text messages were not telephone solicitations.

The class definitions are not defined in a way that precludes membership unless UWM's liability is established. *See, e.g., Boyer v. Diversified Consultants,*

*Inc.*, 306 F.R.D. 536 (E.D. Mich. 2015); *Young*, 693 F.3d at 538. The classes are not fail-safe and UWM's premature alternative motion to strike should be denied.

**B. *In the alternative, the Court should modify the class definitions, not strike them***

If the Court concludes there is an issue with the class definition, refining or revising the class definition is more appropriate and can be done at any stage of the proceeding—even at or after the class certification stage. Whether or not the class is fail safe is not a reason to strike the class allegations at this early stage. "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science. Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814, 825 (7th Cir. 2012) (collecting cases); *see also Sauter*, 2014 U.S. Dist. LEXIS 63122, at *24-25 (permitting plaintiff to modify fail-safe class definition rather than striking class allegations). Accordingly, should the Court find an issue with the proposed class definition, Plaintiffs respectfully request that it be modified or that he be permitted the opportunity to amend.

## CONCLUSION

For the reasons set forth herein, UWM's motion to dismiss or, in the alternative, to strike Plaintiffs' class action allegations, should be denied in its entirety.

Dated: May 12, 2026                           Respectfully submitted,

                                              */s/ Anthony I. Paronich*
                                              PARONICH LAW, P.C.
                                              Anthony I. Paronich
                                              350 Lincoln St., Suite 2400
                                              Hingham, MA 02043
                                              617-485-0018
                                              anthony@paronichlaw.com
                                     *Attorneys for Plaintiff and proposed class*