# EXHIBIT C

2026 WL 2685650
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
West Palm Beach Division.

Michael ANTHONY, individually and on behalf of others similarly situated, Plaintiff,
v.
BRIAN MARKETING GROUP, Defendant.

CASE NO. 24-80800-CIV-CANNON
|
Signed September 11, 2026

**Attorneys and Law Firms**

Ryan L. McBride, Kazerouni Law Group, APC, Phoenix, AZ, Mohammad Reza Kazerouni, Kazerouni Law Group APC, Costa Mesa, CA, for Plaintiff.

Brian Marketing Group., Jupiter, FL, Pro Se.

**ORDER DENYING PLAINTIFF'S MOTION FOR FINAL DEFAULT JUDGMENT**

AILEEN M. CANNON, UNITED STATES DISTRICT JUDGE

***1 THIS CAUSE** comes before the Court upon Plaintiff's Motion for Final Default Judgment (the "Motion") [ECF No. 21]. Plaintiff seeks declaratory relief and $2,500 in damages for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, and the National Do-Not-Call Provision of its implementing regulations, 47 C.F.R. § 64.1200(c) as modified by 47 C.F.R. § 64.1200(e) [ECF No. 21]. The Court has reviewed the Motion, the supporting attachments, and is otherwise advised in the premises. Because the sole count of the Amended Complaint seeks relief under a private right of action for violations of FCC regulations covering residential telephone subscribers, 47 U.S.C. § 227(c)(5), and because the Amended Complaint fails to plausibly establish that Plaintiff is a residential telephone subscriber covered by the plain terms of that provision, 47 U.S.C. § 227(c)(1), Plaintiff fails to state a claim for relief. Accordingly, the Motion is **DENIED** in accordance with this Order [ECF No. 21].

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

In June 2024, Plaintiff filed this putative class action against Defendant seeking monetary, injunctive, and declaratory relief for alleged violations of the TCPA and its implementing regulations [ECF No. 1 (original Complaint); ECF No. 11 (operative Amended Complaint)]. Specifically, Plaintiff brings one claim for "negligent and willful violations of the TCPA," purporting to invoke the TCPA's private right of action found in 47 U.S.C. § 227(c)(5), based on Defendant's alleged violations of § 227(c) and its implementing regulations issued and amended by the Federal Communications Commission ("FCC"), *see* 47 C.F.R. § 64.1200(c), (e) [ECF No. 11 ¶¶ 79–83]. As stated in the Amended Complaint, Plaintiff alleges that Defendant sent five, unsolicited text messages to his cellphone in the span of twelve months—all after Plaintiff put his cellphone number on the National Do-Not-Call Registry ("DNC Registry") [ECF No. 11 ¶¶ 41–50].[2] Each of the text messages contained the following identical language:

> Our records show that you or a loved one reached out for drug or alcohol treatment. We have immediate availability! Call 808-758-5317

[ECF No. 11 ¶ 45].[3] Plaintiff alleges that he has never used drugs or alcohol, heard of Defendant, or sought information regarding treatment for a drug or alcohol addiction [ECF No. 11 ¶ 52]. And he claims that receiving these text messages caused him to suffer "actual harm, including invasion of his privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion" and rendered him unable to use his phone at full capacity [ECF No. 11 ¶¶ 57, 61].

***2** In September 2024, following proper service—and upon Plaintiff's motion—the Clerk entered default against Defendant pursuant to Federal Rule of Civil Procedure 55(a) [ECF Nos. 17, 18].[4] Plaintiff then timely filed the instant Motion, along with a contemporaneously filed notice of voluntary dismissal as to the claims of the putative class members under Federal Rule of Civil Procedure 41 [ECF No. 21; ECF No. 21-3]. The Motion is ripe for adjudication [ECF No. 21].

**LEGAL STANDARDS**

Federal Rule of Civil Procedure 55(b)(2) allows a court to enter a default judgment against a properly served defendant, who, like Defendant here, failed to file a timely responsive pleading. *See* Fed. R. Civ. P. 55(b)(2). A " 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established.' " *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (quoting *Nishimatsu Const. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). But a mere default "does not in itself warrant ... entering a default judgment." *Nishimatsu*, 515 F.2d at 1206. If the admitted facts in the Complaint establish liability—the standard for which is Rule 12(b)(6)—the Court can then evaluate Plaintiff's request for relief. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim.").

**STATUTORY AND REGULATORY BACKGROUND**

Congress enacted the TCPA in 1991 after finding that "[t]he use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques" and that "[m]any consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991); *see also McLaughlin Chiropractic Assocs., v. McKesson Corp.*, 606 U.S. 146, 149 (2025) ("The TCPA protects businesses and consumers from intrusive telemarketing communications."). In particular, Congress expressed concern "that '[a]utomated or prerecorded telephone calls made to private residences ... were rightly regarded by recipients as an invasion of privacy.' " *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264–65 (11th Cir. 2019) (summarizing TCPA legislative findings and quoting *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012)).

The TCPA consists of two parts: § 227(b) imposes "restrictions on [the] use of automated telephone equipment," and § 227(c) protects "subscriber privacy rights" and is colloquially known as the "do-not-call provision." *See Mims*, 565 U.S. at 373 (noting "the TCPA principally outlaws four practices," including "use [of] an automatic telephone dialing system or an artificial or prerecorded voice message," "using artificial or prerecorded voice messages to call residential telephone lines," "sending unsolicited advertisements to fax machines," and "using automatic telephone dialing systems" under certain conditions and without consent). Each subsection contains its own private right of action. *See* 47 U.S.C. § 227(b)(3) (allowing for injunctive relief and statutory damages up to $500 per unlawful automated call); 47 U.S.C. § 227(c)(5) (allowing for injunctive relief and statutory damages up to $500 per violation of regulations "concerning the need to protect residential telephone subscribers' privacy rights").

***3** As part of the TCPA's statutory scheme, Congress granted the FCC authority to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights," 47 U.S.C. § 227(c)(1), and to use that rulemaking proceeding to "prescribe regulations to implement methods and procedures for protecting [residential telephone subscribers' privacy rights] in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers," 47 U.S.C. § 227(c)(2). This Congressional grant of authority specifies that "the regulations ... may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3); *see also Mims*, 565 U.S. at 373–74 (describing § 227(c) as "direct[ing] the FCC to prescribe regulations to protect the privacy of residential telephone subscribers, possibly through the creation of a national 'do not call' system").

Accordingly, in 1992, the FCC engaged in a rulemaking process "to establish procedures for avoiding unwanted telephone solicitations to residences." Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 7 FCC Rcd. 8752, 8753 (1992). The agency then promulgated a series of regulations under § 227(c)(1), requiring solicitors to maintain an internal record of "residential telephone subscribers" and to honor those subscribers' requests "not to receive calls from that person or entity." 47 C.F.R. § 64.1200(e)(iii) (1992). The 1992 regulations also prohibited "telephone solicitation[s] to a residential telephone subscriber before the hour of 8 A.M. or after 9 P.M." 47 C.F.R. § 64.1200(e)(iii) (1992). Although § 277(c)(3) provided the FCC with authority to establish a national database, the agency declined to do so during this 1992 initial rulemaking, citing concerns over costs and accuracy. *See* 7 FCC Rcd. at 8760 (concluding that "[a] national database would be costly

and difficult to establish and maintain in a reasonably accurate form").

In 2002, the FCC again contemplated a national database, among other changes to its initial implementing regulations. *See* In re TCPA Rules & Reguls., 17 FCC Rcd. 17459, 17468 (2002). The agency noted that it "has not opined on whether wireless subscribers or a subset thereof are 'residential telephone subscribers' for purposes of these restrictions [§ 227]." 17 FCC Rcd. at 17485. Recognizing the dramatic increase in the wireless industry, the agency sought "comment on whether telemarketers are including or targeting wireless phone numbers in their telemarketing calls" and whether "telemarketers distinguish between wireless and wireline phone numbers and, if so, how?" 17 FCC Rcd. at 17485. The agency also sought comment on the potential for a joint national database between the Federal Trade Commission ("FTC") and the FCC. In considering the feasibility of this joint national database, the FCC acknowledged in a Notice of Proposed Rulemaking that the TCPA "only grants authority to the Commission to establish a national database for residential subscribers"—and thus sought comment on whether it was possible to consider wireless subscribers "residential" for purposes of the TCPA. 17 FCC Rcd. at 17501, 17491.

The next year, in 2003, Congress enacted the Do-Not-Call Act and authorized the establishment of a joint do not-call registry between the FTC and the FCC. *See* Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), to be codified at 15 U.S.C. § 6101 ("Do-Not-Call Act"). This short piece of legislation allowed the FTC and the FCC to promulgate regulations pursuant to their pre-existing authority under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 *et seq.*, and the TCPA, 47 U.S.C. § 227 *et seq.*, respectively.

Pursuant to that congressional mandate, the FCC promulgated a Report and Order, In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991 (the "2003 Order") —revising its 1992 TCPA implementing regulations—to establish a national database known as the Do-Not-Call Registry (the "DNC") in concert with the FTC.[5] In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14014, 14017 (2003) ("In this Order, we revise the current Telephone Consumer Protection Act (TCPA) rules and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations."). Whereas the text of the TCPA directs the FCC to "implement methods and procedures" for protecting "residential telephone subscribers' privacy rights," 47 U.S.C. § 227(c)(1), the FCC's 2003 Order purports to act "pursuant to [its] authority under section 227(c)" to "protect residential *consumers*." 18 FCC Rcd. at 14034 (emphasis added) (reasoning that "a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations").

***4** In addition to establishing the DNC, the 2003 Order as codified in 47 C.F.R. § 64.1200(e) redefined the term "residential telephone subscriber" as used in § 227(c) to presumptively include "wireless subscribers." 18 FCC Rcd. at 14039 ("[W]e will presume wireless subscribers who ask to be put on the national do-not-call list to be residential subscribers.").[6] In other words, the 2003 Order deems anyone who requests to be put on the DNC—who previously qualified as a "wireless subscriber" under the 1991 regime —a "residential telephone subscriber" within the meaning of TCPA and its implementing regulations. *See* 18 FCC Rcd. at 14039 n.139 (specifying that "[t]his presumption is only for the purposes of section 227 and is not in any way indicative of any attempt to classify or regulate wireless carriers for purposes of other parts of Title II").[7]

Responding to industry backlash against the expanded definition as presented during the notice and comment period, the FCC supported its newly announced definition with both practical and purposive justifications. The agency observed that "wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phone," and "there is a growing number of consumers who no longer maintain wireline phone service and rely only on their wireless telephone service." 18 FCC Rcd. at 14038–39. Accordingly, the agency reasoned that "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections." 18 FCC Rcd. at 14039. Given that "Congress afforded wireless subscribers particular protections in the context of autodialers and prerecorded calls," the FCC thought that other provisions of the TCPA should likewise be extended to wireless subscribers. 18 FCC Rcd. at 14039. The agency also reasoned that, "although Congress expressed concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers"—all of which provided sufficient justification for the "conclu[sion] that wireless subscribers may participate in the national do-not-call list." 18 FCC Rcd. at 14040.

From 2003 until the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), *overruling Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984), courts generally have deferred to the FCC's 2003 redefinition of "residential telephone subscriber" and presumed that cellphone users fall under the ambit of § 227(c)—although there is increasing judicial scrutiny about whether the 2003 Order is consistent with the agency's statutory grant of authority in 47 U.S.C. § 227(c). *See, e.g.*, *Steidinger v. Blackstone Med. Servs.*, 182 F.4th 532, 538 (7th Cir. 2026) (rejecting argument that reference to unwanted "telephone call" in § 227(c)(5) extends to text messages, despite contrary FCC interpretation).

## DISCUSSION

***5** Plaintiff brings his sole claim for relief under § 227(c)(5) of the TCPA and § 64.1200(c) of its implementing regulations as modified by the 2003 Order and 47 C.F.R. § 64.1200(e). [ECF No. 11 ¶¶ 79–83]. *See* 47 U.S.C. § 227; 47 C.F.R. § 64.1200(c), (e). According to Plaintiff, Defendant sent five unsolicited text messages to Plaintiff's personal cell phone, authorizing damages and injunctive relief under that subsection. Based on the plain terms of § 227(c), the Court disagrees and declines to enter final default judgment. Even accepting Plaintiff's allegations as true, Plaintiff's receipt of unwanted text messages on his personal cellphone does not trigger a violation of 47 C.F.R. § 64.1200(c) as amended by 47 C.F.R. § 64.1200(e). This is because the enabling statute, 47 U.S.C. § 227(c), authorizes the FCC to promulgate regulations to protect the privacy rights of "residential telephone subscribers[ ]," not cellular phone subscribers. 47 U.S.C. § 227(c)(1); 47 C.F.R. § 64.1200(c), (e). Because the FCC's 2003 Order purports to redefine the term "residential telephone subscriber" to include "wireless subscriber" and thereby to expand the private right of action under § 227(c)(5) to all cellphone users, the FCC has exceeded its statutory authority under § 227(c)(1)–(2) in that regard.

Questions of law, such as questions of statutory interpretation, are appropriate for resolution under a 12(b)(6) analysis. *Williams v. Homestake Mortg. Co.*, 968 F.2d 1137, 1139 (11th Cir. 1992) (citing *Young v. Comm'r*, 926 F.2d 1083, 1089 (11th Cir. 1991)). Notwithstanding courts' historical deference to agency interpretation, "the basic nature and meaning of a statute does not change when an agency happens to be involved." *Loper Bright*, 603 U.S. at 408. Even when a court is tasked with interpreting a statute that delegates authority to an administrative agency, the court nevertheless must "independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 371. In other words, "[i]n civil enforcement proceedings under the Telephone Consumer Protection Act, are district courts bound by the Federal Communications Commission's interpretation of the Act? The answer is no." *McLaughlin Chiropractic Assocs.*, 606 U.S. at 149. Rather, courts must "independently determine for [themselves] whether the agency's interpretation of a statute is correct." *Id.* at 155 (citing *Loper Bright*, 603 U.S. at 369, 402). Such interpretation is conducted using "ordinary principles of statutory interpretation, affording appropriate *respect* to the agency's interpretation." *Id.* at 152 (emphasis added); *see also Loper Bright*, 603 U.S. at 412–13 (noting that an agency's interpretation "may help inform th[e] inquiry" of whether an agency acted within its statutory scope of authority, but it is not entitled to deference).[8]

***6** The Eleventh Circuit exercised this duty in the context of the TCPA in *Insurance Marketing Coalition*, holding that the FCC exceeded its statutory authority under 47 U.S.C. § 227(b)(2) of the TCPA by promulgating a regulation in 2023 that defined "prior express consent," as set forth in 47 U.S.C. § 227(b)(1)(A), (B), as "prior express *written* consent." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 307–08, 318 (11th Cir. 2025). The Eleventh Circuit observed that, "[i]n its attempt to 'implement' the TCPA, the FCC overstepped statutory boundaries" by "redefining 'prior express consent' to include the additional 'prior express consent' restrictions." *Id.* at 317; *see also Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1308–10 (11th Cir. 2020) (holding that the FCC tried to "expand the [TCPA's] coverage and fill this [legislative] gap" by redefining "automatic telephone dialing system" in § 227(b)(1) as systems that merely store numbers and call them later, rather than equipment that "randomly or sequentially generate[s] telephone numbers" in the first instance, as required by the statute).[9]

Here, § 227(c)(1) of the TCPA required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object" within 120 days after December 20, 1991. 47 U.S.C § 227(c)(1). Relatedly, § 227(c)(2) required the FCC, within nine months after December 20, 1991, to "prescribe regulations to implement methods and procedures for protecting the privacy rights described in [§ 227(c)(1)] in an efficient,

effective, and economic manner and without the imposition of any additional charge to telephone subscribers." 47 U.S.C § 227(c)(2). From this process emerged 47 C.F.R. § 64.1200(c), the do-not-call provision, which provides in relevant part:

> c) No person or entity shall initiate any telephone solicitation to:
>
> (1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or
>
> (2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government ....

47 C.F.R. § 64.1200(c). As mentioned above, § 227(c)(5) provides a private right of action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the [FCC's] regulations prescribed under this subsection ...." 47 U.S.C § 227(c)(5).

In other words, under the § 227(c) regime, the FCC may promulgate regulations to protect the privacy rights of "residential telephone subscribers[ ]," and a residential telephone subscriber may sue if he receives more than one call within one year that is in violation of those regulations. Yet the TCPA does not define "residential telephone subscriber." The Court therefore concludes that the FCC's 2003 Order redefining the term "residential telephone subscriber" in § 227(c) and 47 C.F.R. § 64.1200(c) to include wireless subscribers, *see* 47 C.F.R. § 64.1200(e), conflicts with the term's ordinary statutory meaning and exceeds the agency's statutory authority under the TCPA. This is confirmed by the plain text, the ordinary meaning of the term "residential" at the time the TCPA was enacted, the Act's structure, and the Act's statutory history.

**I. The plain meaning of the term "residential telephone subscriber" in § 227(c) does not cover cellular subscribers.**

***7** As noted, the TCPA provides no statutory definition of the term "residential telephone subscriber," so the Court gives the term its ordinary meaning. *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *see also* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 147, 429 (2012) (defining the foundational fixed-meaning canon as "the doctrine that words must be given the meaning they had when the text was adopted"). "When examining the plain and ordinary meaning of a statute, 'one of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment.' " *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021) (quoting *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016) (examining 1960s dictionaries to assist in interpreting Title VII)).

At the time the TCPA was enacted in 1991, dictionaries defined "residential" as 1) "of or connected with residence," 2) "of, characterized by, or suitable for, residences or homes," and 3) "chiefly for residents rather than transients." *Residential*, Webster's Third New International Dictionary (1986); *see also Residential*, Webster's New World Dictionary, Third College Edition (1988) (same). And "residence" was defined as a "dwelling, place, or abode, especially a house." *Residence*, Webster's Third New International Dictionary (1986); *see also Residential*, Webster's New World Dictionary, Third College Edition (1988) (same); *Residence*, Black's Law Dictionary (6th ed. 1990) (defining "residence" as "[a] house where one's home is; a dwelling house"). Important too, a mainstream definition of "subscriber" at the time of enactment was "an individual having commercial telephone equipment installed on his premises," *Subscriber*, Webster's Third New International Dictionary (1986), or "a homeowner, apartment dweller, business, etc. that pays a monthly charge to be connected to a television cable service," *Subscriber*, Random House Dictionary of the English Language (2d ed. 1987). *See also Subscribe*, Webster's New Collegiate Dictionary (9th ed. 1986) (defining "subscribe" as "to enter one's name for a publication or service"). Definitions at the time of the TCPA's enactment suggest that "residential telephone subscriber," at the very least, meant a person who pays intermittently to receive telephone services that are connected to his or her home. It is also plausible that "subscriber" takes on the verbatim definition set forth in Webster's Third New International Dictionary (1986): "an individual having commercial telephone equipment installed on his premises," and the word "residence" serves only to clarify that "his premises," within the definition of subscriber, is a home. But at the very least, several of the definitions of "subscriber" at the time the TCPA was enacted include language indicating a physical tethering of the service to the residential location. *See Subscriber*, Webster's Third New International Dictionary (1986) ("telephone equipment *installed* on his

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

premises" (emphasis added)); *Subscriber*, Random House Dictionary of the English Language (2d ed. 1987) ("to be *connected* to a television cable service" (emphasis added)).

Common usage at the time of enactment mirrors these dictionary definitions, supporting the ordinary understanding of "residential telephone subscriber" as distinct from "wireless telephone subscriber" and referring to persons who possess home phones, or landlines. *See Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1234, n.1 (9th Cir. 2022) (Ikuta, J., dissenting) (collecting everyday documents (magazines, instruction manuals, industry publications) from the time of enactment to demonstrate that "it was understood that a 'residential telephone' referred to a land line at a residence"); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 615 (2020) (quoting 137 Cong. Rec. 30821 (1991)) (observing that "[a] leading Senate sponsor of the TCPA captured the zeitgeist in 1991, describing [that] robocalls ... '[ ] hound us until we want to rip the telephone right out of the wall' "). This makes sense—cellphones, as we know them today—were in their fledgling stages (better known as wireless/cordless phones at the time). *See* James F. DeRose, The Wireless Data Handbook 132 (4th ed. 1999) (noting that when the TCPA was enacted in 1992, roughly 3% of Americans were cellphone subscribers). Indeed, the first text message was not sent until the end of 1992, after Congress enacted the TCPA. *See Jones*, 2025 WL 2042764, at *4 (observing that "[t]ext messaging was not an available technology in 1991, and thus 'telephone call' would not have included text messages or SMS messages"); *see also* Victoria Shannon, *15 years of text messages, a 'cultural phenomenon,'* N.Y. Times, Dec. 5, 2007 (recounting world's first text message sent in December 1992), available at https://perma.cc/S9LR-4BPH.

***8** Nor is there language in the TCPA that would otherwise permit the FCC to stretch the definition of "residential telephone subscriber" to accommodate technological innovation and prevalence, as further discussed below.[10]

**II. The statutory context of the TCPA confirms the plain meaning.**

A broader examination of the TCPA evidences Congress's differentiation of "residential" and "cellular" such that the FCC's 2003 Order—which purports to expand the scope of the "residential telephone subscriber" provision in 47 U.S.C. § 227(c) to include "wireless telephone subscribers"—exceeds the plain terms of the statute. "In considering the text, we bear in mind that a provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1089 (11th Cir. 2018); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1998) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue as well as the language and design of the statue as a whole").

***9** Section 227(b)—the section of the TCPA devoted to automated telephone equipment—serves as the clearest example of Congress's distinction between residential and cellular telephones because it devotes separate sub-sections to prohibiting what is otherwise the same behavior. *See Barr*, 591 U.S. at 613 (describing § 227(b) as "prohibit[ing] robocalls to cell phones and home phones"). Section 227(b)(1)(A)(iii) prohibits using auto dialers and pre-recordings when "making a call" "to a cellular telephone service," while § 227(b)(1)(B) prohibits using auto dialers and pre-recordings when "initiat[ing] a telephone call to any residential telephone line." 47 U.S.C. § 227(b)(1)(A)(iii), (b)(1)(B). Apart from whether the recipient of the call is on a "residential telephone line" or has a "telephone number [ ] assigned to a cellular telephone service," these provisions are otherwise identical. *See id.* at 648 (Gorsuch, J., concurring in part and dissenting in part) (noting that "[t]he statute limits robocalls to residential landlines, hospitals, emergency numbers, and business lines. The only provision before us today, however, concerns robocalls to cell phones," referring to § 227(b)(1)(A)(iii)); *see also Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 306 (7th Cir. 2017) (Easterbrook, J.) (distinguishing § 227(b)(1)(A)(iii) by observing that "[f]ederal law severely limits unsolicited calls to cell phones, 47 U.S.C. § 227(b)(1)(A)(iii), and the FTC maintains a do-not-call registry for landline phones," referring to the DNC); *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1340 (S.D. Fla. 2022) (comparing the same provisions and concluding that "[t]he TCPA clearly draws a distinction between cellular telephones and residential telephones."). If "residential" encompassed "cellular," as would need to be true to accept the interpretation offered in the 2003 Order, then section 227(b)(1)(A)(iii) of the TCPA, which specifically prohibits certain uses of auto dialers and pre-recordings when calling any "cellular telephone service," would be deemed surplusage because section 227(b)(1)(B) already bars unwanted telephone calls to any "residential telephone line." *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J.) (plurality opinion) (noting the "cardinal rule of statutory interpretation that no provision should be construed to be

entirely redundant”). The Court “refrain[s] from concluding here that the differing language in the two subsections has the same meaning in each.” *Russello v. United States*, 464 U.S. 16, 23 (1983).

Congress also explicitly uses the terms “cellular” and “residential” distinctly and differently throughout the statute. For example, as discussed above, § 227(b)(1)(A)(iii) deals with prohibitions on specific types of technology. 42 U.S.C. 227(b)(1)(A)(iii). Specifically, that section prohibits calls to “any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service.” 42 U.S.C. 227(b)(1)(A)(iii). But Congress allows the FCC to “exempt from th[ose] requirements ... calls to a telephone number assigned to a *cellular* telephone service.” 47 U.S.C. § 227(b)(2)(C) (emphasis added). Similarly, § 227(b)(2)(H) allows the FCC “to restrict or limit the number and duration of calls made to a telephone number assigned to a *cellular* telephone service to collect a debt owed to or guaranteed by the United States.” 47 U.S.C. § 227(b)(2)(H) (emphasis added). In stark contrast, § 227(c), which authorizes the FCC to promulgate regulations to “protect” the “privacy rights” of a group of people—that is, “residential telephone subscribers’ privacy rights”—authorizes the creation of a national database to “compile a list of telephone numbers of residential subscribers,” 47 U.S.C. § 227(c)(3), and “prohibit[s] any residential subscriber from being charged” for participation in the database, 47 U.S.C. § 227(c)(3)(E). *See Turizo*, 603 F. Supp. 3d at 1340 (comparing the same provisions and concluding that “[t]he TCPA clearly draws a distinction between cellular telephones and residential telephones”). This distinction between cellular and residential in sections § 227(b) and § 227(c) shows that Congress treated cellphones uniquely and used appropriate labels in accordance with that distinction.[11]

***10** In sum, it is clear that Congress knew how to differentiate between cellular and residential when it wished to. “Where a scheme ‘includes particular language in one section ... but omits it in another section,’ we generally presume that the omission is intentional and purposeful.” *Tanner v. Stryker Corp. of Michigan*, 104 F.4th 1278, 1286 (11th Cir. 2024) (quoting *United States v. Pate*, 84 F.4th 1196, 1202 (11th Cir. 2023) (en banc)). Congress could have included cellular phones in § 227(c); “it chose instead to enact more restrictive language, and we are bound by that restriction.” *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 99 (1991). “We are fortified in this conclusion by ... examination of the structure of the ... statute.” *Russello*, 464 U.S. at 22. The Court therefore finds that the term residential telephone subscriber does not encompass a wireless subscriber.

**III. Until 2003, the FCC distinguished between cellular and residential.**

Beyond the plain text and contextual evidence strongly supporting the conclusion that § 227(c) does not apply to cell phones, the FCC's own longstanding position bolsters such an interpretation. It appears the FCC expanded its definition of “residential telephone subscriber” once cellphones became more commonplace, but putting expertise and technological innovation to the side, neither an agency nor the courts can expand statutory definitions beyond what the text can bear. *See Loper Bright*, 603 U.S. at 404 (overturning regime that “forc[ed] courts to ... pretend that ambiguities are necessarily delegations”).

From the date of enactment of the TCPA through 2003, the FCC's publications reflected a consistent recognition that the agency lacked authority to regulate beyond what is explicitly outlined in § 227(b)(2) and § 227(c)(1)–(2).[12] Indeed, right after the passage of the Act, the FCC's 1992 Rulemaking Report, issued alongside its regulations enacted pursuant to § 227(c)(2), contemplated whether “there is a need for additional authority from Congress to further restrict telephone solicitations” [beyond what is provided in § 227(c)(1)]. 7 FCC Rcd. at 8756. The agency also concluded that it did not have the requisite authority to effectuate several other contemplated regulations under the TCPA. *See* 7 FCC Rcd. at 8774 (concluding agency is unable to impose restrictions on calls by nonprofit organizations based on TCPA's legislative history and deciding against requesting additional congressional authority); 7 FCC Rcd. at 8779 (finding inability to require caller to state certain information up front based on plain text of § 227(d)(3)(B) and declining to seek more authority). The agency ultimately concluded in its 1992 Report, despite being urged by a “number of commenters” to “request additional authority from Congress to protect consumer privacy rights,” that it need not do so as the “regulations implemented satisfy the TCPA's requirements that residential subscribers be provided with a means to avoid unwanted telephone solicitations, and that autodialers [§ 227(c)] and prerecorded or artificial voice messages be used responsibly in ways that do not impede commerce or threaten public health and safety [§ 227(b)].” 7 FCC Rcd. at 8779–81. Then, during the 2002 proposed rulemaking—the first since the 1992 rulemaking—the agency

again recognized that "the FTC's proposal [for a national database] also appears to allow some business and wireless telephone subscribers to register on the national database, while the TCPA grants authority to the Commission to establish a national database only for residential subscribers." 17 FCC Rcd. at 17501.

***11** Nevertheless, in 2003, and without the previously contemplated additional authority from Congress, the FCC promulgated new implementing regulations—purportedly pursuant to its authority under § 227(c)(1)—to bring wireless subscribers within the orbit of residential subscribers. "What changed? Technology and marketing strategies. But not the statute." *Glasser*, 948 F.3d at 1308. The 2003 Order rests on the fact that cellphones are now ubiquitous and that landlines are increasingly uncommon. *See e.g.*, 18 FCC Rcd. at 14114 (recognizing that "consumers carry their cell phones on their persons, to work, and while driving"); 17 FCC Rcd. at 17485 (justifying notice and comment because "the commercial wireless industry has grown dramatically"); 18 FCC Rcd. at 14038–39 (reasoning that "there is a growing number of consumers who no longer maintain wireline phone service").[13] In pursuit of fulfilling the overall goals of the TCPA, the FCC opined that "it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections." 18 FCC Rcd. at 14039; *see also Chennette*, 50 F.4th at 1229 (Bress, J., concurring) (observing that "[a] fair reading of the 2003 TCPA Order shows that the FCC was concerned with protecting consumers generally, regardless of where they happened to be when an unwanted call reached them"). As best said by the Eleventh Circuit with reference to expansion of § 227(b) via FCC Order,

> Congress in retrospect drafted the 1991 law for the moment but not for the duration. The focus on number generation eradicated one form of pernicious telemarketing but failed to account for how business needs and technology would evolve. Watching this happen in real time, the Commission tried to use a broad 'reading of the legislative history' and an all-encompassing view of the law's purpose to expand the statute's coverage and fill this gap.

*Glasser*, 948 F.3d at 1309 (citing 17 FCC Rcd. at 17474). It goes without saying that such an explicit extension of the statutory definition via implementing regulation—to conclude that cell phones are presumptively residential—would not be necessary if the statute as understood at the time of enactment authorized that interpretation. *See Turizo*, 603 F. Supp. 3d. at 1341 (noting that "when Congress granted the FCC authority to create the DNC Registry via section 227(c)(3), Congress intentionally withheld from the FCC any authority to create a registry that included cellular telephone numbers"). And an agency's newly discovered application of congressional intent in light of technological change is not a sufficient basis at any point to re-define the subject of a statutory provision, much less twelve years after enactment. *See Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 970 (11th Cir. 2016) (en banc) ("Elevating general notions of purpose over the plain meaning of the text is inconsistent with our judicial duty to interpret the law as written."). Even if the FCC is correct as to Congress's presumed intent, the text commands otherwise, and the Court will "not replace the actual text with speculation as to Congress' intent." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)); *see*, *e.g., Ins. Mktg. Coal. Ltd.*, 127 F.4th at 313 (holding that the FCC's expanded definition of "express consent" in 2023 exceeds its authority under TCPA and is contrary to text of § 227(b)).

In light of this history, and affording the FCC whatever "appropriate respect" it is due, *see McLaughlin Chiropractic Assocs., Inc.*, 606 U.S. at 162 (citing *Loper Bright*, 603 U.S. at 386), it is not the job of the FCC or this Court to stretch statutory language beyond its permissible meaning to keep up with the times, *see Facebook, Inc. v. Duguid*, 592 U.S. 395, 408–09 (2021) (rejecting argument that "the TCPA must be treated as an agile tool" because "technology adapts to change"). That is a task reserved to Congress, particularly when the definitional rewrite results in an expansion of a private right of action. U.S. Const. art. 1, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"); *see Duguid*, 592 U.S. at 409 (framing petitioner's TCPA challenge as a "quarrel [ ] with Congress"); *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (noting that "it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself."); *see also Turizo*, 603 F. Supp. 3d at 1341 ("But by presuming that any wireless number on the DNC Registry qualifies as 'residential,' the FCC expands section 227(c)(5)'s right of action to cellular telephone subscribers—without any congressional grant of authority to do so."); *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 313; *Glasser*, 948 F.3d at 1309–10.[14]

***12** For all of these reasons, exercising this Court's duty to interpret the meaning of law, the FCC's definition of

"residential telephone subscriber" as promulgated in the agency's 2003 Order is contrary to the text of the TCPA. Section 227(c) applies to "residential telephone subscribers" and does not authorize the FCC to initiate or promulgate rules protecting the privacy rights of cellular phone users. In the same vein, the private right of action in § 227(c)(5) to remedy violations of regulations promulgated under § 227(c) likewise does not extend to cellular phone users.[15]

**IV. Plaintiff's Claim**

To bring this case back to Plaintiff's Amended Complaint, Plaintiff alleges that he registered his cellphone on the DNC registry and received five unsolicited text messages on that cellphone [ECF No. 11]. Plaintiff grounds his suit in the private right of action codified in § 227(c)(5), asserting that, as a "residential telephone subscriber," Defendant violated 47 C.F.R. § 64.1200(c) (as interpreted by the FCC in the 2003 Order) when it sent unsolicited text messages to his cellular device. For all of the reasons discussed in this Order, and even accepting all of Plaintiff's allegations as true, Plaintiff cannot state a claim for a violation of § 227(c) or its implementing regulations. Any such claim is necessarily predicated on the FCC's 2003 Order, which as the Court has explained, exceeded its statutory authority as granted in § 227(c).[16]

**CONCLUSION**

***13** Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Default Final Judgment [ECF No. 21] is **DENIED**.[17]

2. The **CLERK** shall **MAIL** a copy of this Order to Defendant's registered agent at the address listed below and file a Notice of Compliance documenting same.

3. The Clerk is directed to **CLOSE** this case.

**ORDERED** in Chambers in Fort Pierce, Florida, this 11th day of September 2026.

**All Citations**

Slip Copy, 2026 WL 2685650

Footnotes

1 Plaintiff's factual allegations in the Amended Complaint are taken as true for purposes of this Motion [ECF No. 11]. *See Cotton v. Massachusetts Mut. Life Ins.*, 402 F.3d 1267, 1278 (11th Cir. 2005).

2 The DNC is a website run by the Federal Trade Commission "designed to stop unwanted sales calls." It is "a list that tells registered telemarketers what numbers not to call." Fed. Trade Comm'n, National Do Not Call Registry FAQs (2023), https://consumer.ftc.gov/articles/national-do-not-call-registry-faqs.

3 The five messages direct Plaintiff to call different phone numbers each time; otherwise, the content is identical [ECF No. 11 ¶¶ 46–49].

4 Plaintiff properly served Defendant with the initial Complaint on July 12, 2024, pursuant to Fla. Stat. § 48.081, and then served the Amended Complaint on August 8, 2024 [ECF Nos. 10, 14]. The time for Defendant to respond to either pleading has expired, and Defendant has not appeared or requested additional time to respond.

5 The Do-Not-Call Act did not grant the FCC any additional authority; rather, it directed the agency to "issue a final rule pursuant to the rulemaking proceeding that it began on September 18, 2002, under the Telephone Consumer Protection Act (47 U.S.C. § 227 *et seq.*)." Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003).

6 The R&O is the enacting document that "amends the rules or makes a decision not to do so." *See* FCC, *Understanding FCC Processes*, https://www.fcc.gov/general/understanding-fcc-processes (last visited on 9/10/2026). Accordingly, the R&O dictates the FCC's official policy. *Id.* After a R&O is released, summaries of the document are then published in the Federal Register, and the specific rule changes are later extracted and published in the Code of Federal Regulations. *Id.* In this Order, the Court refers to the 2003 Order as the relevant "regulation," and notes that the 2003 Order was incorporated into 47 C.F.R. § 64.1200(e), which as relevant here, specifically purports to include cellphone users as a protected class. *See* 47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph (c) and (d) of this section are applicable

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.' ").

7 As explained in the 2003 Order, the presumption that wireless subscribers who ask to be put on the national do-not-call list are "residential subscribers" applies across the board, but the FCC "may require a complaining wireless subscriber to provide further proof of the validity of that presumption" in the event of an enforcement action. 18 FCC Rcd. at 14039.

8 Courts have interpreted 47 U.S.C. § 227 in a variety of ways since *Loper Bright*. Some have narrowed in on the term "telephone call" within § 227(c) and rejected the 2003 Order's expansion of that term to include text messages as contrary to the statute's text. *See* *Steidinger v. Blackstone Med. Servs.*, 182 F.4th 532 (7th Cir. 2026) (rejecting view that "telephone call" in 47 U.S.C. § 227(c)(5) applies to text messages, notwithstanding plaintiffs' appeal to FCC interpretation in 2003 Order); *Davis v. CVS Pharmacy, Inc.*, No. 24-477, 2025 WL 2491195, at *1 (N.D. Fla. Aug. 26, 2025) (concluding that "a text message is not a 'telephone call' " within the meaning of § 227(c), and thus "it unnecessary to address the separate (and more difficult) question of whether a cell phone subscriber is a 'residential telephone subscriber' "); *Jones v. Blackstone Med. Servs., LLC*, No. 24-01074, 2025 WL 2042764, at *3–4 (C.D. Ill. July 21, 2025) (observing that a plain reading of § 227(c) makes clear that it does not apply to text messages and declining to defer to the 2003 Order, citing *Loper Bright*). Others have focused, as here, on the term "residential subscriber." Several courts have held that § 227(c) accords with the "presumption" that cellphones are residential phones provided in the 2003 Order. *Wilson v. Hard Eight Nutrition LLC*, No. 25-00144, 2025 WL 1784815, at *6–7 (D. Or. June 27, 2025) (concluding "without deferring to the FCC ... that the FCC got it right" that "residential subscriber" presumptively includes cellphones); *Lirones v. Leaf Home Water Sols., LLC*, 23-02087, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024) (reasoning, without more, that "based on the text of the statute and tools of statutory interpretation, the Court would reach the same conclusion [as the 2003 Order]"); *Lyman v. QuinStreet, Inc.*, No. 23-05056, 2024 WL 3406992, at *1 (N.D. Cal. July 12, 2024) (noting the FCC's interpretation is "especially informative" and "particularly persuasive" and applying the "presumption"). From there, a few courts also have construed the 2003 Order's use of the term "presumption" as requiring a purpose-based test to determine whether wireless subscribers are residential subscribers. *See* *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 202, 208 (S.D.N.Y. 2024) (determining that "cellphone users are not categorically excluded from the definition of 'residential subscriber' " and allowing plaintiff's claims to proceed where he alleged that he performed "domestic tasks with his phone"); *Dobronski v. CHW Grp.*, No. 24-11649, 2025 WL 2426370, at *6 (E.D. Mich. Aug. 21, 2025) (reasoning that "because Plaintiff's numbers are on the DNC Registry, Plaintiff is entitled to the FCC's presumption of residential telephone subscriber," and allowing his claims to proceed because he alleges "that his cell phone is primarily used for 'personal, family, and household communications' "). Finally, some have declined to address the question entirely. *See, e.g.*, *Newman v. SGMS, Inc.*, No. 25-00042, 2025 WL 2524131, at *2 (W.D.N.C. Sept. 2, 2025) (observing that "[t]he Fourth Circuit has not addressed whether cell phone or VOIP owners are considered 'residential telephone subscribers' under 47 U.S.C. § 227(c)(5) ... [and] [a]lthough historically courts that have addressed the issue have reached different conclusions, recent district court decisions in the Fourth Circuit generally assume that the TCPA extends to wireless telephone numbers").

9 Prior to the Supreme Court's decision in *McLaughlin*, the Hobbs Act arguably stood in the way of district court resolution of this question. *See*, *e.g.*, *Radvansky v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314, 1319–20 (N.D. Ga. 2024) (sympathizing with "the sentiment that the 2003 FCC order may violate separation of powers by going further than the authority Congress vested the FCC with," but ultimately applying the FCC's 2003 definition of residential telephone subscriber because the Hobbs Act prevents the court from "refus[ing] to enforce an FCC interpretation"); *Correll v. Iconic Mortg. Corp.*, No. 20-24858, 2021 WL 5014122, at *5 (S.D. Fla. Feb. 8, 2021) (concluding that the Hobbs Act precluded review of the 2003 Order).

10 The Court departs from the one other district court in this circuit to address the question of whether the term "residential telephone subscriber" excludes cellphone users after *Loper Bright* and *McLaughlin*. *See* *Shawn Isaacs v. US Health Advisors, LLC*, No. 24-00216, 2025 WL 2268359, at *3 (N.D. Ga. Aug. 7, 2025). In *Shawn Isaacs*, the Court defined "residential subscriber" (rather than "residential telephone subscriber," as used in the statute) as "a person who uses their phone for activities associated with their private, domestic life." *Id.* It reasoned, through use of 2024 and 2025 dictionary definitions, that "[t]he term 'residential' modifies 'subscribers,' meaning that the TCPA applies to a certain type of phone *subscriber* rather than to a particular type of phone *technology*." *Id.* (emphasis in original). On that reasoning,

the court in *Shawn Isaacs* concluded that a " 'residential subscriber' is a person who maintains a phone for the purposes of their private residence rather than for commercial or business purposes," and concluded that the plaintiff qualified as a residential subscriber because he used his cell phone to "communicat[e] with friends and family, and ... not ... for a business." *Id.* at *4. Respectfully, this Court finds the approach in *Shawn Isaacs* atextual and purposivist; it largely omits the word "telephone" from the statutory phrase and hinges largely on current dictionaries rather than on those in place at the time of enactment. *See* *Chinchilla*, 987 F.3d at 1308 (quoting *Catastrophe Mgmt. Sols.*, 852 F.3d at 1026). But methodology aside, an interpretation of "residential telephone subscriber" as having to do with "purposes of their private residence rather than for commercial or business purposes," *Shawn Isaacs*, 2025 WL 2268359, at *3, is inconsistent even with the FCC's own interpretation in 2005, which left open the possibility that "home-based businesses" were "residential telephone subscribers" in 2005—well after the agency's 2003 Order. *See* In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 20 FCC Rcd. 3788, 3793 (2005) (electing to review on a case-by-case basis whether the home business was a residential telephone subscriber).

11 Some courts that view the 2003 Order as consistent with § 227(c) argue that reliance on the cellular/residential distinction in § 227(b) and § 227(c) to gain insight into the meaning of "residential telephone subscriber" is improper. *See* *Shawn Isaacs*, 2025 WL 2268359, at *4; *Cacho*, 739 F. 3d at 205; *Wilson*, 2025 WL 1784815, at *4 (describing the exercise as "a strained apples-to-apples comparison"). As posited by one court, "Congress has sometimes limited the scope of the TCPA to specific types of phone lines, but, in this case, has limited the TCPA only to a particular type of subscriber." *Shawn Isaacs*, 2025 WL 2268359, at *4. Or as described by another, § 227(b) "lists [ ] telephone technologies" whereas § 227(c) "focuses not on the equipment used to generate and transmit calls but on end-user protections." *Wilson*, 2025 WL 1784815, at *4. Under this logic, "a 'residential [telephone] subscriber' and a cellular telephone are not members of the same genus," and therefore any insight from comparison of the two is purportedly misplaced. *Cacho*, 739 F. 3d at 205. The Court disagrees that nothing can be gleaned from comparison to the rest of the statute at issue merely because the two subsections are not constructed identically. Of course, types of technology and classes of persons are not synonymous, but in this case, the concepts are inextricability intertwined and provide illuminating insight nonetheless. As discussed above, "residential telephone subscriber" is defined, at least in part, by the characteristics of the telephone technology, rendering helpful to the interpretive exercise other instances in the same statute in which Congress clearly chose to mention cellular phones/cellular subscribers as distinct from "residential telephones." *See* *Chennette*, 50 F.4th at 1234 (Ikuta J., dissenting) (comparing and observing that "[t]his language indicates that Congress knew how to refer to cellular telephones when it wanted to, and that it chose not to use that terminology in describing the types of persons (residential telephone subscribers) whose privacy would be protected under § 227(c)").

12 *See* *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1308 (11th Cir. 2020) (Sutton, J. sitting by designation) (observing that the FCC agreed with one interpretation of the auto dialer provision in § 227(b) "for the first dozen years of the statute's existence" until 2003 when it provided an expanded definition).

13 Tellingly, however, the FCC continued to recognize cellphones as distinct from home phones, even after the 2003 Order. *See, e.g.*, 30 FCC Rcd. at 7961 (2015) (noting that "[the agency] agree[s] with the large number of consumer commenters and the Federal Trade Commission that consumers need new and better tools to stop robocalls to their homes and wireless numbers"); 30 FCC Rcd. at 8072 (Commissioner Pai, dissenting and noting that his "family and [him] get [telemarkering calls] on [their] cellphones during the day and on [their] home phones at night").

14 The Court in *Shawn Isaacs*, in answering this question the other way, mirrored the justification of the FCC and reasoned that allowing cellphone use to fall within the meaning of "residential telephone subscriber" furthers the "overall purpose of the TCPA" because "the negative impact to their residential privacy remains the same," "[r]egardless of whether a person receives a call to their home phone or a personal cell phone." 2025 WL 2268359, at *4. The *Shawn Issacs* Court also concluded that a definition of "residential telephone subscriber" that does not presumptively include cellphone users "would tie residential privacy interests to an obsolete and disappearing phone technology." *Id.* This reasoning is pure policy. It is not the courts' job to prevent legislation from becoming obsolete or to "update" the law to match up with technological evolution. *See* *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 313; *Glasser*, 948 F.3d at 1309–10; *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 642 (7th Cir. 2012) (Easterbrook, J.) ("When a text can be applied as written, a court ought not revise it by declaring the legislative decision 'absurd.' Nor should a court try to keep a statute up to date. Legislation means today what it meant when enacted.") (citations omitted).

15 Although unnecessary to disposition of the Motion, the Court notes the following regarding the 2003 Order. It also includes a "Constitutionality" Section, which appears to rest entirely on a vision of the DNC that penalizes only solicitous speech directed toward DNC registrants while in their homes. As justification for the DNC on First Amendment grounds, the FCC reasons that "there is a substantial governmental interest in protecting residential privacy," and that "[t]he Supreme Court has 'repeatedly held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom.' " 18 FCC Rcd. at 14053 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)); 18 FCC Rcd. at 14053 n.206 (citing *FCC v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) ("[I]n the privacy of the home, ... the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.")). The agency goes on to say that the DNC is constitutional because "the government has an interest in upholding the right of *residents* to bar unwanted speech from their homes," citing *Rowan v. United States Post Office*, 397 U.S. 728, 737–738 (1970), and *Martin v. City of Struthers*, 319 U.S. 141, 141–48 (1943). 18 FCC Rcd. at 14053 (emphasis in original). These arguments are also repeated in the FCC's Orders following the 2003 Order. *See* In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7995–96 (2015). The Court notes that *Rowan* and *Martin* hinge, in large part, on the fact that the challenged speech was directed into a person's home, affording the homeowner a heightened ability to control his own property. *Rowan*, 397 U.S. at 737–738 (1970) (upholding law allowing resident to block certain mail to his home and "categorically reject[ing] the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another" because the "sanctuary of the home" is afforded special protection from unwanted speech); *Martin*, 319 U.S. at 141–48 (striking down ordinance that prohibited door-knocking wholesale as insufficiently tailored but noting in *dicta* that a regulation "which would make it an offense for any person to ring a bell of a householder who has appropriately indicated that he is unwilling to be disturbed" would be constitutional). This cuts against a reading of the 2003 Order that would purport to authorize private rights of action for telephone solicitations made to a person outside their residence. Such an interpretation would seem to eviscerate the private-public sphere distinction and likely require extending the private interest in controlling "the sanctuary" of one's home, as described above, to the metaphorical public square (and everywhere else for that matter) as cellphone users carry their phones everywhere.

16 As a final matter, the Court also determines that the private right of action in § 227(c)(5) for persons receiving "more than one telephone call within any 12-month period" does not authorize suits by cell phone users based on unwanted *text* messages (rather than calls). 47 U.S.C. § 227(c)(5). For that proposition, the Court incorporates and adopts the analysis by the Seventh Circuit in *Steidinger v. Blackstone Med. Servs.*, 182 F.4th 532 (7th Cir. 2026). Without minimizing that clear and correct textual answer, which itself provides an independent basis to deny Plaintiff's Motion, the Court elects to lead in this Order with the enabling statute itself. 47 U.S.C. § 227(c) (authorizing FCC to initiate rulemaking to protect "residential telephone subscribers[ ]"). This approach is most aligned with two key principles: courts have a duty to independently interpret statutes, *McLaughlin Chiropractic Assocs., Inc.*, 606 U.S. at 155 ("District courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." (citing *Loper Bright*, 603 U.S. at 402)), and agencies possess only that power given to them by Congress, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). Translated here, that decisional sequence starts most purely with the enabling statute itself, i.e., with the inquiry whether Congress gave the FCC the authority to issue the rule at all. In other words, we start with the rulemaking grant of power in § 227(c), not with the second-order question whether the plaintiff has a private right of action to remedy violations of such rules. The Court is aware of no authority that would mandate a different order of operations, and indeed, the thrust in *Loper* and *McLaughlin* is to emphasize judicial interpretation of law rather than to ignore regulations in excess of Congressional authority.

17 There is no basis to warrant further amendment of Plaintiff's claim in this case, which rests entirely on unwanted text messages to a cell phone—none of which can support a claim for relief under 47 U.S.C. § 227(c) or its regulations as properly understood.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.